IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ANGEL DOMENECH,

                              Plaintiff,

                                          Civ. Action No.
              v.                          9:09-CV-162 (FJS/DEP)

JUSTIN TAYLOR, Superintendent, Gouverneur,
Correctional Facility; Medical Administrator
MR. BATEMAN; R.N. V. STONE; P. SALISBURY;
R.N. 223 CONGLETON; DR. STURTZ,

                          Defendants.

_____

APPEARANCES:                         OF COUNSEL:

FOR PLAINTIFF:

ANGEL DOMENECH, *Pro Se*
99-A-3060
Greene Correctional Facility
P.O. Box 975
Coxsackie, New York 12051

FOR DEFENDANTS:

HON. ANDREW CUOMO                    JAMES J. SEAMAN, ESQ.
Office of the New York State         Assistant Attorney General
Attorney General
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Angel Domenech, a New York State prison inmate who suffers from Hepatitis C, a condition which was unsuccessfully treated by prison medical personnel through the use of anti-viral therapy, as well as a lumbar back condition, hypertension, and hemorrhoids, has commenced this action pursuant to 42 U.S.C. § 1983 against the superintendent and various other personnel employed at the correctional facility in which he was confined at the relevant times alleging the deprivation of his civil rights.  In his complaint, plaintiff maintains that defendants were deliberately indifferent to his various medical conditions, all of which have deteriorated over time.  As relief Domenech requests, *inter alia*, an order directing his transfer to another facility where adequate medical treatment can be provided.

Currently pending before the court in connection with the action are cross-motions for summary judgment.  Defendants initiated the motion filing process, asserting that the record, including plaintiff's medical history, fails to support a claim that defendants were deliberately indifferent to his medical needs and further that it lacks evidence demonstrating the requisite personal involvement on the part of certain of the defendants, and

2

that in any event they are entitled to qualified immunity.  Plaintiff opposes

defendants' motion and has cross-moved for partial summary judgment in

his favor on the issue of liability in connection with his Eighth Amendment

claims.  For the reasons set forth below, I recommend that defendants'

motion be granted and plaintiff's denied.

I.      BACKGROUND[1]

        Plaintiff is a prison inmate entrusted to the care and custody of the

New York State Department of Correctional Services ("DOCS").  *See*

*generally* Amended Complaint (Dkt. No. 6).  While he is now incarcerated

in another DOCS facility, between December 17, 2007 and the time this

action was commenced plaintiff was designated to the Gouverneur

Correctional  Facility ("Gouverneur"), located in Gouverneur, New York.

*Id.*; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶ 1.[2]

        Prior to the time of his arrival at Gouverneur, plaintiff was diagnosed

as suffering from Hepatitis C, high blood pressure/hypertension, and a

---

[1]      In light of the procedural posture of the case the following recitation is
derived from the record now before the court with all inferences drawn and
ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137
(2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's
allegations are sharply contested by the defendants.

[2]      Unless otherwise noted, all citations to Defendants' Local Rule 7.1(a)(3)
Statement are to sections which have been admitted by the plaintiff in his response.
*See* Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 35-1).

lumbar back condition.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶¶ 2-3, 8.  While it is unclear when he was diagnosed as suffering from Hepatitis C, the record discloses that plaintiff received Pegylated Interferon with Ribavirin treatment for his Hepatitis C for forty-eight weeks, ending in July of 2006.  *Id.* at ¶ 5; Bateman Reply Decl. (Dkt. No. 46) ¶ 7 and Exh. A.  Testing following that treatment revealed that it did not have a significant effect on plaintiff's viral load, suggesting that he had developed a resistence to treatment and indicating that retreatment with the same drugs would not likely succeed.  Bateman Reply Decl. (Dkt. No. 46) ¶¶ 9-10 and Exh. A.

Plaintiff was diagnosed with hypertension in 2002.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶ 3.  While plaintiff cannot recall when he first injured his back, he believes that it began bothering him while he was an inmate at Sing Sing Correctional Facility.  *See* Seaman Aff. (Dkt. No. 41-1) Exh. A (Transcript of Plaintiff's Deposition, held on October 22, 2009, hereinafter cited as "Domenech Dep. Tr.") p. 48.

In this action plaintiff complains that defendants prescribed various pain medications for his back condition, contending that it was medically irresponsible to do so given that he has been diagnosed with Hepatitis C,

4

based upon the potential adverse affects of such medications on the liver. Plaintiff also maintains that the defendants failed to provide him with adequate treatment for his Hepatitis C, hypertension, and bleeding hemorrhoids, as well as for his back condition.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on February 11, 2009 and later filed an amended complaint, the operative pleading now before the court, on April 6, 2009.  Dkt. No. 6.  In his complaint, as amended, plaintiff has named as defendants Justin Taylor, the Superintendent at Gouverneur; Stephen Bateman, a Nurse Administrator at the facility; Registered Nurses V. Stone and E. Congleton; Dr. Sturtz, a prison physician at Gouverneur; and P. Salisbury, whose position at Gouverneur is not disclosed in plaintiff's complaint.  *Id.*  Plaintiff's complaint alleges that defendants' conduct constituted deliberate indifference to his medical needs, in violation of the Eighth Amendment.

Following the joinder of issue and completion of discovery, defendants moved on February 4, 2010 for summary judgment dismissing plaintiff's complaint on a variety of bases, arguing that 1) the record does not support a claim that any of the defendants were deliberately indifferent

5

to plaintiff's medical needs; 2) the record fails to disclose the requisite

personal involvement on the part of defendants Bateman, Taylor, and

Salisbury in the constitutional violations alleged; and 3) in any event the

defendants are entitled to qualified immunity.  Plaintiff responded in

opposition to defendants' motion on April 1, 2010, and also moved for

partial summary judgment in his favor on the issue of liability.  Dkt. No. 45.

Defendants have since replied in opposition to plaintiff's cross-motion and

in further support of their summary judgment motion.  Dkt. No. 46.

The parties' cross-motions, which are now fully briefed and ripe for

determination, have been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

6

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect the

outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248,

106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute

"if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

     A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477

U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to

special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   Sufficiency of Plaintiff's Eighth Amendment Claim

In his complaint, as amended, plaintiff challenges the adequacy of medical treatment provided to him by personnel at Gouverneur for various

8

of his medical conditions, including his Hepatitis C, back condition, hypertension, and bleeding hemorrhoids.  Offering plaintiff's medical records, which defendants maintain detail the many interventions by medical personnel at Gouverneur and fail to substantiate plaintiff's claim of having requested additional treatment, defendants argue that the uncontradicted record reflects that plaintiff received the constitutionally mandated minimum level of care for his various conditions.

### 1.   Governing Standard

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976).  The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct.

1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates."  *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[3]  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by

_____

[3]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

Claims of medical indifference are subject to analysis utilizing this Eighth

Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81

(2d Cir. 2006).

<div align="center">

a)      <u>Objective Requirement</u>

</div>

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . . .",

and centers upon whether prison officials acted reasonably in treating the

plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the objective

test addresses whether the inadequacy in medical treatment was

sufficiently serious.  *Id*. at 280.  If there is a complete failure to provide

treatment, the court must look to the seriousness of the inmate's medical

condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on

the other hand, the complaint alleges that treatment was provided but was

inadequate, the seriousness inquiry is more narrowly confined to that

alleged inadequacy, rather than focusing upon the seriousness of the

prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example,

if the prisoner is receiving on-going treatment and the offending conduct is

<div align="center">11</div>

an unreasonable delay or interruption in treatment. . . [the focus of] the

inquiry is on the challenged delay or interruption, rather that the prisoner's

underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185)

(internal quotations omitted).  In other words, at the heart of the relevant

inquiry is the seriousness of the medical need, and whether from an

objective viewpoint the temporary deprivation was sufficiently harmful to

establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course,

"when medical treatment is denied for a prolonged period of time, or when

a degenerative medical condition is neglected over sufficient time, the

alleged deprivation of care can no longer be characterized as 'delayed

treatment', but may properly be viewed as a 'refusal' to provide medical

treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132,

137 (2d Cir. 2000)).

     Since medical conditions vary in severity, a decision to leave a

condition untreated may or may not raise constitutional concerns,

depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting,

*inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

Relevant factors informing this determination include whether the plaintiff

suffers from an injury or condition that a "'reasonable doctor or patient

would find important and worthy of comment or treatment'", a condition that

"'significantly affects'" a prisoner's daily activities, or "'the existence of

chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted);

*Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3

(N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

> b)   Subjective Element

The second, subjective, requirement for establishing an Eighth

Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of

one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson

v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)).  Deliberate

indifference, in a constitutional sense, exists if an official "knows of and

disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he [or she] must also draw the

inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Leach v. Dufrain,*

103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*);

*Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct.

1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a

13

mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998) (citation omitted).  Accordingly, mere disagreement with prison officials about a course of treatment does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

     2.   <u>Hepatitis C</u>

It is undeniable that Hepatitis C is a serious illness.  Plaintiff's medical records, however, do not support his claim that DOCS medical

14

personnel failed to address the condition.

As was previously discussed, plaintiff underwent a regimen of treatment for his Hepatitis C prior to his transfer into Gouverneur. *See* Amended Complaint (Dkt. No. 6) at p. 5; *see also* Bateman Reply Decl. (Dkt. No. 46) ¶ 7 and Exh. A. At the conclusion of that nearly year long process, plaintiff's viral load was in excess of 873,000, a fact indicative both of a failure of treatment and that retreatment would likely be ineffective. Bateman Reply Decl. (Dkt. No. 46) ¶¶ 9-10 and Exh. A; *see Motta v. Wright* , No. 9:06-CV-1047, 2009 WL 1437589, *7 (N.D.N.Y. May 20, 2009).

It is unclear from plaintiff's amended complaint what treatment he claims to have been denied for his Hepatitis C while at Gouverneur. As he himself acknowledges, sadly Hepatitis C is a disease for which there is no known cure. Amended Complaint (Dkt. No. 6) at p. 5. Plaintiff's medical records reveal that while at Gouverneur he was seen by a physician on a regular basis and that his Hepatitis C was monitored including on June 17, 2008 when comprehensive blood work, including a viral load and lipid profile, was ordered.[4] Seaman Aff. (Dkt. No. 41-1) Exh. B at pp. 35, 54,

---

[4] Apparently plaintiff has commenced proceedings in state court in an effort to obtain an order directing the DOCS to provide him with anti-viral medication for life

15

57; Domenech Dep. Tr. at p. 69.

One of plaintiff's chief complaints regarding his Hepatitis C is that medical personnel at Gouverneur prescribed him medication for his back pain which, in his view, placed him at risk of suffering liver damage given his Hepatitis C. *See* Amended Complaint (Dkt. No. 6) at p. 4 ("The prescribing of pain medications, knowing that the plaintiff is a sufferer of hepatitis "c' is [sic] a callous unprofessional decision, . ."). Plaintiff has offered nothing of evidentiary value to substantiate his claim that he was placed at risk by the prescription of medication to address his pain, however, and in any event his allegations in this regard present a non-issue in light of his steadfast refusal to take the pain medications prescribed for him. *See, e.g.,* Seaman Aff. (Dkt. No. 41-1) Exh. B at pp. 28, 38-40, 47, 95, 100.

Plaintiff's complaints regarding the failure of medical personnel to counsel him regarding his Hepatitis C fare no better. Although plaintiff was seen regularly by physicians and other medical personnel while at Gouverneur, his medical records fail to reflect any requests by him for

———————————————

for his Hepatitis C. *See* Domenech Dep. Tr. at p. 40. Nowhere in his amended complaint in this action, however, does he allege that the failure to provide such medication represents deliberate indifference to his medical condition.

16

counseling or information regarding his Hepatitis C, nor do they support the assertion that defendants were indifferent by refusing to provide him with necessary information regarding that condition.  Bateman Decl. (Dkt. No. 41-5) ¶¶ 8-9.

In sum, plaintiff was treated by the DOCS for his Hepatitis C. Unfortunately, that treatment failed.  The Eighth Amendment requires only adequate treatment of medical conditions suffered by inmates; it does not require a perfect plan, nor does it guaranty successful treatment of every medical condition.  *See Powell v. Fischer*, 9:08-CV-0371, 2010 WL 843877, at *9 (N.D.N.Y. Mar. 9, 2010) (Mordue, C.D.J. and Homer, M.J.) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . ..")).  Given the circumstances now presented, no reasonable factfinder could conclude that the defendants were deliberately indifferent to plaintiff's Hepatitis C condition.

### 3. Back Condition

The next area of focus of plaintiff's deliberate indifference claim is upon his lumbar back condition, another ailment that pre-dated his arrival

17

at Gouverneur.  Plaintiff's medical records reveal that shortly after his

transfer into Gouverneur he was given a bottom bunk pass and was

restricted by medical personnel to light duty programming.  Seaman Aff.

(Dkt. No. 41-1) Exh. B at pp. 25, 103-04.  In mid-January of 2008, one

month after his arrival at Gouverneur, plaintiff underwent magnetic

resonance imaging ("MRI") testing, revealing a disc protrusion at L3-L4 and

a herniation at L4-L5.  *Id.* at p. 71;  *see also* Bateman Decl. (Dkt. No. 41-5)

¶ 3.  As a result, plaintiff was provided with a physical therapy evaluation

and consultation, a back brace, muscle relaxants, and pain medications.[5]

Seaman Aff. (Dkt. No. 41-1) at pp. 11, 28-29, 39-40, 43, 47, 71, 75, 80, 95,

100.

It is true that in January of 2010 a recommendation was made by a

Dr. Kasulke, a physician at Gouverneur, that plaintiff be seen by a

neurosurgeon for his back complaints.  Bateman Decl. (Dkt. No. 41-5) ¶ 6.

That recommendation was denied, however, based upon the fact that

plaintiff had not exhibited progression of his symptoms since 2003 and his

lack of participation in physical therapy; instead, Domenech was provided

––––––––––––––––––––––

[5]   The result of the physical therapy consultation was a recommendation that
plaintiff be provided with pain relief medication and encouraged to walk as much as
possible.  Seaman Aff. (Dkt. No. 41-4) Exh. B. at p. 80.

with physical therapy, beginning on February 2, 2010, with the understanding that if the more conservative course of treatment was not effective, a consultation by a specialist would not be ruled out.  Bateman Decl. (Dkt. No. 41-5) at ¶¶ 6-7.

Based upon this chronology it appears clear that plaintiff was afforded ample and adequate treatment for his back condition, though not necessarily meeting his expectations, and no reasonable factfinder could conclude otherwise.

### 4.    Hypertension/High Blood Pressure

Another condition for which plaintiff has received extensive treatment from prison medical officials is his diagnosed hypertension.  Plaintiff's medical records reflect intensive monitoring and treatment of that condition, and in particular his blood pressure, by medical personnel at Gouverneur.  Plaintiff was diagnosed in 2002 as suffering from hypertension.  Seaman Aff. (Dkt. No. 41-1) Exh. B at p. 124.  While at Gouverneur plaintiff was provided with pills to control his blood pressure, and he was trusted to take the correct dosage at the proper times.  Sturtz Decl. (Dkt. No. 46-3) ¶ 8.  On occasion, when plaintiff's blood pressure was found to be outside of normal limits he was promptly transferred into the

prison infirmary, where he was administered his blood pressure pills by medical personnel, and his blood pressure came under control in short order.  *See, e.g.,* Sturtz Decl. (Dkt. No. 46-3) ¶¶ 7-10; Seaman Aff. (Dkt. No. 41-1) Exh. B at pp. 48, 82-85.

In sum, although plaintiff's blood pressure was found to have been elevated at various times while at Gouverneur, plaintiff's medical records reveal that he was provided with medication to address the issue, and plaintiff conceded during his deposition that prison officials were doing everything they could to control it.  *Id.* at pp. 27, 83-85; Domenech Dep. Tr. at pp. 47-48, 67.  Given defendants' efforts to address plaintiff's hypertension, no reasonable factfinder could conclude that the defendants were deliberately indifferent to that condition.

     5.  <u>Hemorrhoids</u>

The last medical condition associated with plaintiff's medical indifference claim involves his ongoing complaints of hemorrhoids.  At the outset, it should be noted that several courts have determined that this condition, without more, is not sufficiently serious to support an Eighth Amendment medical indifference claim.  *Lowman v. Perlman*, No. 9:06-CV-0422, 2008 WL 4104554, at *5 (N.D.N.Y. Aug. 29, 2008) (Kahn, D.J. and

Treece, M.J.); *Cabassa v. Gummerson*, No. 01-CV-1039,  2006 WL

1559215, at *9-10 (N.D.N.Y. Mar. 30, 2006) (Lowe, M.J.), *report and*

*recommendation adopted,* 2006 WL 1555656 (N.D.N.Y. Jun. 1, 2006)

(Hurd, D.J.); *Kendall v. Kittles*, 2004 WL 1752818, at *6 ("Hemorrhoids,

albeit, uncomfortable, are a minor issue, far removed from the category of

medical conditions that have been deemed 'sufficiently serious' by other

courts.").  Furthermore, the record establishes that plaintiff was provided

treatment for this problem.  Indeed, Domenech was seen on several

occasions by medical personnel at the facility, including Nurse Stone in

mid-May of 2008, at which time he complained of symptoms resulting from

that condition.  *See* Seaman Aff. (Dkt. No. 41-1) Exh. B at pp. 32-33.  On

that occasion plaintiff was given hemorrhoidal cream; however, since

plaintiff had already been scheduled for a doctor visit to address other

complaints, no other action was taken.  *Id.*  At other times when plaintiff

complained of hemorrhoids, he was provided with treatment, including

hemorrhoidal cream, cleansing pads, suppository pads, and a stool

softener.  *See, e.g., id.* at pp. 29, 33, 36-37, 38, 40.

Having considered plaintiff's allegations regarding his hemorrhoids

and the record now before the court, I conclude that no factfinder could

determine that objectively the hemorrhoids and defendants' alleged failure to treat rose to a level sufficient to support a finding of a serious medical need, and further conclude that plaintiff has not demonstrated any defendant's subjective indifference to that condition.

C.    Personal Involvement

In their motion defendants also assert that the record in this case fails to reflect the requisite personal involvement in the constitutional violations alleged on the part of Nurse Administrator Bateman, Superintendent Taylor, and defendant Salisbury.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Two of the three defendants implicated in this portion of defendants'

motion are supervisory employees at Gouverneur.  A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

      1.   <u>Defendant Salisbury</u>

Plaintiff's complaint in this action does not identify the position held by defendant Salisbury, nor does it make any allegations regarding his or

her involvement in his medical treatment.  In his deposition, plaintiff testified frankly that he did not know he had sued defendant Salisbury, and conceded he had no actual legal claim against him or her.  *See* Domenech Dep. Tr. at pp. 69-70.  I therefore recommend dismissal of plaintiff's claims against that defendant.

### 2.   Nurse Administrator Bateman

Among the allegations raised by plaintiff concerning defendant Bateman is his alleged providing of false information to those investigating plaintiff's grievance regarding the inadequacy of treatment received from prison officials.  Such allegations, however, fail to state a cognizable constitutional claim.  *See DeJesus v. Wright*, No. 9:06-CV-1496, 2009 WL 2929805, at *7 (N.D.N.Y. Sept. 20, 2009) (Scullin, S.D.J. and DiBianco, M.J.).

In his opposition papers plaintiff clarifies that his claims against Nurse Administrator Bateman are based principally upon his supervisory position and plaintiff's assertion that in his position defendant Bateman "is responsible for promulgating facility policy relating to the care of inmate's[] medical need".  *See* Plaintiff's Memorandum (Dkt. No. 45-3) at p 6. Plaintiff offers no support for his assertion that Nurse Administrator

24

Bateman indeed has that responsibility at Gouverneur.  Moreover, it is

clear that as a nurse administrator defendant Bateman has no ability to

diagnose and treat inmates or to override the professional judgment of

medical doctors at the facility.  *See Benitez v. United* States, No. 92 Civ.

7670 (DC), 1995 WL 444352, at *4  (S.D.N.Y. Jul. 23, 1999).  Plaintiff's

allegations therefore fall short of establishing a claim against defendant

Bateman based upon his supervisory position at Gouverneur.

### 3.   Superintendent Taylor

The basis for plaintiff's allegations concerning the involvement of the

Superintendent Taylor in the constitutional deprivations alleged in his

amended complaint is less than clear.  During his deposition plaintiff

acknowledged having speculated as to what Superintendent Taylor may

have said regarding Domenech's medical treatment, and Taylor's only

confirmed involvement in the case relates to denial of plaintiff's grievance

regarding the adequacy of his medical treatment.  Domenech Tr. at pp. 33-

34; Seaman Aff. (Dkt. No. 41-1) Exh. C at p. 4.  Though admittedly

tenuous, assuming there were a constitutional violation, it is conceivable

that a reasonable factfinder could conclude that plaintiff's grievance should

have placed Superintendent Taylor on notice of the inadequacy of plaintiff's

medical treatment at a point in time when he could have ended the alleged deprivation and directed medical officials at Gouverneur who were under his supervision to provide adequate medical treatment. This could suffice to potentially support a finding of the requisite personal involvement on the part of Superintendent Taylor to support a finding of liability against him. See*, e.g., Baez v. Harris,* No. 9:01-CV-807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *see also Cepeda v. Coughlin*, 785 F. Supp. 385, 391 (S.D.N.Y. 1992). For this reason, I have concluded that plaintiff has raised questions of fact regarding Taylor's personal involvement sufficient to avoid summary judgment on this basis, but that there are no facts to show personal involvement on the part of defendants Salisbury and Bateman, and that defendants' motion to dismiss the plaintiff's claims against defendant Salisbury and Bateman on the alternative, independent basis of lack of personal involvement should be granted.

IV.   SUMMARY AND RECOMMENDATION

By all accounts plaintiff suffers from Hepatitis C, a disease which he

concedes is incurable and, unfortunately, did not respond to anti-viral treatment provided by the DOCS prior to his transfer into Gouverneur. While he was incarcerated at Gouverneur, the record fails to reveal any failure on the part of medical officials at that facility to address plaintiff's serious medical needs, both related to his Hepatitis C and those associated with his various other medical conditions. Accordingly, I find based upon the record now before the court that no reasonable factfinder could conclude that the defendants were deliberately indifferent to his serious medical needs and therefore recommend dismissal of plaintiff's Eighth Amendment claim.[6]  It is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 41) be GRANTED, that plaintiff's motion for partial summary judgment (Dkt. No. 45) be DENIED, and that plaintiff's complaint be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

---

[6]    In light of this determination I have found it unnecessary to address defendants' alternative argument that they are entitled to qualified immunity from suit.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:        September 8, 2010
              Syracuse, New York

28



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:
(1) there was no evidence that administrative remedy was
available to inmate;
(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;
(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;
(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;
(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;
(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;
(7) sheriff was not liable under § 1983; but
(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 🔑 **25**

170A Federal Civil Procedure
   170AI In General
      170AI(B) Rules of Court in General
         170AI(B)1 In General
            170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4]** Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5]** Attorney and Client 45 ☞ 62

45 Attorney and Client
   45II Retainer and Authority
      45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ☞ 2546

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2546 k. Weight and sufficiency.
Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6]** Civil Rights 78 ☞ 1304

78 Civil Rights
   78III Federal Remedies in General
      78k1304 k. Nature and elements of civil actions.
Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7]** Prisons 310 ☞ 317

310 Prisons
   310II Prisoners and Inmates
      310II(H) Proceedings
         310k316 Exhaustion of Other Remedies
            310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8]** Prisons 310 ☞ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 ☞ 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 ☞ 192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🔑 **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🔑 **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🔑 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
  350HVII Cruel and Unusual Punishment in General
    350HVII(H) Conditions of Confinement
      350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 ☞ 1355

78 Civil Rights
  78III Federal Remedies in General
    78k1353 Liability of Public Officials
      78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 ☞ 1358

78 Civil Rights
  78III Federal Remedies in General
    78k1353 Liability of Public Officials
      78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 🔑    1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A 🔑    2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
**\*347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.<sup>FN1</sup> They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> **FN8.** Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> **FN9.** Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> **FN10.** Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported *353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post-*Woodford.* However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*357 Hayes, 84 F.3d at 620 (internal citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In Salahuddin v. Goord, the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); see also Jones v. Westchester County Dep't of Corr. Medical Dep't, 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware *358 of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardner,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. *360 at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> **FN13.** Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> **FN14.** Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> **FN15.** In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> **FN16.** Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010) ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009) ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009) ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions ... do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

697 F.Supp.2d 344
 (Cite as: 697 F.Supp.2d 344)


### V. CONCLUSION


For the foregoing reasons, the Court grants in part and
denies in part defendants' motion for summary judgment.
Specifically, the Court grants defendants' motion with
respect to plaintiff's claim regarding the dosage of his
renal disease medication and with respect to all of
plaintiff's claims against Sheriff Reilly. Defendants'
motion is denied in all other respects. The parties to this
action shall participate in a telephone conference on
Monday, April 5, 2010 at 3:30 p.m. At that time, counsel
for defendants shall initiate the call and, with all parties on
the line, contact Chambers at (631) 712-5670.


SO ORDERED.


E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

> FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

> FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

> FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

> FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

## IV. DISCUSSION

### A. Legal Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

### B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted*). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' " are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that there is a significant risk of serious injury to that prisoner.*" *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Steven MOTTA, Plaintiff,
v.
Dr. Lester WRIGHT, Deputy Commissioner of Health
Services, NYS Docs; Dr. Syed Haider Shah, Marcy
Correctional Facility, Defendants.
No. 9:06-CV-1047.

May 20, 2009.

West KeySummary
**Prisons 310** 🔑 **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In General. Most Cited Cases

**Prisons 310** 🔑 **194**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k194 k. Psychological Conditions and
Treatment. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.

Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1547**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1547 k. Psychological and Psychiatric
Treatment. Most Cited Cases
In his § 1983 action, prisoner failed to state Eighth
Amendment claim against prison doctor who was
allegedly deliberately indifferent to prisoner's serious
medical needs because the doctor delayed prisoner's
hepatitis treatment from October of 2002 until June of
2006. There was no evidence that the delay was
substantially serious. Moreover, the doctor's explanation
for the delay in providing prisoner with the hepatitis
treatment was based upon the lack of a psychiatric
clearance between October 2002 and October 2005. The
hepatitis protocol clearly required a psychiatric clearance
for individuals who have a history of major depression or
other major psychiatric illness. U.S.C.A. Const.Amend. 8;
42 U.S.C.A. § 1983.

Steven Motta, Dannemora, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Office of the Attorney General, Charles J.
Quackenbush, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants Haider Shah and
Wright.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
DiBianco, duly filed on the 29th day of April 2009.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The defendants' motion for summary judgment (Dkt. No. 29) is granted, and the complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendants denied him constitutionally adequate medical care from October 10, 2002 until June 1, 2006, while plaintiff was an inmate in the custody of the Department of Correctional Services (DOCS) at Marcy Correctional Facility (Marcy). Complaint (Dkt. No. 1). In the jurisdictional section of the complaint, in addition to 42 U.S.C. § 1983, plaintiff cites the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.;* the

Rehabilitation Act (RA), 29 U.S.C. § 794; and 42 U.S.C. §§ 1985, 1988. Compl. ¶ 8. In the body of the complaint plaintiff also quotes the text of the ADA, RA, and sections 1985 and 1988.[FN1] Compl. ¶¶ 67, 68-69. Plaintiff's Causes of Action, however, do not mention these statutes. The complaint contains seven causes of action and all of them state that they are violations of the "Eighth and Fourteenth Amendments." Compl. ¶¶ 73-88. The complaint seeks declaratory and substantial monetary relief.[FN2] Compl. at 28.

FN1. The jurisdictional section also mentions unspecified state law claims. Compl. ¶ 8.

FN2. The complaint also requests "costs and disbursements," including "reasonable attorneys fees" and asks for permission to "be placed before District Court Judge David N. Hurd, who presides over the recently certified class action suit in *Hinton v. Wright,"* ...." Plaintiff is referring to Hilton v. Wright, 235 F.R.D. 40 (N.D.N.Y.2006). The court would point out that a *pro se* litigant is not entitled to attorneys fees under 42 U.S.C. § 1988. *See* SEC v. Price Waterhouse, 41 F.3d 805, 808 (2d Cir.1994). This would be true even it the *pro se* plaintiff were an attorney. *See* Kay v. Ehrler, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). Thus, plaintiff would not be entitled to attorneys fees even if he were successful in the action. The court will discuss plaintiff's request regarding the class action later in this report.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt. No. 29). Plaintiff has responded in opposition to the motion. (Dkt. No. 33). Although the docket sheet indicates that defendants have filed a "Reply," the document filed is simply "dated copies of signature pages from the Declarations of Dr. Haider Shah and Dr. Wright" that were originally filed in support of defendants' motion for summary judgment.[FN3] (Dkt. No. 34). For the following reasons, this court agrees with defendants and will recommend dismissing plaintiff's complaint.

FN3. Plaintiff's first argument in opposition to

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

the defendants' motion was that the defendants' Declarations were unsigned and undated and, thus, not admissible in support of the motion. Plaintiff's Memorandum of Law at 2. (Dkt. No. 33). Defendants corrected their error by submitting copies of the appropriate signed and dated pages, together with a certificate of service on plaintiff, but this correction is docked as a "Reply." (Dkt. No. 34).

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*\*2* In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The

second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). Plaintiff in this case has responded to defendants' motion, however, the court will still carefully review the entire record in making its determination.

### 2. *Facts and Contentions*

In his complaint, plaintiff states that he has been in the custody of DOCS since 1982, and has Hepatitis-C (HCV).[FN4] Plaintiff's medical records show that he was diagnosed with HCV in December of 1995. Haider Shah Decl. ¶ 9 & Ex. A [FN5] at 503. The first several paragraphs of plaintiff's complaint are entitled "INTRODUCTION" and discuss plaintiff's allegations generally. Compl. ¶¶ 1-7. The complaint then contains a section entitled "ALLEGATIONS," containing a more specific statement of facts and chronology of plaintiff's claims. Compl. ¶¶ 25-63.

> FN4. Plaintiff disputes when he contracted the illness. Plaintiff states that he contracted the virus *after* he was incarcerated, and defendants state that plaintiff became infected sometime *prior* to his incarceration in 1982. This dispute is not relevant to the court's analysis since it is undisputed that he was not diagnosed with HCV until December of 1995.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

FN5. Defendant Haider Shah has submitted a declaration in support of defendants' motion for summary judgment. Exhibit A are plaintiff's medical records including his Ambulatory Health Record (AHR) and other relevant medical records. An inmate's AHR contains entries referring to medical visits on particular days, however, multiple visits are recorded on each day, with up to three visits from three dates recorded on one page. Exhibit A has been paginated, and the page numbers appear at the bottom. Thus, the court will cite to the page number of Exhibit A with further citation to the date of a particular entry of the AHR if necessary.

Plaintiff alleges that after he arrived at Marcy on October 10, 2002, defendant Dr. Haider Shah failed to monitor plaintiff's elevated liver function tests (LFT's) for nineteen months, in violation of the HCV "protocol" FN6 and failed to refer plaintiff to a liver specialist. Compl. ¶ 1. Plaintiff claims that defendant Haider Shah refused to give plaintiff HCV treatment "on a number of occasions" for improper reasons, including that plaintiff was too close to being paroled; needed psychiatric clearance; or "needed outside clearance." Compl. ¶ 2. Plaintiff states that defendant Haider Shah failed to order the prescribed liver biopsy on October 20, 2005 and failed to seek psychiatric clearance for plaintiff until October 20, 2005. *Id.* Plaintiff claims that once defendant Haider Shah obtained the psychiatric clearance in October of 2005, he delayed giving plaintiff the HCV treatment for another nine months. *Id.*

FN6. Plaintiff is referring to the DOCS Division of Health Services "protocol" entitled "Hepatitis C Primary Care Practice Guidelines ." (DOCS Guidelines). Defendants have submitted various revisions of the DOCS Guidelines, dated January 17, 2000; July 20, 2004; and October 13, 2005. Wright Decl. Ex. A-1-A-3

*3 Plaintiff states that he filed two grievances regarding his medical care. Compl. ¶¶ 3-4. Plaintiff claims that defendant Haider Shah did not order a genotype blood test until February 14, 2006, after plaintiff's second grievance

was filed, and "after nineteen straight months of no blood tests at all." Compl. ¶ 4. Plaintiff states that only after he filed his second grievance, did defendant Haider Shah begin to check plaintiff's liver function. On June 1, 2006, plaintiff claims that he vomited in front of a nurse, and that on the same day, plaintiff was examined by defendant Haider Shah, who had plaintiff sign a "Contract for Specialty Care" appointment, and requested medication for plaintiff from defendant Wright. Compl. ¶ 6. Plaintiff states that if it had not been for the vomiting incident, defendant Haider Shah never would have ordered the medication that eventually was started on June 9, 2006. Compl. ¶ 7.

In the complaint, plaintiff has listed a number of medical terms that are associated with HCV. Compl. ¶¶ 12-24. Plaintiff has filed a substantial number of documents in support of his complaint, including numerous medical records and other references concerning HCV. Compl. App. A-C. Plaintiff begins the "Allegations" portion of the complaint by outlining the facts surrounding the diagnosis and care of his condition since October 10, 1990, when a laboratory report of blood tests taken at Elmira Correctional Facility, showed that plaintiff tested positive for Hepatitis A FN7 (HAV) and B(HBV). Compl. ¶ 26 & App. B at 3-5.

FN7. Plaintiff states that the tests were positive for both A and B, but the pages he cites only show that the tests were positive for Hepatitis B. Compl. App. B at 3-5.

Plaintiff was diagnosed with HCV on December 12, 1995, while he was in Clinton Correctional Facility. Compl. ¶ 28. Plaintiff states that the tests showed an "out of control chronic Hepatitis C virus," and that although plaintiff complained of liver pain, dizziness, and nausea, he was not scheduled to see a "liver specialist." *Id.* The complaint discusses 1995 through 2002, stating that at various times, plaintiff complained about symptoms that he was experiencing. Compl. ¶¶ 29-34.

Plaintiff states that in June of 1999, he was incarcerated at Riverview Correctional Facility and experienced dizzy spells. Compl. ¶ 33. Plaintiff states that on June 15, 1999, Dr. R. Hentschel noted that plaintiff was positive for HCV

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

and recommended a follow-up with a private physician, "Rx medication for hepatitis C, [and] lab monitoring." FN8 Compl. ¶ 33 (citing App. B at 40-45). Plaintiff states that when he was at Franklin Correctional Facility in April of 2002, he requested medication for HCV and signed consent forms. Compl. ¶ 34. Plaintiff's Ambulatory Health Record (AHR) indicates that he was interested in HCV treatment, and he signed consent forms in April of 2002. Pl.App. at 65 (AHR entries of 4/8 and 4/11/02).

FN8. The court must point out that in the pages of the medical records cited by plaintiff there is no reference to "medication." Pl.App. B at 41. It is unclear what Dr. Hentschel wrote. The notation appears to be "Needs f/u private physician Rx of Hepatitis C. Lab monitoring." Pl.App. at 41.

Plaintiff was transferred to Marcy in October of 2002, and plaintiff states that on October 17, 2002, he requested HCV treatment again, and that defendant Haider Shah told plaintiff that he would review the policy and record to see if plaintiff met the criteria for medication. Compl. ¶ 35 (citing App. B at 71 AHR entry of 10/17/02). Plaintiff then states that on October 23, 2002, he requested HCV treatment and a "Nurse" told plaintiff that he needed psychiatric clearance. FN9 Id. Plaintiff states that after the October 17, 2002 "examination," defendant Haider Shah failed to administer a course of treatment; send plaintiff to a private physician; and monitor his liver function every six months as ordered by Dr. Hentschel in 1999. Compl. ¶ 37.

FN9. Plaintiff is again mistaken regarding his citation to the record. Pages 70 and 71 of plaintiff's appendix are copies of the same page. The *October 17, 2002* entry is written by Nurse K. Dooley. App. B at 70, 71. Nurse Dooley states that plaintiff is requesting treatment for HCV, and Nurse Dooley stated that she would consult P. Perrotta about reviewing the record to determine whether plaintiff met the criteria. The entry dated October 23, 2002 contains the notation of a variety of requests made by plaintiff, including vaccine for Hepatitis A and B; a lead-level test because of a gunshot wound; a memory test; and HCV treatment. Pl.App. B at 70, 71. The entry ends with the notation "Psych Clearance for Possible Hep C Rx." *Id.* Defendant Haider Shah states in his declaration that *he* met with plaintiff on October 23, 2002. Haider Shah Decl. ¶ 11.

**\*4** Plaintiff states that he was examined by defendant Haider Shah on August 7, 2003 and told that he was not ready for medication because he was "too close to going home." Compl. ¶ 39. Plaintiff then cites various laboratory test results, showing that he had a high HCV viral load in 2003. Compl. ¶¶ 40-41. Plaintiff states that consistent with the high viral count, he went to sick call on August 13, 2003, January 7, 2004, and March 31, 2004. Compl. ¶ 42. Plaintiff claims that although he had serious symptoms, no medical action was taken. *Id.* Plaintiff then cites additional dates on which he was tested. Compl. ¶¶ 43-47.

Plaintiff states that on January 9, 2004, he had a liver function test, and the notation on the report stated that plaintiff "needs to be seen." Compl. ¶ 43. On October 20, 2004, defendant Haider Shah sent plaintiff for a CAT Scan of his abdomen to rule out a bile duct obstruction. Compl. ¶ 45. The CAT Scan was performed on November 5, 2004. *Id.* (citing App. B at 83). Plaintiff states that on October 13, 2005, defendant Lester Wright sent a memorandum, rescinding the DOCS policy that would prevent an inmate from having HCV treatment if he had not participated in the Alcohol and Substance Abuse Treatment (ASAT)/Residential and Substance Abuse Treatment (RSAT) programs. Compl. ¶ 48. At the same time, defendant Wright rescinded that policy prohibiting approval for HCV treatment if the inmate were going to be released prior to the completion of the treatment. *Id.* (citing Pl.App. A-HCV Guidelines dated 2/10/06).

Plaintiff states that on October 20, 2005, he asked again for the HCV treatment and discovered that he had not received psychiatric clearance. Compl. ¶ 49. Plaintiff states that the sick call nurse cited to the AHR dated 10/20/04, 6/25/04, 10/23/02 after she noted that there was no psychiatric clearance in the medical records. Compl. ¶ 49. Plaintiff claims that the main reason that he did not obtain his treatment was that he did not have psychiatric clearance, but maintains that no request had ever been made for the clearance. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Plaintiff states that he the request was finally made on October 20, 2005, and he obtained the psychiatric clearance on the same day, using the same form upon which the request was written. Compl. ¶ 50 & App. B at 90. Plaintiff claims that on January 4, 2006, he complained to defendant Haider Shah about some of the symptoms plaintiff had been having. Compl. ¶ 52. Plaintiff alleges that during the examination, defendant Haider Shah was going through the medical records and "deliberately lied" about not receiving a reply from the Mental Health Department, when in fact the clearance had been sent on October 20, 2005. *Id.*

Plaintiff states that he wrote a grievance on January 14, 2006 that was consolidated with a prior grievance dated November 15, 2002. Compl. ¶ 53. Plaintiff states that he had an Inmate Grievance Resolution Committee (IGRC) hearing, but that the IGRC could not override a medical decision. *Id.* Plaintiff states that the Superintendent denied his grievance on January 30, 2006, in part because the medical department was waiting for the psychiatric clearance, and that when that clearance was obtained, the medical department would pursue the next step. Compl. ¶ 54. Plaintiff appealed the grievance, stating that he had already received the clearance, but that in any event, he had met the criteria "for years." Compl. ¶ 55.

**\*5** In the meantime, on February 15, 2006, defendant Haider Shah made a request for plaintiff to have a liver biopsy which was completed on March 27, 2006. Compl. ¶¶ 57-58. Plaintiff claims that on June 1, 2006, he reported for sick call and vomited in front of the nurse. Compl. ¶ 59. Plaintiff states that the nurse wrote in the AHR that plaintiff was seeking HCV treatment. *Id.* Plaintiff states that he was examined by defendant Haider Shah on the same day and that plaintiff signed the "Contract for a Specialty Care Appointment." Compl. ¶ 60. Plaintiff states that his HCV treatment began on June 9, 2006, however, if it had not been for the incident in which plaintiff vomited in front of the nurse, "Defendant Haider Shah would never have ordered the medication...." Compl. ¶ 61.

Finally, plaintiff states that on July 5, 2006, defendant Haider Shah informed plaintiff that the high "iron readings" on his liver function tests were the "number one **'killer,'** for him." Compl. ¶ 62 (emphasis in original). Plaintiff stated that his iron levels had always been high

and asked defendant Haider Shah whether there was any medication that could bring plaintiff's iron levels down. *Id.* Plaintiff states that defendant Haider Shah told plaintiff that such medication existed, but that he did not believe that plaintiff needed it at the time. *Id.*

Essentially, plaintiff claims that the delay in his treatment caused him serious physical and emotional injury since plaintiff now has fibrosis of the liver that cannot be cured "except by way of liver transplant...." Compl. ¶ 63. Plaintiff alleges that defendant Wright may be held liable for failure to train and supervise his medical employees in the care of inmates such as plaintiff, who have been identified by their treating physicians as being in need of treatment for HCV. Compl. ¶ 70. Plaintiff also seeks to hold defendant Wright liable for establishing an unconstitutional policy and custom of refusing to administer treatment because inmates are too close to going home or because plaintiff did not complete a substance abuse program. Compl. ¶ 71.

The complaint contains seven causes of action, each referring *only* to the Eighth and Fourteenth Amendments and not to any statutory basis for relief. [FN10]

FN10. In any event, the court would point out that while the defendants must be sued in their individual capacities for purposes of section 1983, defendants may *not* be sued in their "individual" capacities for violations of the ADA or the RA. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Thus, any suit for statutory relief would be against the defendants in their "official" capacities. Without discussing whether the Eleventh Amendment in this case would bar damage relief against the State (defendants in their "official" capacities), the court would merely note that plaintiff does not state a claim under the ADA or the RA. *See e.g. Carrion v. Wilkinson,* 309 F.Supp.2d 1007 (D.Ohio 2004).

In *Carrion,* the court specifically stated that the ADA and RA "afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not provide

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

them with a general federal cause of action for challenging the medical treatment of their underlying disabilities." *Id.* (quoting *Galvin v. Cook,* CV-00-29, 2000 U.S. Dist. LEXIS 15181, \*19-20, 2000 WL 1520231 at \*6 (D.Ore. Oct. 3, 2000)). Plaintiff in this case is only challenging the medical treatment of his underlying medical condition, thus, he could not proceed under either the ADA or the RA, even if this court were to interpret his complaint to raise those claims. The court will analyze this case under the Eighth and Fourteenth Amendment claims that plaintiff includes in his "Causes of Action." Compl. ¶¶ 73-88.

(1) Defendant Haider Shah violated plaintiff's Eighth and Fourteenth Amendment rights when he delayed plaintiff's HCV treatment from October 17, 2002 until June 1, 2006.

(2) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he delayed plaintiff's HCV treatments until June 1, 2006, even after he received the psychiatric clearance on October 20, 2005.

(3) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he departed from the "new" HCV Primary Care Guidelines from October 20, 2005 until June 1, 2006.

(4) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he failed to administer liver function tests every eight to twelve weeks.

\*6 (5) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he ignored "numerous 'red flags' " regarding plaintiff's condition that indicated that plaintiff was in need of immediate treatment.

(6) Defendant Wright is responsible for the delay

between October 23, 2002 and October 13, 2005, when he changed the HCV policy.

(7) Defendants Wright and Haider Shah were deliberately indifferent to plaintiff's serious medical needs when defendant Haider Shah refused to administer HCV treatment on August 7, 2003 because plaintiff was "too close to going home."

Compl. ¶¶ 73-88.

Both defendants have submitted declarations in support of their motion for summary judgment. (Dkt.Nos.29-15, 29-16). Defendants have also submitted the declaration of John B. Rogers, M.D., whose primary area of practice is Gastroenterology. Rogers Decl. (Dkt. No. 29-21). Dr. Rogers has examined a copy of plaintiff's medical records, dating back to 1995. Rogers Decl. ¶¶ 4, 7 & Ex. B.

Defendant Haider Shah states that he is a clinical care physician with the Medical Department at Marcy, and he has been providing medical services to plaintiff since his arrival at Marcy in 2002 and during the time period relevant to this case. Haider Shah Decl. ¶¶ 2, 4. Defendant Haider Shah has also submitted copies of plaintiff's medical records as Exhibit A.[FN11] In his declaration, defendant Haider Shah gives a short description of HCV in general, stating that, while it is a serious infection, is progression is variable and generally slow. Haider Shah Decl. ¶ 10. Defendant Haider Shah states that HCV may go undetected for a number of years without physical signs or symptoms. *Id.* ¶ 7.

FN11. The medical records have been "traditionally filed" and are not part of the electronic docket. The court notes the medical records submitted by plaintiff are also contained in the defendants' exhibits, except for those records from prior to 1995 that plaintiff has submitted in his appendices. Defendants medical records are more extensive than those submitted by plaintiff.

Dr. Rogers states that HCV has the potential of producing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

cirrhosis of the liver and/or liver cancer. Rogers Decl. ¶ 10. HCV is the leading cause of liver cancer in the United States, and thus, it is important to treat the disease "when possible." *Id.* Dr. Rogers states that advances in treatment during the past *six* years have been "particularly helpful," but notwithstanding these advancements, it is not yet possible to cure all individuals who are infected with HCV. *Id.*

The current drug treatment for HCV is a combination of two drugs, pegylated interferon and ribavarin. Rogers Decl. ¶ 11. Dr. Rogers states that treatment is often difficult for the patient because these drugs have many serious side effects, some of which can be considered life-threatening. *Id.* Thus, before starting this treatment, patients must be carefully evaluated to determine if they will have a good chance of tolerating the treatment itself. *Id.* Dr. Rogers states that it is also important to check patients for "coinfections" with Hepatitis B (HBV) or human immune deficiency virus (HIV) because the treatment "is very likely to fail" if the patient has either one of those viruses in addition to HCV. *Id.*

Because of all the above variables regarding whether the existing drug treatment is appropriate, and because of the great number of inmates infected with HCV, DOCS has developed a "protocol" to make certain that all of the necessary information is considered regarding each patient with HCV before starting the drug treatment. Rogers Decl. ¶ 11; Wright Decl. ¶¶ 4-7. Defendant Wright states that DOCS develops and regularly updates "Clinical Practice Guidelines" for various diseases in an effort to maintain the consistency of care and stay current with scientific advances. Wright Decl. ¶ 5. The "Hepatitis C Primary Care Practice Guideline" (the Guidelines) used by DOCS was initially approved on March 31, 1999 and revised December 17, 1999, December 13, 2000, July 20, 2004, and October 13, 2005. Wright Decl. ¶ 6. Copies of these Guidelines are included as Exhibits A-1 to A-3, attached to defendant Wright's declaration.

**\*7** Defendant Wright states that the Guidelines were developed by a task force of physicians and other health professionals, including DOCS practitioners, and experts from medical colleges and hospitals. Wright Decl. ¶ 5. The Guidelines are based upon many sources of information and research regarding HCV, including

publications of the National Institutes of Health (NIH); the United States Centers for Disease Control; the New York State Department of Heath Bureau of Communicable Disease Control; the New England Journal of Medicine; and the Federal Bureau of Prisons Treatment Guidelines for Viral Hepatitis. Wright Decl. ¶¶ 7-8.

Dr. Rogers states that it is now possible to achieve a "cure" in almost fifty percent of the HCV cases after 24 to 48 weeks of treatment, "depending upon the genotype of the virus." Rogers Decl. ¶ 12. Dr. Rogers states that it is "well worth the risks and costs of therapy to prevent the development of cirrhosis of the liver and/or liver cancer which often develops in patients with untreated HCV." Rogers Decl. ¶ 12. If the patient's viral levels remain undetectable six months after completion of the drug therapy, it is considered a "sustained viral response" and the patient may be considered "cured," however, relapses have been reported. Rogers Decl. ¶ 13. The likelihood of a relapse depends upon "individualized" factors, including the virus genotype, the patient's ethnicity, gender, age, the duration of the disease, and alcohol use. *Id.*

The "current" treatment with pegylated interferon and ribavirin was approved by the United States Food and Drug Administration (FDA) in 2001. Wright Decl. ¶ 12. However, there are patients that do not achieve sustained suppression of the virus even after treatment, and they are referred to as "nonresponders." Wright Aff. ¶ 13. Defendant Wright states that at this time, there is no alternative treatment for these individuals. *Id.* There are also patients called "relapsers," who initially respond to the treatment, but experience a re-emergence of the virus. *Id.* In the case of a "relapser," it may be appropriate to explore re-treatment with variations on the duration of therapy and/or the dosage of the drugs. *Id.*

Defendant Haider Shah states that plaintiff was diagnosed with HCV in December of 1995, but was not transferred to Marcy until October of 2002. Haider Shah Decl. ¶¶ 8-9. In 1992, it had been determined that plaintiff had also been exposed to Hepatitis A and B, but had acquired immunity to those viruses. *Id.* ¶ 9. By the time that he was transferred to Marcy, plaintiff's HCV had already progressed to the "chronic" stage. *Id.* Defendant Haider Shah had no responsibility for plaintiff's care until he was transferred to Marcy in 2002.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Defendant Haider Shah states that he met with plaintiff on October 23, 2002. [FN12] The medical records confirm that October 23, 2002 was the first time that defendant Haider Shah met with plaintiff at Marcy. Haider Shah Decl. Ex. A at 331. On October 17, 2002, plaintiff met with **Nurse Dooley,** and he told the nurse that he wanted a lead level test because he had metal fragments in his abdomen; [FN13] wanted a treatment plan for his HCV; wanted "injections" for his HAV and HBV; and had some concerns about his memory. *Id.*

> FN12. Although as stated above, plaintiff states that the October 17, 2002 AHR entry was based on an examination by defendant Haider Shah, it is clear that the October 17th entry was written by Nurse Dooley, and that defendant Haider Shah's entry is dated October 23rd. Haider Shah Decl. Ex. A at 331.

> FN13. These fragments were apparently the residue of a gunshot wound. Haider Shah Decl. Ex. A at 331.

**\*8** Nurse Dooley advised plaintiff of the "policy" regarding reviewing the record and determining whether plaintiff met the criteria for treatment. *Id.* Nurse Dooley also stated that there would be a follow up with Nurse Perrotta to "review for need." *Id.* Nurse Dooley also questioned the need for "injections" because the medical records indicated "immunity" for HAV and HBV. *Id.* Finally, Nurse Dooley wrote in the AHR entry that plaintiff had an "md" appointment on October 23, 2002. *Id.*

Dr. Haider Shah states that when he met with plaintiff on October 23, they discussed various medical issues. Haider Shah Decl. ¶ 11 & Ex. A at 331. Defendant Haider Shah told plaintiff that the vaccinations for HAV and HBV were not necessary [FN14] and the lead level testing was not necessary. *Id.* Defendant Haider Shah also noted that plaintiff was requesting treatment for HCV, and states in his declaration that he "made a notation on [plaintiff's] AHR requesting a psychiatric consultation ... this was the first of a series of such requests." Haider Shah Decl. ¶ 12

& Ex. A at 311.

> FN14. The reason that vaccinations were not necessary was that although plaintiff had been exposed to both HAV and HBV, the tests showed that his body had already developed an immunity to both. *See* Pl.App. C at 29 ("medical conditions").

Defendant Haider Shah states that some of the risks involved in the HCV treatment include suppression of the bone marrow; damage to the thyroid gland; damage to the heart and kidneys; and depression that can lead to suicide. Haider Shah Decl. ¶ 16. Dr. Haider Shah states that due to the risks, the slow rate of the disease's progression, and the moderate success of the current treatment, "very often it is most reasonable to refrain from drug therapy entirely and await the next innovation in treatment." Haider Shah Decl. ¶ 17.

Defendant Haider Shah states that when an inmate/patient has a history of depression or other serious mental disorder, he must be examined by a psychiatrist and issued a clearance to proceed with the drug therapy for HCV. *Id.* ¶ 21. The drugs may sometimes trigger depression even in those who have no prior psychiatric history, but those who do have such a history are "particularly susceptible." *Id.* Thus, before a DOCS treating physician will submit an HCV treatment request to Albany, [FN15] a psychiatric clearance must be obtained for the inmate. *Id.* A psychiatric clearance is obtained by the DOCS physician submitting a referral/consultation request to the Office of Mental Health (OMH), which oversees the provision of mental hygiene services to DOCS inmates. Haider Shah Decl. ¶ 22. Defendant Haider Shah states that OMH processes and fulfills the request "in due course." *Id* .

> FN15. Before an inmate may be treated for HCV, the treating physician must submit a request for treatment to defendant Wright, the Chief Medical Officer of DOCS. Haider Shah Decl. ¶ 20.

Defendant Haider Shah states that prior to 2002 and during the following years, plaintiff had a "significant history" of clinical depression, was seen by a psychiatrist,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

and was prescribed medication on a number of occasions. Haider Shah Decl. ¶ 23. Defendant Haider Shah states that "we submitted multiple requests for psychiatric evaluations between October of 2002 and October of 2005, when the clearance was finally obtained. *Id.* ¶ 24 (citing Ex. A at 331 (10/23/02 request); 261 (10/29/04 request); 245-47 (8/5/05 request); and 239 (10/20/05 request)); Pl.App. B at 89-92. Defendant Haider Shah speculates that "it may well be" that the psychiatrists did not clear plaintiff for treatment earlier because between 2002 and 2005, plaintiff was reporting symptoms of depression and was receiving medication off and on for the condition. *Id.* ¶ 25 (citing Ex. A at 293-94 (4/8/04 consult/treatment for depression)).

**\*9** On October 30, 2002, plaintiff had laboratory tests related to his HCV diagnosis. Haider Shah Decl. Ex. A at 325-27. Between 2002 and 2005, testing was done in August of 2003; in January of 2004; February of 2004; in April of 2004; in June of 2004; in July of 2004; in August of 2004; and in May of 2005. Haider Shah Decl. Ex. A at 312-15; [FN16] Pl.App. B at 77; Haider Shah Decl. Ex. A at 305-309; 290; 284-85; 278; 273-74; and 250. Plaintiff had laboratory testing in February of 2006 [FN17] and twice in March of 2006. Haider Shah Decl. Ex. A at 220-23; 207-208. After plaintiff started his treatments in June of 2006, he was receiving regular laboratory testing to monitor his blood levels. Ex. A at 226 (chart of lab testing). *See also* Pl.App. B at 109 (AHR of June 22, 2006-HCV tracking note regarding the frequency of lab testing).

FN16. Plaintiff's August 13, 2003 AHR entry has a "Lab" notation, and the following AHR entry for what appears to be February 2004 states "Last Labs 8/03." Pl.Ex. B at 75.

FN17. The record indicates that on February 11 and 15, 2006. plaintiff did not show up for his laboratory testing, and the tests had to be rescheduled. Haider Shah Decl. Ex. A at 227.

It appears from the medical records that as of January 4, 2006, defendant Haider Shah did not know that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 235 (AHR dated January 4, 2006).

However, by February 15, 2006, defendant Haider Shah had requested a referral to a gastroenterologist to approve the HCV treatment and for a liver biopsy, noting that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 190 (Referral dated February 15, 2006). On March 20, 2006, plaintiff's history and physical were done in anticipation of his liver biopsy. Haider Shah Decl. Ex. A at 210. Plaintiff had the biopsy on March 27, 2006. *Id.* Ex. A at 195 (surgical pathology report of biopsy) [FN18] The biopsy report indicated that plaintiff's diagnosis was "chronic hepatitis with stage 3 fibrosis." Haider Shah Decl. ¶ 33 & Ex. A at 195. Defendant Haider Shah states that they then obtained additional blood chemistry tests, including a thyroid hormone analysis. *Id.* & Ex. A at 186. On June 1, 2006, defendant Haider Shah requested a repeat CT Scan based on the plaintiff's complaints of nausea and pain in the area of the lesion. Haider Shah Decl. ¶ 33 & Ex. A at 180. Defendant Haider Shah states that after considering all the available information, including the biopsy result, he determined that it was appropriate to proceed with the drug therapy requested by plaintiff. Haider Shah Decl. ¶ 33. Final approval was requested from DOCS, and plaintiff obtained his first of a twenty four week dose of HCV medication on June 6, 2006. *Id.*

FN18. Page 197 of Ex. A is a copy of the biopsy report.

After plaintiff began his drug treatment, the medical records show constant monitoring. In July of 2006, plaintiff complained of abdominal pain, and another CT Scan was performed on July 21, 2006. Haider Shah Decl. Ex. A at 160. On August 3, 2006, plaintiff was noted to be continuing his treatment without complaints. *Id.* at 157. However, on August 6, 2006, plaintiff was "agitated" and wanted to be referred to the mental health department. *Id.* at 155-56. Plaintiff was crying and wringing his hands, but denied thoughts of self-harm or harm to others. *Id.*

**\*10** There are approximately eight entries in plaintiff's medical records in August 2006 alone. *Id.* at 142-53. Plaintiff had laboratory tests and was examined for complaints of headaches. *Id* . The monitoring continued through September and October. *Id.* at 122-42. In November of 2006, plaintiff had an abnormal thyroid and platelet count. *Id.* at 112-16. Plaintiff completed his HCV treatment on December 11, 2006 after 24 weeks. *Id.* at

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

105. Defendant Haider Shah states that upon completion of the treatment, plaintiff's virus had dropped to undetectable levels. Haider Shah Decl. ¶ 34. However, the virus has re-emerged. *Id.* Both defendant Haider Shah and Dr. Rogers state that the timing of the treatment was not related to the re-emergence of the virus, and that it was unlikely that drug therapy in 2002 would have been any more successful. Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14. Defendant Haider Shah states that the viral response to the drug therapy depended upon the effect of the drugs upon plaintiff's particular virus and not upon the timing of the drugs. *Id.* ¶ 34.

Plaintiff filed this action on August 29, 2006, during the time that he was receiving his drug treatment. (Dkt. No. 1). Defendants have submitted a great deal of medical records relating to plaintiff's medical care, even after he filed this complaint. A CT Scan performed on January 3, 2007 showed that the lesion in plaintiff's liver had increased in size from 8 by 13 millimeters to 13 by 15 millimeters. Haider Shah Decl. Ex. A at 91. His monitoring continued, however, most of the AHR entries for January and part of February of 2007 are unrelated to plaintiff's HCV. *Id* . at 84-88. Plaintiff was transferred to Elmira Correctional Facility (Elmira) on February 15, 2007. *Id.* at 79-84.

Although plaintiff received laboratory tests while at Elmira, most of the AHR entries are unrelated to plaintiff's HCV. *Id.* at 61-76. Plaintiff was transferred to Clinton Correctional Facility in June of 2007. *Id.* at 58-61. On March 4, 2008, while still at Clinton, plaintiff was examined by an endocrinologist for abnormal thyroid function. *Id.* at 20. The consultant stated that plaintiff's abnormal thyroid readings were likely due to the HCV, however, the consultant stated that plaintiff "[d]oes not need treatment as Interferon is known to be able to cause ... abnormalities in thyroid function...." *Id.* The doctor suggested another test in six to eight months. *Id.* at 9, 20.

**3.** *Personal Involvement*

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted);

*Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

**\*11** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In this case, it is clear that defendant Wright, who is the Chief Medical Officer of DOCS, was not involved in plaintiff's day-to-day medical care and was in no way involved in plaintiff's case. Wright Decl. ¶ 3. The only "involvement" by defendant Wright would have been when defendant Haider Shah made the request for the approval of plaintiff's treatment and ordered the medications. Haider Shah Decl. Ex. A at 179, 181. Plaintiff is claiming that the delay in treating him for HCV was the unconstitutional conduct. To the extent that defendant Wright had any actual involvement at all, it was **after** the allegedly unconstitutional delay had occurred.

Plaintiff claims that he can establish personal responsibility either because defendant Wright created an unconstitutional policy or because he failed to properly train physicians such as defendant Haider Shah in the proper care of inmates with HCV. Compl. ¶¶ 70, 71. Plaintiff attempts to hold defendant Wright liable for the allegedly unconstitutional policy of denying inmates HCV treatment if they are within fifteen months of parole, or the policy of denying inmates HCV treatment if they have not participated in a drug treatment program.

The court would first point out that prior to 2005, the HCV Guidelines contained a provision stating that the

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

inmate's "anticipated incarceration" had to be adequate to complete the evaluation and treatment. Wright Decl. Ex. A-2, June 20, 2004 Guidelines at p. 4 (Criteria for Treatment No. 13). The length of anticipated incarceration required was different for different genotypes of the virus: nine months for genotypes 2 and 3 and fifteen months for genotypes 1 and 4, from the time of referral, including the 24-48 week treatment course. *Id.* This section provided that inmates who would not be able to complete a course of treatment due to their time of incarceration would receive a baseline evaluation and be referred for medical follow-up and treatment upon release. *Id.* Additionally, inmates who had a substance abuse history were required to successfully complete or be enrolled in a substance abuse program. *Id.* (Criteria for Treatment No. 11).

In October 2005, the Guidelines were revised, and the above requirements were amended. Wright Decl. Ex. A-1 at p. 2. Instead of requiring the substance abuse program, the new Guidelines "strongly encouraged" inmates with a history of substance abuse to complete the program "since dealing with alcohol or substance use issues is an essential part of their Hepatitis C/liver treatment and protection program." *Id.* (Criteria for Treatment No. 11). Finally, if the inmate does not have an anticipated incarceration adequate to complete the evaluation and treatment, the new Guidelines provide that he could begin the treatment, and he would be followed *after release* through the "Continuity Program," as long as the inmate agreed to the conditions of the program. *Id.* (Criteria for Treatment No. 13).

**\*12** While defendant Wright might be responsible for helping to create these guidelines, plaintiff in this case was *never* denied treatment *because of* the failure to take the substance abuse program since he completed the program in 2000, long before he requested the treatment that became available in *2002. See* Haider Shah Decl. Ex. A at 350. Thus, even if defendant Wright were responsible for the "policy," plaintiff was never denied treatment based on this policy.

Plaintiff somehow claims that he also may have been denied the HCV treatment because of the pre-2005 policy limiting treatment based on an inmate's anticipated length of incarceration. There are some notations in the record, indicating that he was going to be paroled in the near

future. On August 7, 2003, a nurse noted on plaintiff's AHR that plaintiff "goes home in 30-60 days." *See* Haider Shah Decl. Ex. A at 321. On August 5, 2005, Nurse Perrotta wrote in the AHR that plaintiff "states [sic] is paroling soon-needs psych eval." *Id.* at 247. Based upon plaintiff's August 5, 2005 statement, on the same day, Nurse Perrotta completed a "Request and Report of Consultation Form," with a similar notation that plaintiff "states [sic] paroling soon-mandatory psy. eval. needed." *Id.* at 245.

Neither of these notations indicates that plaintiff was being denied HCV treatment because he was not going to be incarcerated long enough.[FN19] In any event, by October 13, 2005, DOCS had removed the anticipated length of incarceration requirement from the Guidelines. Although plaintiff states that on August 7, 2003, defendant Haider Shah told plaintiff that "he was too close to going home, '30-60 days', 'not ready for medication,' " plaintiff cites the AHR entry written by Nurse Dooley, *not* by defendant Haider Shah. *See* Haider Shah Decl. Ex. A at 321; Pl.Ex. B at 72. In any event, plaintiff was clearly *not* being released within 30-60 days of August 7, 2003, nor was "paroling soon" in 2005 when the note was written by Nurse Perrotta. Thus, plaintiff was not subjected to either "policy" that he claims was unconstitutional.

> FN19. In fact, the court notes that the only time that plaintiff's length of incarceration was mentioned in conjunction with HCV treatment was in April of 2002, while plaintiff was still at Franklin, and a Hepatitis Consult Request was completed. Haider Shah Decl. Ex. A at 350. At that time, the older guidelines required at least 15 months, and the individual completing the form stated that plaintiff *met the criteria. Id.*

The court notes that in *Hilton v. Vasquez,* 235 F.R.D. 40 (N.D.N.Y.2006), District Judge David N. Hurd certified a class of inmates who had been denied HCV treatment based upon their failure to complete a DOCS-sponsored substance abuse program. *Id.* at 50-54. By memorandum, defendant Wright had voluntarily rescinded the requirement, however, the court was concerned that the plaintiff class would not be assured of the appropriate relief. *Id.* at 46-50. The parties entered into an interim settlement agreement in July of 2007, and on January 2,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

2008, Judge Hurd approved the interim agreement as a final settlement agreement. *Hilton v. Vasquez, 9:05-CV1038, 2008 U.S. Dist. LEXIS 461, 2008 WL 53670 (N.D.N.Y. Jan. 2, 2008).* The settlement required DOCS to reevaluate any prisoner who was denied treatment for HCV ***"because of"*** the ASAT program. *Id.* at *3.

**\*13** Plaintiff was not, and clearly is not a class member in *Hilton.* Plaintiff in this case has obtained his treatment, and thus, only has a claim for damages. Plaintiff was ***never*** denied treatment because he failed to participate in a substance abuse program. Nor does the record support that he was ever denied treatment because he was being paroled "soon." [FN20] Thus, plaintiff cannot show that he was denied treatment due to any "policy" that was created or condoned by defendant Wright.

> FN20. The court notes that the amended complaint in *Hilton* also alleged that it was difficult to enroll in the programs due to the number of inmates who took the programs. (Dkt. No. 11 at ¶ 4) (*Hilton* ). The amended complaint further alleged that even if an inmate finally had the opportunity to enroll in the substance abuse program, he would be denied participation in the program if the inmate were going to be released on parole before finishing the program. *Id.* ¶ 5. There was no challenge, however, to the requirement that an inmate had to have enough time remaining on their sentence before they were allowed to get treatment. There were various ***other*** issues related to the requirement that inmates participate in the substance abuse programs, and one of the important allegations was that the DOCS policy did not allow for individualized assessments of an inmate's drug history or medical condition prior to imposing this requirement. *Id.* ¶ 3.

Plaintiff's HCV drug treatment was delayed because of the requirement that an individual with a prior psychiatric history must be cleared by a psychologist or a psychiatrist prior to beginning the treatment. Although this requirement is one of the criteria for treatment [FN21] and is, thus, part of the DOCS "policy," plaintiff is not challenging the "policy" or the requirement. Plaintiff is

claiming that defendant Haider Shah "failed to seek the psychiatric clearance until October 20, 2005," and "failed to acknowledge" that plaintiff was cleared for treatment for six months after he was cleared, causing an unconstitutional delay in treatment. Compl. ¶ 2.

> FN21. *See* Hepatitis C Primary Care Guidelines dated October 13, 2005, Criteria for Treatment No. 10. Wright Decl. Ex. A-1 at p. 6.

Plaintiff claims that defendant Wright may be held liable because he failed to train and supervise employees such as defendant Haider Shah in the care of inmates who are identified by their treating physicians as being in need of HCV treatment. Compl. ¶ 70. Defendant Wright is the Chief Medical Officer of DOCS and is not located at any particular correctional facility. Because the allegedly unconstitutional policies plaintiff has cited as created by defendant Wright were not applied to plaintiff, plaintiff would now have to show that defendant Wright was "grossly negligent" in supervising defendant Haider Shah. *Colon,* 58 F.3d at 873.

Plaintiff does not claim that defendant Wright had notice of the alleged improper delay in plaintiff's case. Thus, it is unclear how defendant Wright would be "grossly negligent" in supervising defendant Haider Shah, given that the adequacy of the general policy of requiring psychiatric clearances for HCV treatment is ***not in dispute.*** Thus, plaintiff has failed to show that defendant Wright was personally involved in plaintiff's alleged denial of constitutionally adequate medical care, and any claim for damages may be dismissed as against defendant Wright. The court may proceed to consider plaintiff's medical care claims as against defendant Haider Shah.

**4. *Medical Care***

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

### A. Objective Element

**\*14** In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the *inadequacy* in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### B. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk, however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

**\*15** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**C. Application**

In this case, plaintiff essentially claims that defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs because the doctor delayed plaintiff's HCV treatment from October of 2002 until June of 2006 for a series of improper reasons. Plaintiff's other claims, alleging that defendant Haider Shah also failed to "monitor plaintiff's elevated liver functions tests (LFT's), for nineteen straight months, when the HCV protocol called for monitoring every 8-12 weeks; failed to refer plaintiff to a liver specialist; and failed to order a "prescribed" liver biopsy are related to the delay.

No one disputes that HCV is a "serious medical condition." However, since a review of the plaintiff's medical records in this action show that plaintiff received **substantial** medical care for his illness, this court must analyze the Eighth Amendment claim with reference to whether the "delay" was sufficiently serious. The Second Circuit opinion in *Salahuddin* is instructive in this regard. The plaintiff in *Salahuddin* also had HCV, and the defendant doctor cancelled plaintiff's liver biopsy, postponing the procedure for a period of five months. 467 F.3d at 281. The court stated that it could not determine as a matter of law that it was "reasonable" for a prison official to postpone the plaintiff's course of treatment for HCV "because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole." *Id.* The court then assumed that the five-month delay was "objectively serious" because the defendants

did not address the issue on appeal.[FN22]

> **FN22.** The Second Circuit pointed out that the defendants incorrectly believed that the objective prong turned upon the severity of plaintiff's HCV, rather than the severity of the delay. *Salahuddin,* 467 F.3d at 281 n. 7. The court relied on the defendants' forfeiture of the argument.

*16 The delay in this case was approximately three and one half years, according to plaintiff.[FN23] The court first finds that plaintiff has not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis. There is no evidence that the delay was "substantially serious." It is clear that on October 23, 2002, defendant Haider Shah's entry in plaintiff's AHR "ordered" a psychiatric clearance. In *Salahuddin,* the defendants did not present any evidence regarding the "seriousness" of the harm caused by the five month delay. 467 F.3d at 281. Unlike defendants in *Salahuddin,* the defendants in this case have presented evidence that the delay was not "substantially serious." Both defendants and Dr. Rogers state in their declarations that because HCV progresses so slowly, the three year delay was "unremarkable." Wright Decl. ¶ 35; Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14.[FN24] Dr. Rogers states that "it is unlikely that drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006." Rogers Decl. ¶ 14. Thus, plaintiff has not raised a genuine issue regarding the objective prong of the test. In any event, assuming that the delay were substantially serious, the court will proceed to analyze the subjective prong of the test.

> **FN23.** As stated above, plaintiff complains about the delay between October of 2002 and June 1, 2006, whereas defendants interpret the "delay" as beginning in October 2002, but ending on October 30, 2005, when plaintiff's psychiatric clearance was obtained.

> **FN24.** Dr. Rogers actually states that "four years is not a particularly long period in the course of a Hepatitis C progression." Rogers Decl. ¶ 14.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Again, reference is made to the analysis in *Salahuddin.* Notwithstanding the question of fact regarding the reasonableness of the defendant's actions in *Salahuddin,* the court granted summary judgment for the defendant doctor based upon the subjective element of the analysis. *Id.* at 281-82. The court found that the doctor had written a letter expressing his belief that because "Hepatitis C leads to cirrhosis only over 20 to 30 years, Salahuddin 'is in no immediate danger' and that '[f]rom a medical standpoint [,] there is no urgency for [the cancelled liver biopsy].' " *Id.* at 282 (alteration in original). The court stated that while the assumption could have been "unsound" absent an investigation into the progression of the plaintiff's HCV, the doctor's letter was "direct evidence that he was not aware of a substantial risk that postponing the liver biopsy would cause serious harm." *Id.*

The court in *Salahuddin* stated that there was no circumstantial evidence to contradict the doctor's conclusion, distinguishing the court's own decision in *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005). *See Salahuddin,* 467 F.3d at 282. In *Johnson,* another HCV case, the Second Circuit denied summary judgment because there was evidence raising a genuine issue of material fact surrounding the defendant's decision to administer one drug over another, based upon other treating physicians' recommendations of the rejected medication. *Id.* The court stated that *Johnson* involved a case of "willful blindness," and the idea of "willful blindness" would have required that someone arouse the defendant's suspicion that postponing Salahuddin's biopsy would be seriously harmful. *Id.* (distinguishing *Johnson,* 412 F.3d at 404-05).

**\*17** In this case, defendant Haider Shah's explanation for the delay in providing plaintiff with the HCV treatment is based upon the lack of a psychiatric "clearance" between October 2002 and October 2005. The HCV protocol clearly requires a psychiatric clearance for individuals who have a history of "major depression" or other major psychiatric illness." Wright Decl. Ex. A-1, Criteria for Treatment No. 10. The requirement itself is a medical judgment that is not in dispute in this case. In any event, there appears to be no question that one of the side effects of the HCV treatment is "depression with associated suicidal feelings," making the requirement of psychiatric clearance reasonable. *See* Rogers Decl. ¶ 18. Dr. Rogers states that some inmates who receive the HCV treatment

"will need to be followed by psychiatry and treated with mood altering drugs." *Id.* ¶ 20.

Defendant Haider Shah states that "multiple requests" were submitted for psychiatric evaluations of plaintiff. Haider Shah Decl. ¶ 24. Plaintiff's October 23, 2002 AHR shows that defendant Haider Shah noted the need for a psychiatric clearance for "possible" HCV treatment. Haider Shah Decl. Ex. A at 331. In his declaration, defendant Haider Shah cites this notation in the AHR as one of the multiple "requests" that were "submitted" for "psychiatric evaluations" between October 2002 and October of 2005. Haider Shah Decl. ¶ 24. The other dates cited by defendant Haider Shah are October 29, 2004; August 5, 2005; and October 20, 2005, the date that clearance was finally obtained. *Id.* (citing Ex. A at 262; 245-47; 239).

A review of the above "requests" shows that the first is a "notation" in the AHR. The second request is a "Mental Health Referral" form, dated October 29, 2004. Haider Shah Decl. Ex. A at 261. The form states that plaintiff was requesting to resume the psychiatric medications that he had refused two months before because of increased "frustration, anxiety, and sleeplessness." *Id.* The AHR contains a nurse's entry, dated October 29, 2004 stating that plaintiff was requesting to resume his Paxil and Vistaril. *Id.* at 263.

The third request consists of an AHR entry and a "Request and Report of Consultation," dated August 5, 2005. Haider Shah Decl. Ex. A at 245, 247. This entry on the AHR is made by a nurse and follows the notation that plaintiff "states" he is paroling soon. *Id.* at 245. The top of the "Request and Report of Consultation" form is also completed by the nurse and states that plaintiff told the nurse that he was paroling soon, and the nurse wrote that plaintiff needed a mandatory psychiatric evaluation. *Id.* at 247. The bottom of the form is blank, indicating that the evaluation was never performed.[FN25] *Id.*

FN25. It is possible that the evaluation was never performed because plaintiff was ***not*** paroling soon. It appears from other portions of the plaintiff's medical records that psychiatric evaluations may be required for parole purposes.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

*See* Haider Shah Decl. Ex. A at 383-84 (Mental Health Status Report for Division of Parole, dated August 20, 2001).

The final request is the October 20, 2005 "Request and Report of Consultation," and the AHR entry dated the same day, referencing the HCV treatment as the reason for the request. *Id.* at 239, 240. The bottom of the form was completed on the same day, stating that plaintiff was only treated briefly for "a few months for depression" after the death of a family member and stating that there was no contraindication for the treatment. *Id.* at 239. The AHR entry states that on October 30, 2005, plaintiff was "asking" about the HCV treatment, and defendant Haider Shah referred to all the requests for psychiatric consultation listed above and stated that there had been "no psych. clearance." *Id.* at 240.

*18 In the October 30, 2005 AHR entry, defendant Haider Shah refers to another prior request, dated June 25, 2004. *Id.* A review of the June 25, 2004 AHR entry shows that one of defendant Haider Shah's "orders" on that date was a "note to tracking nurse" to check for the "Hep C tx." *Id.* at 286. The entry also states "Ret if not written." *Id.* On October 30, 2005, defendant Haider Shah ordered "Psych. Clearance" and "GI Consult." *Id.* There is a notation by the nurse indicating that she "so noted" the ordered section of the entry.[FN26] *Id.* The October 29, 2004 and August 5, 2005 requests, however, do not reference HCV or HCV treatment as the reason for the referral.

FN26. This notation also appears on the October 23, 2002 entry. Haider Shah Decl. Ex. A at 331.

Interestingly, the record contains various versions of the October 30, 2005 request for psychiatric clearance. Plaintiff himself has submitted four such versions. Pl.App. B at 88-92. One of these versions is simply the referral form with only the top portion (the request) completed. *Id.* at 91. The second has the top portion and the bottom portion (the clearance) completed. *Id.* at 88, 90 (two copies). The third document contains a notation at the bottom, written by defendant Haider Shah, which appears to be dated June 1, 2006, but the notation is very difficult to read. *Id.* at 92. It appears to state "How did it get ... without ... us ... seeing." *Id.* Defendants' exhibit contains

the same notation. Haider Shah Decl. Ex. A at 239.

Finally and most interestingly, *plaintiff's appendix* contains a version of the document with what appears to be a note copied onto the top left corner of the document, written by Dr. L. Kalias, the doctor who signed the clearance at the bottom. Pl.App. B at 89. The note states "Sorry this took so long-Also FYI-Gave MH approval for Hep C tx today." *Id.* It is unclear why Dr. Kalias would be apologizing for taking "so long," when the form request and the clearance are dated the same day, unless, there had in fact been prior requests that had gone unanswered. This version does not appear in the defendants' exhibits.

It thus appears that although plaintiff seeks to blame defendant Haider Shah for the delay, it may not be completely attributable to this defendant. Defendant Haider Shah also states in his declaration that plaintiff may not have been cleared sooner because between 2002 and 2005, he was reporting symptoms of depression and was receiving medication for the condition. Haider Shah Decl. ¶ 25. The records *do* show that plaintiff had periods of psychiatric treatment. Plaintiff had signs of depression as early as January 1995, while he was incarcerated at Collins Correctional Facility. Haider Shah Decl. Ex. A at 534. However, in 1999, plaintiff was psychiatrically evaluated by Dr. David Goldman at Riverview Correctional Facility for the Parole Board, and there were "no current psychiatric problems." *Id.* at 420-23. Dr. Goldman had the same opinion in 2001 when he performed another psychiatric review for the Parole Board.[FN27] *Id.* at 383-85.

FN27. It is clear from these documents that each time an inmate is considered for parole, there is a mandatory psychiatric examination.

*19 On February 25, 2002, plaintiff was again examined by Dr. Goldman, who wrote a report, changing plaintiff's OMH level to Level III [FN28] and prescribing Zyprexa. *Id.* at 372. Dr. Goldman wrote a second report the next day, February 26, 2002, continuing plaintiff's OMH level as III. *Id.* at 368-69. Plaintiff was still taking the psychiatric medication when he was transferred to Franklin on March 15, 2002. *Id.* at 365, 368. The medications were discontinued by plaintiff's own request on March 30,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

2002. *Id* . at 358-59. His OMH Level was changed to 6 on September 13, 2002. *Id*. at 335.

> FN28. Mental Health Service Level 3 indicates that the inmate needs short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders. Haider Shah Ex. A at 444. (listing of levels). Level 6 is an inmate who does not need Mental Health Services. *Id*. The medical providers use roman numerals and arabic numbers interchangeably to refer to these levels.

Although there was no discussion of plaintiff's mental status in the 2003 medical records, in plaintiff's April 8, 2004 AHR entry, there is a notation that plaintiff was complaining of being depressed, that a relative was dying, and that he wanted to resume his psychiatric medication. Haider Shah Decl. Ex. A at 294. An urgent mental health referral was made. *Id*. at 293. Plaintiff was prescribed his Paxil and Vistaril on April 12, 2004. *Id*. at 291. Although plaintiff stopped taking this medication in June of 2004, he resumed the medication in October of 2004. *Id*. at 261, 263, 283. The court notes that plaintiff did experience some psychiatric problems on August 6, 2006, during the course of his HCV treatment. *Id*. at 155-56.

Defendant Haider Shah also states that aside from plaintiff's psychiatric history, there were physical conditions to consider prior to beginning the HCV treatment. Haider Shah Decl. ¶ 27. The medical personnel were concerned about the risk to plaintiff's thyroid and the scarring of plaintiff's internal organs due to a gunshot wound. *Id*. Defendant Haider Shah points out that plaintiff did experience some thyroid problems as a result of the treatment. *See* Haider Shah Decl. ¶ 27 & Ex. A at 9, 17, 20, 23-24. Plaintiff was referred to a specialist for evaluation. Ex. A at 20.

Although plaintiff in this case complains about the "delay" between October of 2005 and June of 2006 when he began his treatment, there is no evidence of "delay." Dr. Rogers and defendant Wright state that even after the psychiatric clearance was obtained, further evaluation was required, and "significant medical steps" had to be taken before the administration of the treatment. Rogers Decl. ¶ 22; Wright

Decl. ¶ 34. Beginning in January of 2004, plaintiff had laboratory tests more frequently.FN29 After the psychiatric clearance was obtained in October 2005, plaintiff was referred to a gastroenterologist, and had a liver biopsy prior to beginning his treatment in June of 2006. Haider Shah Decl. Ex. A at 192-93 (biopsy report). Plaintiff's extensive medical care continued throughout his HCV treatment and afterward.

> FN29. Plaintiff had laboratory testing for liver function done twice in January 2004; July; and October of 2004. Haider Shah Decl. Ex. A at 306, 308-09, 278-81, 268. On October 20, 2004, defendant Haider Shah made a request for a CT scan of plaintiff's abdomen to rule out a possible obstruction of plaintiff's bile duct because plaintiff was complaining of vomiting and weight loss. *Id*. at 260, 269. The CT scan was performed on November 5, 2004. Plaintiff had laboratory tests again on May 25, 2005; February 14, 2006; March 7, 2006; March 16, 2006; and April 4, 2006. *Id*. at 250, 220-23, 217, 211-12, 186.

Defendant Haider Shah states that upon completion of the HCV therapy, plaintiff's viral levels had become almost undetectable, however, the virus reemerged. Haider Shah Decl. ¶ 34. Defendant Haider Shah states that this reemergence was not related to the delay in treatment, but rather due to the effectiveness of the drugs on plaintiff's particular virus. *Id*. Defendant Wright states that by the time that plaintiff had his liver biopsy on March 27, 2006, the fibrosis in his liver had progressed to Stage 3, a severe degeneration, falling short of cirrhosis. Wright Decl. ¶ 27.

**\*20** There is no evidence in this case that defendant Haider Shah was "deliberately indifferent" to plaintiff's condition. At worst the failure of defendant Haider Shah to follow up on the request for psychiatric clearance was inadvertence or negligence,FN30 and it is unclear whether the delay was attributable to defendant Haider Shah since the notation on plaintiff's exhibit from Dr. Kalias contains an apology that the clearance "took so long." The delay appears to have been due to a possible misunderstanding regarding the request for psychiatric clearance.

> FN30. The court in no way states this as a

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

"finding."

According to Dr. Rogers, the delay was based on a "combination of legitimate factors." Rogers Decl. ¶ 30. These factors were based on medical reasons, and any delay between obtaining the psychiatric clearance in October of 2005 and the eventual commencement of the treatment in June of 2006 was due to plaintiff undergoing the required tests prior to the administration of the drugs, including plaintiff's biopsy in March of 2006. Rogers Decl. ¶ 31. As in *Salahuddin,* since all of the doctors in this case have indicated that it is their medical judgment that the disease progresses so slowly that even a four year delay would not affect the efficacy of plaintiff's treatment,[FN31] there is no evidence to show that defendant Haider Shah was deliberately indifferent to a serious risk to plaintiff.

> FN31. As stated above, although plaintiff initially responded to the treatment, the virus has reemerged. All the doctors state, however, that the re-emergence of the virus is not due to any delay in treatment, but rather due to the type of virus. The doctors state that because plaintiff is a "relapser," the virus would have re-emerged whether he had the treatment in 2002 or 2006. Haider Shah Decl. ¶ 34; Wright Decl. ¶ 27. *See also* Rogers Decl. ¶ 28 ("the likelihood of a different response to the same drugs is not high").

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.
Motta v. Wright
Slip Copy, 2009 WL 1437589 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Fred POWELL, Plaintiff,
v.
Brian FISCHER, Commissioner, New York State
Department of Correctional Services; Jeffrey
Tedford, Superintendent, Camp Gabriels Correctional Facility;
Dr. Roy Parker, P.A., Camp Gabriels Correctional
Facility; and Dr. Bergamini, Physician, Adirondack
Correctional Facility, Defendants.
No. 9:08-CV-0371.

March 9, 2010.

Fred Poweell, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, James Seaman, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

*1 The above matter comes to me following a
Report-Recommendation by Magistrate Judge David R.
Homer, duly filed on the 17th day of February 2010.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

Such Repot-Recommendation, which was mailed to
plaintiff's last known residence, was returned to the Court
as undeliverable to plaintiff at such address. *See* docket
no. 44.

Additionally, plaintiff was previously advised by the Court
that plaintiff was required to promptly notify the Clerk's
Office of any change in his address, and that failure to
keep such office apprised of his current address would
result in the dismissal of the instant action. *See* docket no.
7.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
objections submitted thereto, it is

**ORDERED** that:

1. The Report-Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (docket
no. 40) is granted and that judgment be entered as to all
defendants on all claims.

3. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Fred Powell ("Powell"), an **inmate** in the
custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
DOCS Commissioner and three DOCS employees,
violated his constitutional rights under the Eighth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

Amendment. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 40. Powell has not responded to the motion. For the following reasons, it is recommended that defendants' motion be granted.

**I. Failure to Respond**

Powell did not oppose defendants' motion. The failure to respond continued even after the Court, acting *sua sponte,* granted Powell an extension of time to file a response and reminded him of the consequences of failing to do so. *See* Dkt. Nos. 41 (order), 42 (receipt for service).

"Summary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants provided such notice in their Notice of Motion here. Dkt. No. 40. The Court reiterated that notice in its order. Dkt. No. 41. Despite these notices, Powell failed to respond. "The fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Champion,* 76 F.3d at 436. Even in the absence of a response, a defendant is entitled to summary judgment only if the material facts demonstrate his or her entitlement to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

**\*2** Because Powell has not responded to raise any question of material fact, the facts as set forth in defendants' Rule 7.1 Statement of Material Facts (Dkt. No. 40-24) [hereinafter "Defs. Statement"] are accepted as true. *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co.,* No. 00-CV-1619, 2002 WL 449757, at \*1 (N.D.N.Y. Mar.18, 2002) (McAvoy, J.) (citing *Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997)); *see also* N.D.N.Y.L.R. 7.1(a) (3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

**II. Background**

**A. Prior Incarceration**

Powell was first incarcerated in March 2000, prior to which, he had experienced no medical problems with his knees. Defs. Statement ¶ 2. After arriving into DOCS custody, Powell complained of pain, clicking, numbness, and locking in his knees. *Id.* ¶ 3. Consequently, both knees were x-rayed on September 29, 2000. *Id.* ¶ 4. The x-rays were negative. *Id.* Powell continued to complain of pain, and was sent to physical therapy in February 2001, despite no significant medical findings indicating that therapy was appropriate. *Id.* ¶ 5. The physical therapy ended in May 2001 with the therapist noting that therapy was not effective for Powell's "multiple and fluctuating complaints." *Id.*

At or about the same time, Powell was examined by an orthopedic specialist who ordered MRIs of both knees. Defs. Statement ¶ 6. The MRIs were conducted on June 9, 2001, showing that the left knee was normal and that the right knee showed "minimal thinning of the cartilage on the knee cap, but was otherwise normal." *Id.* ¶ 7 (internal quotation marks omitted). Powell saw the orthopedist again in June of 2001, where it was noted that Powell maintained a full range of motion and tested within the normal limits, though there were a few positive findings during the examination. *Id.* ¶ 8. Powell was again prescribed physical therapy, despite "no objective clinical signs of any abnormality ...." *Id.* ¶ 9. Powell attended physical therapy for approximately one month before "the therapist requested that the therapy be discontinued due to [Powell's] lack of motivation." *Id.* ¶ 10.

On October 8, 2001, an orthopedist who performed a right knee arthroscopy on Powell, removing synovial plica.[FN2] Defs. Statement ¶ 11. No other abnormalities were discovered. *Id.* Despite medical advice to remain in the infirmary to recover from the surgical procedure, Powell ignored the advice and left the infirmary immediately. *Id.* In February 2002, the orthopedist recommended a left knee arthroscopy looking for possible meniscal tears. *Id.* ¶ 12. On September 23, 2002, the orthopedist performed a right knee arthroscopy and found no torn cartilage. *Id.* ¶ 13.

FN2. "The knee joint is lubricated with ...

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

synovial fluid [which] ... is surrounded by and produced by ... the synovial sheath." *Synovial Plica (Patella Plica),* <http://www. s p o r t s i n j u r y c l i n i c . n e t / c y b e r therapist/front/knee/synovial-plica.htm> (visited Feb. 11, 2010). "The synovial plica is a ... fold found along the inside border of the knee cap." *Id.* The main symptom is pain and treatment includes removal via an arthroscope. *Id.*

In February 2003, Powell saw a different orthopedic specialist for continued complaints of knee pain. Defs. Statement ¶ 14. During the examination, medical records noted a "normal range of motion, an insignificant patellar apprehension test, a questionable McMurray's test and a stable joint, with some tenderness on the inside of the knee." *Id.* ¶ 15. The orthopedist performed a left knee arthroscopy on August 26, 2003, finding no meniscal or ligament tears, general normal findings, and "shredded plica over the medial ... condyle ... which was removed." *Id.* ¶ 16 (internal quotation marks omitted). As Powell had done before, he left the infirmary immediately after surgery against medical advice. *Id.* ¶ 17.

**\*3** Approximately one year later, Powell was released from prison. *Id.* ¶ 18. Powell was free from incarceration for more than three years, during which time he continued to experience knee pain but sought no medical attention for such pain. *Id.* ¶¶ 19, 21-22. Powell claims he was that unable see a physician because he had no insurance, though both probation and Social Services offered to assist Powell to apply for Medicaid, but Powell refused. *Id.* ¶¶ 23-26, 27.

### B. Camp Gabriels

Powell returned to custody in August 2007, whereupon he immediately began complaining about knee pain. Defs. Statement ¶ 29. On September 12, 2007, Powell was transferred to Camp Gabriels. *Id.* ¶ 30. On the day he arrived, Powell complained to staff that he did not want to be at Camp Gabriels because of all the work he would be required to do. *Id.* ¶ 31. Additionally, Powell told medical staff that he had persistent pain in his knees. *Id.* ¶ 32.

On September 21, 2007, defendant Parker wrote Powell a prescription for aspirin for his knee pain, but did not examine him until October 3, 2007. Defs. Statement ¶¶ 33-34. Parker's examination was benign, finding nothing wrong with Powell's knees. *Id.* ¶ 34. Powell requested an MRI, a second opinion, and referral to an orthopedist. *Id.* ¶ 35. These requests were denied. *Id.* Parker evaluated Powell again on October 31, 2007, finding "both knees solid, both anterior and posterior cruciate ligaments stable and both medial and lateral collateral ligaments stable as well." *Id.* ¶ 36. Parker again concluded that Powell's knees were normal, and Powell again requested MRIs, a second opinion, and a consultation with an orthopedist. *Id.* ¶¶ 36-37. The requests were again denied. *Id.* ¶ 37. However, after the visit, Parker ordered Naprosyn, "which has both pain relief and anti-inflammatory properties." *Id.* ¶ 38.

On November 14, 2007, Powell saw Parker for the final time about his knee complaints. Defs. Statement ¶ 39. Parker again found no abnormality with Powell's knees, Powell again demanded an MRI, referral, and orthopedic consult, and Parker explained that an MRI, second opinion, or specialist consult were all inappropriate "with a normal clinical exam and normal x-rays." *Id.* ¶¶ 39-40. Powell insisted that his left knee was far more painful than his right, Parker still declined to make any further recommendations, and Powell became aggressive and was escorted from the exam room. *Id.* ¶¶ 40-41.

On December 2, 2007, Powell filed a grievance complaining about Parker's repeated denials of his requests for consultations with an orthopedist. Defs. Statement ¶ 42. A few days later, while the grievance was pending, Powell was examined by defendant Dr. Bergamini. *Id.* ¶ 44. Powell complained of torn ligaments in both his knees, which he alleged happened while he was free from incarceration. *Id.* ¶ 45. Dr. Bergamini "identified a slight laxity of [Powell's] right anterior cruciate ligament and moderate weakness bilaterally ... [but generally determined that] his knees were good and there was nothing wrong with them." *Id.* ¶ 46. Powell asked for MRIs, a second opinion, and an orthopedic referral, which were all denied by Dr. Bergamini. *Id.* ¶ 47. Instead, Dr. Bergamini showed Powell exercises he could do to strengthen his knees and instructed him to return for a follow-up appointment in two weeks. *Id.* ¶ 47.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

**\*4** On December 20, 2007, the grievance was ultimately denied, relying on the opinions of defendants Parker and Bergamini. Defs. Statement ¶ 50. The following day, Powell was scheduled to see Dr. Bergamini for his follow-up visit, but he refused to go. *Id.* ¶ 51. Powell continued to see Dr. Bergamini between December and when he commenced this action on May 8, 2008, but Powell did not complain about his knees in any of the subsequent visits. *Id.* ¶ 52. Powell was transferred from Camp Gabriels in August 2008. *Id.* ¶ 52. At the subsequent correctional facility, medical personnel ordered MRIs of his knees, "which were both unremarkable except for a trace of fluid in the joints." *Id.* ¶ 54.

### III. Discussion

In his complaint, Powell alleges that his Eighth Amendment rights were violated when he received inadequate medical treatment for his knees. Defendants move for summary judgment on the grounds that (1) Powell failed to exhaust his administrative remedies, (2) defendants were not personally involved, (3) Powell's constitutional claims are meritless, and (4) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendants # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... X a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Failure to Exhaust

**\*5** Under 42 U.S.C. § 1997e(a), an **inmate** must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a **prisoner's** overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the **inmate**. *Nussle,* 534 U.S. at 524.

While the Supreme Court has deemed exhaustion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). Exhaustion for an **inmate** in DOCS custody is generally achieved through the **Inmate** Grievance Program (IGP),[FN3] *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1 *et seq.*. However, when **inmates** fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims. A court must consider whether

> FN3. "The IGP is a three-step process that requires an **inmate** to: (1) file a grievance with the IGRC [ **Inmate** Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

(1) administrative remedies are not available to the **prisoner**; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the **prisoner's** failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. *Id.* at 688. Courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* No. CV-04-4587 (DST), 2007 WL 389003, at *8 (E.D.N.Y.2007) (internal citations omitted).

Here, Powell has undeniably failed to follow the IGP with respect to all defendants except Parker. There is no indication in the record that Powell was unfamiliar with the procedures or that they were in any way inaccessible to him, especially since he successfully filed, and appealed, a grievance about the medical care which he received from Parker. Powell does not allege, nor does the record support, a contention that he did not understand the procedure or that he was precluded from engaging in the procedure. It appears that Powell simply failed to participate in the mandatory administrative system. This failure is fatal to Powell's claim. *See generally Harris v. Gunderman,* 30 F.Supp.2d 664, 665 (S.D.N.Y.1999) (dismissing claim pursuant to the PLRA because "the exhaustion requirement [is] mandatory rather than directory ....").

*6 Therefore, defendants' motion for summary judgment should be granted on this ground as to all defendants except Parker.

### C. Personal Involvement

Defendants contend that Powell has failed to establish that defendants Fischer and Parker were personally involved in any of the alleged constitutional deprivations.

" '[P]ersonal involvement of defendantss in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1)[T]he defendants participated directly in the alleged constitutional violation;

> (2) the defendants, after being informed of the violation through a report or appeal, failed to remedy

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

the wrong;

(3) the defendants created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendants was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendants exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Fischer

Defendant Fischer, Commissioner of DOCS, was named because he had "control over all the facilities and what goes on inside them," and because Powell wrote him a letter. Defs. Statement ¶ 55. Thus, it is not alleged that Fischer was directly involved in the incidents surrounding Powell's medical care. Furthermore, to the extent Fischer is named due to his title, the lone fact that he is a supervisor is insufficient to impose personal liability. *Wright,* 21 F.3d at 501. Additionally, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a **prisoner** is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a **prisoner's** grievance or otherwise reviews and responds to a **prisoner's** complaint."). As there are no allegations, nor does the record support, that Fischer ever received the letter, let alone personally read, reviewed, or investigated its contents, Powell has failed to allege his personal involvement. Moreover, there is nothing in the record to suggest that Fischer was grossly negligent in

supervising individuals or deliberately indifferent to the rights of the **inmates** concerning provision of their medical care.

**\*7** Accordingly, defendants' motion on this ground as to Fischer should be granted.

### 2. Tedford

Defendant Tedford, Superintendent of Camp Gabriels, was named because of his supervisory position and act of denying Powell's grievance. Defs. Statement ¶ 56. As previously stated, an individual holding a supervisory position cannot be held personally involved based solely upon his or her position. *Wright,* 21 F.3d at 501. Additionally, allegations that Tedford summarily denied Powell's grievance, without more, are also insufficient to state personal involvement. *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007). Moreover, there is nothing in the record to suggest that Tedford was grossly negligent in supervising individuals or deliberately indifferent to the rights of the **inmates** concerning provision of their medical care.

Accordingly, defendants' motion on this ground as to Tedford should be granted.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the **prisoner** must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the **prisoner** must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to **inmate** health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

at 844.

" 'Because society does not expect that **prisoners** will have unqualified access to healthcare,' a **prisoner** must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the **prisoner** "to prove that the prison official knew of and disregarded the **prisoner's** serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**\*8** In this case, defendants state that Powell has failed to show an objectively serious medical need. First, the objective medical evidence has completely failed to show any type of serious knee injury. Defs. Statement ¶¶ 4-5, 7-11, 15-16, 29, 34, 36, 39, 46, 54. Contentions in the absence of such evidence have been found deficient in demonstrating a serious medical need. *See Powell v. Cusimano,* 326 F.Supp.2d 322, 339 (D.Conn.2004) ("It is clear from other cases ... that plaintiff's complaints of knee and head pain ... do not constitute a serious medical

need.") (citations omitted).

The lack of such a serious medical need is also demonstrated by Powell's own actions while he was free from incarceration. Powell contends that he suffered pain, but never once sought medical treatment. Defs. Statement ¶¶ 21-22. Powell states that he had no insurance, but the record is clear that both probation and social services offered to assist him with the application for Medicaid and arrangement of further care. *Id.* ¶¶ 23-26. Nevertheless, Powell refused to accept the assistance and never applied. *Id.* ¶ 27. Such actions belie his present claims that the pain was so severe, and the situation so urgent and dire, that he required medical attention. Moreover, Powell continued to work in labor intensive jobs during his freedom. *Id.* ¶ 20. This employment also contradicts contentions that his pain interfered with activities of daily living. As such, Powell has failed to raise a material question of fact as to whether his knee injuries constituted a serious medical condition.

Powell has also failed to establish the subjective prong of the analysis. The record belies any allegations of defendants failing to treat Powell. Upon arrival at Camp Gabriels, Parker reviewed Powell's medical records, prescribed him pain relief, and personally examined him shortly thereafter. Defs. Statement ¶¶ 33-34. Powell saw Parker about his knee pain three times in a six week period. *Id.* ¶¶ 34, 36, 39. Such actions refute any claim that a defendant delayed or interfered with treatment. The same is true of Dr. Bergamini, who examined Powell just days after Powell filed his grievance against Parker. *Id.* ¶ 44. Such actions refute any claims of delay or indifference.

Additionally, both medical professionals examined Powell and agreed that there was nothing wrong with his knees. Defs. Statement ¶¶ 34, 36, 39, 46. Such findings are supported by the prior accounts from the physical therapy department and orthopedic consults, unremarkable diagnostic tests, and normal arthroscopy findings. *Id.* ¶¶ 4-5, 7-11, 15-16, 29, 54. Despite this, Parker still continued to treat Powell by changing his knee and anti-inflammatory medication to attempt to alleviate Powell's complaints. *Id.* ¶ 38. Additionally, Dr. Bergamini showed Powell exercises which he could complete to strengthen any weakness in his knee and improve his complaints of pain and discomfort. *Id.* ¶ 47.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2010 WL 843877 (N.D.N.Y.)
(Cite as: 2010 WL 843877 (N.D.N.Y.))

**\*9** The fact that Powell continued to demand MRIs, a second opinion, and an orthopedic consultation and did not receive them are insufficient to state an **Eighth Amendment** claim. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that **inmates** be given the kind of **medical** attention that **judges** would wish to have for themselves. The essential test is one of **medical** necessity and not one simply of desirability.") (internal quotation marks and citations omitted).[FN4] As Parker explained, such extraordinary requests were unreasonable in light of the negative clinical and diagnostic findings. Powell's disagreement with such conclusions and treatment regimens are not sufficient to maintain a deliberate indifference claim. *Sonds,* 151 F.Supp.2d at 312. Therefore, no questions of fact have been shown by Powell as to whether the **medical** treatment he received complied with constitutional guarantees as it was appropriate and timely.

> FN4. After Powell was transferred and received an requested MRIs, the findings indicated that there was nothing wrong with his knees. Defs. Statement ¶ 54.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants also contends that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525, at \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* it has not been shown that defendants violated Powell's constitutional rights.

Therefore, it is recommended in the alternative that defendants' motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 40) be **GRANTED** and that judgment be entered as to all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2010.
Powell v. Fischer
Slip Copy, 2010 WL 843877 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Vincent LOWMAN, Plaintiff,
v.
Kenneth PERLMAN, Superintendent of Mid-state
Correctional Facility, Glenn Goord, Commissioner of
New York State Department of Correctional Services,
Dr. Ramineni,[FN1] Director of Administrator Health
Services, Defendants.

FN1. The Complaint and Docket misspell this
Defendant's name as "Dr. Remeinena." We will
refer to the correct spelling used in the caption.

No. 9:06-CV-0422 (LEK/RFT).

Aug. 29, 2008.

Vincent Lowman, Marcy, N.Y., pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Stephen H. Schwartz, Esq., Assistant
Attorney General, of Counsel, Albany, N.Y., for
Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 4, 2008 by the
Honorable Randolph F. Treece, United States Magistrate
Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt. No.

54). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including the
objections by Plaintiff Vincent Lowman, which were filed
on August 8, 2008. Objections (Dkt. No. 55).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
54) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

*Pro se* Plaintiff Vincent Lowman brings this civil rights action, pursuant to 42 U.S.C. § 1983, asserting that the Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. Dkt. No. 1, Compl. Specifically, Plaintiff claims that the treatment and medication he was receiving at Woodbourne Correctional Facility ("Woodbourne") for his back, knee, high blood pressure, and asthma were wrongly discontinued after his transfer to Mid-State Correctional Facility ("Mid-State"). *Id.* at p. 3. Defendants now move for Summary Judgment pursuant to Fed.R.Civ.P. 56, (Dkt. No. 42), which Plaintiff opposes (Dkt. No. 48). For the reasons that follow, it is recommended that the Defendants' Motion be **granted** and the Complaint **dismissed.**

## I. FACTS

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ( "*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically converted by the opposing party.*" (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional violations.

*2 Plaintiff was transferred from Woodbourne to Mid-State on June 28, 2005, where Defendant Dr. Ramineni was employed. Dkt. No. 42, Defs.' Mot. for Summ. J., Defs.' 7.1 Statement, at ¶ 1. During Plaintiff's first visit with Dr. Ramineni on August 18, 2005, he complained of pain in his lower back and right knee, although an examination revealed no swelling, discoloration, or any other signs of injury to his back or knee. *Id.* at ¶ 8. Dr. Ramineni prescribed Naprosyn, an anti-inflammatory drug. *Id.* On September 14, 2005, Plaintiff again complained of back and knee pain. Again, Dr. Ramineni found no inflammation nor swelling. *Id.* at ¶ 10. Plaintiff requested a magnetic resonance imaging (MRI) and a transcutaneous electrical nerve stimulator (TENS) unit, but Dr. Ramineni denied those requests as medically unnecessary. *Id.* at ¶ 11. Plaintiff's final meeting with Dr. Ramineni was on November 14, 2005. Plaintiff

complained of pain in his left knee for which he was prescribed Motrin. *Id.* at ¶ 12.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional

violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has not made any specific allegations against Defendants Perlman and Goord, nor has he advanced a theory of supervisory liability against them. *See generally* Compl. Because his Complaint is completely devoid of any mention of Defendants Perlman and Goord beyond listing them as Defendants, it is recommended that the Complaint be **dismissed** as to these Defendants.[FN2]

FN2. In addition, it appears that Plaintiff may not have intended to file this action against Defendants Perlman and Goord. In his Statement of Undisputed Material Facts, included in his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff states "[t]he plaintiff's [sic] only file [sic] a civil action against the defendant Dr. Ramineni." *See* Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., at p. 1.

### C. Eighth Amendment Claim

**\*4** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d at 66). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

### 1. Serious Medical Need

Plaintiff alleges that prior to his arrival at Mid-State, he sustained injuries to his lower back and knee and suffered from asthma and high blood pressure, and that because the

treatment he received at Woodbourne was discontinued upon his arrival at Mid-State, he suffered "swelling of the knee, continued lost [sic] of sleep, joint swelling and discoloration in the lower back area, and knee." Compl. at Statement of Facts, ¶¶ 2-4. Plaintiff also alleges that while at Mid-State he had problems going to the bathroom and may have had hemorrhoids. Compl. at [unnumbered] p. 4.

**\*5** Plaintiff's Ambulatory Health Record (AHR) reflects that he made several complaints of pain in his knee and back, but provides no additional evidence of any concrete injury beyond a pulled groin muscle he suffered while playing basketball and Dr. Ramineni's diagnosis of a sprained left knee. *See* Defs.' 7.1 Statement, Ex. A, AHR. Plaintiff has failed to allege any specific injury, serious or otherwise, with respect to his back. Plaintiff's indication that he had trouble going to the bathroom and suffered from hemorrhoids is supported by one entry in his AHR noting that he was constipated and possibly had hemorrhoids. AHR, entry dated Oct. 24, 2005. However, these conditions, without any other evidence or allegation as to their severity, are not sufficiently serious to establish an Eighth Amendment claim. *See, e.g., Cabassa v. Gummerson,* 2006 WL 1559215, at *9-10 (N.D.N.Y. Mar. 30, 2006) (evidence that plaintiff may have suffered from hemorrhoids, without more, did not establish a viable Eighth Amendment claim); *see also Kendall v. Kittles,* 2004 WL 1752818, at *6 (S.D.N.Y Aug. 4, 2004) (stating hemorrhoids "are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts.")).

With respect to Plaintiff's knee, two referral orders indicate that a MRI from August 2004 "showed possible small partial tear of [Plaintiff's] ACL [anterior cruciate ligament]," and that after a consultation with orthopedics on December 6, 2005, Plaintiff was scheduled to have arthoscopic surgery on his left knee [FN3] and possibly ACL reconstruction. Defs.' 7.1 Statement, Ex. C, Referrals, dated Nov. 28, Dec. 6, 2005, & Jan. 10, Feb. 23, 2006 & CORC Response, dated Mar. 1, 2006 (stating "CORC also notes that on 2/27/06 the greivant was referred for arthroscopic [sic] knee surgery, which is pending approval.").[FN4]

FN3. We note that it is not altogether clear which knee Plaintiff asserts was not properly treated. In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

his Complaint, Plaintiff refers nonspecifically to his knee, while his AHR entries make references to problems in both the left and right knees. *See* AHR, entries dated Aug. 18, Nov. 7, & Nov. 14, 2005. In any event, our analysis is the same.

FN4. There is no record of Plaintiff's surgery in the AHR or in any other submissions to the Court, however, Plaintiff indicated in his Opposition to the Defendants' Motion for Summary Judgment that "[i]t took [him] two or three grievances to see another doctor and have the knee surgery done." Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., Pl.'s Decl., at ¶¶ 10 & 18. Thus, it appears that at some point after February 23, 2006, Plaintiff underwent arthoscopic knee surgery.

However, even assuming that Plaintiff suffered from a small tear in his ACL, generally speaking, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." *Guarneri v. Bates,* 2008 WL 686809, at *7 (N.D.N.Y. Mar. 10, 2008)* (internal quotation marks and citations omitted). Furthermore, in this case, Plaintiff was able to walk and apparently play basketball until he pulled a groin muscle on July 8, 2005. AHR, entries dated July 8, 2005 (noting Plaintiff pulled his groin playing basketball) & Sept. 9, 2005 (noting Plaintiff's ability to walk without any pain). In addition, Dr. Ramineni noted that there was no inflammation nor restricted movement in Plaintiff's left knee. *Id.* at entry dated Nov. 14, 2005. Thus, Plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *See Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y. July 11, 2006)* (partially torn ACL in conjunction with other knee problems did not establish Eighth Amendment claim); *see also Moody v. Pickles,* 2006 WL 2645124, at *6-7 (N.D.N.Y. Sept. 13, 2006)* (holding that a "medial meniscal tear, with joint effusion," which did not render plaintiff immobile, was not a serious medical need).

### 2. *Deliberate Indifference*

**\*6** Even assuming, *arguendo,* that Plaintiff met his burden on the first prong, he has failed to establish that Dr.

Ramineni was deliberately indifferent to his medical needs. Plaintiff claims that upon being transferred from Woodbourne to Mid-State, the treatment he had been receiving for his back and left knee was arbitrarily discontinued. Plaintiff first visited with Dr. Ramineni on August 18, 2005, complaining of pain in his lower back and right knee.[FN5] AHR, at entry dated Aug. 18, 2005. Dr. Ramineni observed no inflammation nor swelling in his knee and prescribed Naprosyn, an anti-inflammatory drug. *Id.;* Defs.' Mot. for Summ. J., Subbarao Ramineni, M.D., Decl., dated Dec. 20, 2007, at ¶ 5. Plaintiff saw Dr. Ramineni on September 14, 2005, again complaining of back and knee pain and requesting a MRI, a referral to orthopedics, a TENS unit, and physical therapy. AHR, at entry dated Sept. 14, 2005. Dr. Ramineni noted Plaintiff was able to walk without any pain and showed no objective signs of swelling nor inflammation, and denied Plaintiff's requests for a MRI and TENS unit because they were "not medically indicated." *Id.* With respect to Plaintiff's request for physical therapy, Dr. Ramineni noted he had received such treatment in the past but it did not help. *Id.;* Ramineni Decl. at ¶ 8.

FN5. Plaintiff's AHR indicates that he was a "no show" for an appointment with Dr. Ramineni scheduled for July 21, 2005. AHR, entry dated July 21, 2005.

November 14, 2005, was the date of Plaintiff's last meeting with Dr. Ramineni. Ramineni Decl. at ¶ 10. Plaintiff complained of pain in his left knee, although Dr. Ramineni observed no inflammation nor restricted movement. AHR, at entry dated Nov. 14, 2005. Dr. Ramineni diagnosed Plaintiff with a sprained knee and prescribed Motrin. *Id.*

Considering this record, there is no indication that Dr. Ramineni displayed anything close to the criminal recklessness required under the Eighth Amendment subjective prong. In order to establish deliberate indifference, an individual must " 'know of and disregard an excessive risk to inmate health or safety.' " *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000)* (quoting *Chance v. Armstrong,* 143 F.3d at 702 & *Farmer v. Brennan,* 511 U.S. at 837). Although Dr. Ramineni denied Plaintiff's requests for physical therapy, a MRI, and x-ray, those denials were based on his opinion that they were not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

medically necessary as Plaintiff showed no objective signs
of serious injury such as swelling, inflammation, nor
inhibited ambulation. Furthermore, Dr. Ramineni did not
disregard Plaintiff's medical needs, but rather, prescribed
him Naprosyn and Motrin for the pain he complained of in
his knee.

Thus, Plaintiff has failed to establish that Dr. Ramineni
displayed a deliberate indifference towards his medical
needs. For the reasons stated above, this claim should be
**dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Plaintiff's Complaint (Dkt.
No. 1) be **dismissed** in its entirety and Defendants' Motion
for Summary Judgment **granted;** and it is further

**\*7 ORDERED,** that in the event the District Judge adopts
this recommendation, Plaintiff's Motion to Compel (Dkt.
No. 44) is **denied** as moot; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of
this Report-Recommendation and Order upon the parties
to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten
(10) days within which to file written objections to the
foregoing report. Such objections shall be filed with the
Clerk of the Court. *FAILURE TO OBJECT TO THIS
REPORT WITHIN TEN (10) DAYS WILL PRECLUDE
APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993) (citing Small v. Sec'y of Health and
Human Servs ., 892 F.2d 15 (2d Cir.1989)); *see also* 28
U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.
Lowman v. Perlman
Not Reported in F.Supp.2d, 2008 WL 4104554
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner/Director of Special Housing/
Disciplinary Program; Anthony Graceffo, Chief Medical
Doctor, Auburn Correctional Facility; Glenn S. Goord;
Hans Walker; Gary Hodges; D.W. Seitz; Terry A.
Halcott; Christine Coyne; Nancy O'Connor; Ann
Driscoll; John Mcclennen; John Rourke, Captain,
Security Services, Auburn Correctional Facility; Koors,
Head Pharmacist, Auburn Correctional Facility; Robert
Mitchell, Correctional Counselor, Auburn Correctional
Facility; and Androsko, Registered Nurse, Auburn
Correctional Facility, Defendants.
**No. 01-CV-1039 (DNH/GHL).**

March 30, 2006.

Samuel Cabassa, Wallkill, NY, Plaintiff, Pro Se.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, David L. Fruchter, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

GEORGE H. LOWE, United States Magistrate Judge.

### REPORT-RECOMMENDATION

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c). In this *pro se*
civil rights complaint brought under 42 U.S.C. § 1983,

Inmate Samuel Cabassa ("Plaintiff") generally alleges that
Defendants (fifteen employees of the New York State
Department of Correctional Services) violated his rights
under the First, Eighth and/or Fourteenth Amendments
between January of 1998 and August of 1998 by confining
him to the Auburn Correctional Facility Special Housing
Unit without cause or explanation, and by being
deliberately indifferent to his serious medical needs, which
included severe dehydration during his hunger strike, a
painful eye condition, a painful hemorrhoid condition, and
a deteriorating mental health condition. (*See generally*
Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No.
58.) Generally, Defendants' motion raises three issues: (1)
whether Plaintiff's claims against Defendants Mitchell,
Koors, Coyne, Halcott and Hodges should be dismissed
due to Plaintiff's failure to serve them with process, (2)
whether the majority of Plaintiff's claims should be
dismissed as barred by New York State's three-year statute
of limitations governing such claims, and (3) whether two
of Plaintiff's claims should be dismissed for lack of
personal involvement and/or failure to establish a claim
under the Eighth Amendment. (Dkt. No. 58, Part 4 [Def.'s
Mem. of Law].) For the reasons discussed below, I answer
each of these questions largely in the affirmative. As a
result, I recommend that Defendants' motion for summary
judgment be granted in part and denied in part, with leave
to renew.

### I. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is
warranted if "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). In
determining whether a genuine issue of material [FN1] fact
exists, the Court must resolve all ambiguities and draw all
reasonable inferences against the moving party. *Schwapp
v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)
(citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716,
720 (2d Cir.1990) (citation omitted). However, when the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." FN2

FN2. Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts

as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

**\*2** "If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v.. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c] ). FN3 Therefore, the Court must review the merits of the motion. *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

FN3. Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the record. FN4 A district court has no duty to perform an independent review of the record to find proof of a factual dispute. FN5 In the event the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN6] I note that, here, Plaintiff's Fourth Amended Complaint ("Complaint") is verified.

FN4. *See* Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g .*, *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN5. *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN6. *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [FN7] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN9] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN10]

FN7. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

FN8. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

personal knowledge is not satisfied by assertions made 'on information and belief.'% y(3)27 [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

FN9.  *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN10.  *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that,

in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN11]

FN11.  *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**II. ANALYSIS**

**A. Whether Plaintiff's Claims Against Defendants Mitchell, Koors, Coyne, Halcott and Hodges Should Be Dismissed Due to Plaintiff's Failure to Serve Them with Process**

In their Memorandum of Law, Defendants argue that Auburn C.F. Corrections Counselor Robert Mitchell, Auburn C.F. Pharmacist "Mr. Koors," Auburn C.F. Nurse Christine Coyne, Auburn C.F. C.O. Terry A. Halcott and Gowanda C.F. Superintendent Gary Hodges are not properly "Defendants" in this action because they were never served with process. (Dkt. No. 58, Part 4 at 2.)

I find that this argument is factually supported by the record. Specifically, the docket in this action shows that, in the nearly two years between the filing of Plaintiff's (Fourth Amended) Complaint on February 3, 2003, and the filing of Defendants' motion for summary judgment on January 28, 2005, Plaintiff repeatedly failed to take the steps necessary to have these five individuals served with process,[FN12] despite being twice ordered by the Court to provide "any documents that are necessary to maintain this action" (e.g., USM 285 Forms),[FN13] and despite the agreement of two of the five individuals to permit the

DOCS' Counsel's Office to accept service on their behalf if an Acknowledgment of Receipt by Mail of Summons and Complaint were sent to DOCS' Counsel's Office.[FN14] Because of Plaintiff's failure to provide the necessary USM 285 Forms, service was not effected on these five individuals.[FN15]

FN12. (Dkt. No. 43 [documents, filed on 3/29/04, showing that Gary Hodges could not be served with process and that Plaintiff had to submit a new USM 285 form if he wished service to again be attempted]; Dkt. No. 45 [Notice to Plaintiff from U.S. Marshals Service, filed on 4/19/04, informing him that he failed to properly sign his USM 285 forms]; Dkt. No. 50 [Notice to Plaintiff from U.S. Marshals Service, filed on 7/9/04, that Plaintiff failed to provide USM 285 forms for each Defendant].)

FN13. (Dkt. No. 17 at 3-4 [Order of Judge Hurd, filed on 3/27/03, directing that, *inter alia,* "the Clerk shall issue summonses and forward them ... to the United States Marshal for service upon Defendants .... [and] Plaintiff shall ... comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action"], *accord,* Dkt. No. 21 at 2-3 [Order of Judge Hurd, filed on 10/15/03].)

FN14. (Dkt. No. 47 [letter to Court from DOCS' Counsel filed on 5/26/04, informing Court that Defendants Coyne and Halcott have authorized DOCS' Counsel to accept service on their behalf if an Acknowledgment of Receipt by Mail of Summons and Complaint were sent to DOCS' Counsel].)

FN15. (Dkt. No. 26 [documents, filed on 11/17/03, showing that Christine Coyne could not be served with process because "she is no longer employed by the Dept. of Corrections and her whereabouts is unknown"]; Dkt. No. 34 [documents, filed on 12/3/03, showing that Terry A. Halcott could not be served with process because the U.S. Marshals Service "tried unsuccessfully to contact Ms. Halcott. She has

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

not been employed by the Dept. of Corrections for several years"]; Dkt. No. 43 [documents, filed on 3/29/04, showing that Gary Hodges could not be served with process because "service of process ... was attempted [unsuccessfully] on 11/6/03]; Dkt. No. 51 [documents, filed on 8/5/04, showing that Robert Mitchell and Mr. Koors could not be served with process because "Mr. Mitchell retired to Florida several years ago and [DOCS has no record of anyone] named Koors currently employed at" Auburn C.F."]; Dkt. No. 57 [documents, filed on 12/14/04, showing that Gary Hodges could not be served with process because he was "no longer employed at Gowanda C.F."].)

**\*3** Plaintiff acknowledges this failure to serve, but blames the failure on (1) opposing counsel (Assistant Attorney General David L. Fruchter), whom he says promised to "locate ... and serve [these five individuals] on [Plaintiff's] behalf," and (2) two of his named Defendants (Terry Halcott and Gary Hodges), whom he argues "twice refused to accept service from the U.S. Marshal." (Dkt. No. 60, Part 4 at 2 [Plf.'s Mem. of Law].) I can find no evidentiary support for these conclusory arguments. Furthermore, I am unconvinced by Plaintiff's legal argument that opposing counsel somehow abrogated or assumed Plaintiff's legal duty to provide USM 285 forms to the U.S. Marshals Service.

The only plausible argument that Plaintiff has that the failure to serve was not his fault is with respect to Defendants Coyne and Halcott. As indicated above, Defendants Coyne and Halcott authorized the DOCS' Counsel's Office (on or about May 26, 2004) to accept service on their behalf. The U.S. Marshals Service then informed Plaintiff (on or about July 9, 2004) that he needed to provide them with new USM 285 Forms. However, no record exists of Plaintiff having done so in a timely manner (or at all). Under the circumstances, I find the failure to serve was Plaintiff's fault, not the U.S. Marshal's fault. [FN16] Even after receiving notice of Defendants' failure-to-serve argument through the filing of their summary judgment motion in January of 2005, Plaintiff has not taken the steps necessary to effectuate service on these two individuals (or the other three individuals).[FN17]

FN16. See Davidson v. Talbot, 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at \*6-7, 21-23 (N.D.N.Y. March 31, 2005) (Scullin, C.J.) (reaching same conclusion where U.S. Marshal's Service notified the plaintiff that, if he desired further attempts of service on two defendants, he must notify the U.S. Marshal's Service in writing, which the plaintiff did not do; also finding that two other defendants were properly served where they had authorized the DOCS' Counsel's Office to accept service on their behalf, *and the plaintiff had provided proper USM 285 forms for those two defendants* ).

FN17. See Webber v. Hammock, 973 F.Supp. 116, 121 (N.D.N.Y.1997) (Scullin, J.) (holding that, even if initial failure to serve Defendant Hammack in 1990 was attributable to U.S. Marshal's Service, due to its failure to reasonably infer that when Plaintiff referred to "Dr. Hammock" he meant Dr. Hammack, "this error may have constituted 'good cause' for the Court to allow an extension of time for service of Defendant Hammack in 1990, [but] it is now 1997" and "[t]he Court cannot, at this point in time, overlook the Plaintiff's failure to serve the Defendants with a complaint that was filed in 1990").

As a result, I recommend that the Court dismiss Plaintiff's claims against Defendants Mitchell, Koors, Coyne, Halcott and Hodges under the Local and Federal Rules.[FN18] In the alternative, I would recommend dismissal of nearly all Plaintiff's claims against these five individuals (i.e., all of Plaintiff's claims except his claim, asserted in his "Fourth Cause of Action," that Defendant Mitchell violated Plaintiff's Fourteenth Amendment rights by failing to provide "meaningful review" of Plaintiff's status in administrative segregation), based on Plaintiff's violation of the three-year statute of limitations governing such claims, as discussed below in Part II.B. of this Report-Recommendation.

FN18. See Fed. R. Civ. 16(f) ("If a party ... fails to obey a scheduling or pretrial order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

just [including dismissal]...."); Fed.R.Civ.P. 4(m) ("If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); N.D.N.Y. L.R. 4.1(b) ("General Order 25 ... requires ... service of process upon all defendants within sixty (60) days of the filing of the complaint.... In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4.").

**B. Whether the Majority of Plaintiff's Claims Should Be Dismissed as Barred by the Statute of Limitations**

Defendants argue that the vast majority of Plaintiff's claims are barred by New York State's three-year statute of limitations governing such claims. (Dkt. No. 58, Part 4 at 3-5.) However, Plaintiff responds correctly that, under "the prison mail box rule," his original Complaint should be deemed as having been "filed" with the Court when he handed that Complaint to a corrections officer to be mailed.[FN19] In addition, Plaintiff has persuaded me, through the submission of record evidence, that he handed the original Complaint in this action to a corrections officer for mailing on June 20, 2001.[FN20] Even if Plaintiff had submitted no such record evidence, I would conclude that the date that Plaintiff handed his original Complaint to corrections officers at Auburn C.F. for mailing was June 20, 2001, based on the date Plaintiff signed that Complaint (June 20, 2001) (Dkt. No. 1 at 20).[FN21]

FN19. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (applying the rationale of *Houston v. Lack,* 487 U.S. 266 [1988], regarding the filing date of appeals in *habeas corpus* proceedings, to prison civil rights actions filed pursuant to 42 U.S .C. § 1983); *accord, Pritchard v. Kelly,* 98-CV-0349, 2000 WL 33743378, at *2 & n. 2 (N.D.N.Y. Oct. 3, 2000) (Sharpe, M.J.).

FN20. (Dkt. No. 60, Part 5 at 3-4 [referenced by Plaintiff as Exhibits "A1" and "A2," containing two New York State Department of Correctional

Services Disbursement or Refund Requests, signed by Plaintiff, addressed to the Clerk's Office of this Court, and dated 6/20/01].) Evidence like this was found sufficient in *Dory v. Ryan,* 999 F.2d 679, 681 (2d Cir.1993) ("[Plaintiff's] argument is substantiated by a copy of the Department of Correctional Services form demonstrating that he had submitted his legal papers to prison officials prior to the official filing of the complaint.").

FN21. *See Minguez v. C.O. Nelson,* 96-CV-5396, 2004 WL 324898, at *3 (S.D.N.Y. Feb. 20, 2004) ("Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed.").

*4 However, this does not end the inquiry. Also needing to be determined is the date of the events giving rise to each of the claims asserted in Plaintiff's (Fourth Amended) Complaint. Generally, I agree with Defendants and not with Plaintiff regarding the dates of the events giving rise to each of Plaintiff's claims in this action. (*Compare* Dkt. No. 58, Part 4 at 3-5 with Dkt. No. 60, Part 4 at 5-6.) After carefully scrutinizing Plaintiff's (Fourth Amended) Complaint, I find that, liberally construed, Plaintiff's claims, and the dates of the events giving rise to those claims, are accurately summarized as follows:

(1) **January 12, 1998-January 13, 1998**-Defendant Seitz violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when he authored an Administration Segregation ("AS") recommendation without first making an independent inquiry as to the reliability and credibility of the confidential informants (who provided the information upon which that recommendation was based). (Dkt. No. 16, ¶¶ 6-6(3) ["First Cause of Action"] );

(2) **January 14, 1998**-Defendant Gummerson violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when, after a disciplinary hearing, he accepted Defendant Seitz's recommendation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

without first making an independent inquiry as to the reliability and credibility of the confidential informants (who provided the information upon which that recommendation was based) (Dkt. No. 16, ¶¶ 6[4]-6[5] ["Second Cause of Action"] );

(3) **March 11, 1998**-Defendants Goord and Selsky violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when they affirmed on appeal and "deliberately fail[ed] to overturn the faulty disciplinary conviction" of January 14, 1998 (Dkt. No. 16, ¶¶ 6[6]-6[10] ["Third Cause of Action"] );

(4) **January 14, 1998-June 22, 1998**-Defendants Walker, Rourke, Seitz and Mitchell violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when they repeatedly failed to provide meaningful review of his status in administrative segregation despite the existence of grounds that required such review (Dkt. No. 16, ¶ 6[18] ["Fourth Cause of Action"] );

(5) **June 19, 1998-June 22, 1998**-Defendants Walker, Gummerson and Seitz violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment, and his right of access to the courts under the First Amendment, when they intentionally delayed his release from SHU for three days (i.e., from June 19, 1998, to June 22, 1998), despite knowing of the issuance of a state court decision requiring Plaintiff's release from SHU (Dkt. No. 16, ¶¶ 6 [11]-6[17] ["Fifth Cause of Action"] );

(6) **January 25, 1998**-Defendants Walker and Hodges violated Plaintiff's rights under the Eighth Amendment when they deliberately interfered with Plaintiff's necessary access to emergency medical treatment outside Auburn C.F. (e.g., for dehydration, malnutrition, and ketosis) (Dkt. No. 16, ¶¶ 6 [23]-6[26] [first part of "Sixth Cause of Action"];

**\*5** (7) **February 19, 1998-May 13, 1998**-Defendant Hodges violated Plaintiff's rights under the Eighth Amendment when he repeatedly "vetoed" Defendant Graceffo's plan to safely break Plaintiff's hunger strike

with a special diet (Dkt. No. 16, ¶¶ 6[36], 6[52]-6[55], 6[58]-6[61] [second part of "Sixth Cause of Action"];

(8) **February 17, 1998-February 19, 1998** and **April 6, 1998-April 20, 1998**-Defendants O'Connor and Holcott violated Plaintiff's rights under the Eighth Amendment when they deliberately tormented him through the sadistic use of bright light on him when he was in the facility's infirmary (causing him eye pain, migraine headaches, etc.) (Dkt. No. 16, ¶¶ 6[33]-6[34], 6[51] ["Seventh Cause of Action"] );

(9) **January 14, 1998-January 25, 1998**-Defendant Androsko violated Plaintiff's rights under the Eighth Amendment when she was deliberately indifferent to Plaintiff's serious medical needs and failed to competently diagnose his medical conditions (e.g., dehydration, malnutrition, and ketosis) (Dkt. No. 16, ¶¶ 6[20]6[23] ["Eighth Cause of Action"] );

(10) **January 25, 1998-January 31, 1998, February 17, 1998-March 4, 1998** and **March 28, 1998**-Defendants Driscoll, O'Connor, McClellan and/or Graceffo violated Plaintiff's rights under the First and Eighth Amendments when they tampered with and falsified Plaintiff's medical records to worsen his condition and/or to "oust" him from the facility's infirmary, in retaliation against his hunger strike (Dkt. No. 16, ¶¶ 6[27]-6[28], 6[35], 6[50] ["Ninth Cause of Action"]);

(11) **February 11, 1998-May 13, 1998**-Defendant Graceffo violated Plaintiff's rights under the First and Eighth Amendments when he was repeatedly deliberately indifferent to Plaintiff's serious medical eye condition (for a twenty-five day period), his serious hemorrhoid condition, and his serious mental health condition in retaliation against Plaintiff's hunger strike (Dkt. No. 16, ¶¶ 6[32], 6[44]-6[47], 6[52]-6[55], 6[58], 6[61] [part of "Tenth Cause of Action," part of "Eleventh Cause of Action," "Twelfth Cause of Action," part of "Thirteenth Cause of Action," and part of "Fifteenth Cause of Action"] );

(12) **March 2, 1998-March 28, 1998**-Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

O'Connor, Koors, and McClellan violated Plaintiff's rights under the Eighth Amendment when they were repeatedly deliberately indifferent to Plaintiff's serious medical eye condition in retaliation against Plaintiff's hunger strike (Dkt. No. 16, ¶¶ 6[37]-6[43], 6[48]-6[49] [remainder of "Tenth Cause of Action," and "Fourteenth Cause of Action"] );

(13) **January 14-1998-January 25, 1998** and **May 19, 1998**-Defendant Androsko violated Plaintiff's rights under the Eighth Amendment when he was repeatedly deliberately indifferent to Plaintiff's serious medicals needs when she denied Plaintiff pain medication for his migraine headaches and medication for his serious hemorrhoid condition (Dkt. No. 16, ¶ 6[21], 6[63] [remainder of "Eleventh Cause of Action"] );

***6** (14) **February 11, 1998-April 15, 1998**-Defendant Coyne violated Plaintiff's rights under the Eighth Amendment when he was deliberately indifferent to Plaintiff's serious mental health needs (Dkt. No. 16, ¶¶ 6 [32], 6[57] [remainder of "Thirteenth Cause of Action"];

(15) **January 12, 1998-May 15, 1998**-Defendants Walter, Hodges, Rourke, Gummerson, Seitz, Mitchell, Halcott, Coyne, O'Connor, Driscoll and McClellan violated Plaintiff's rights under the First and Eighth Amendments by retaliating against Plaintiff's hunger strike and/or filing of grievances, and by being deliberately indifferent to Plaintiff's serious medical needs (*see generally* Dkt. No. 16, ¶¶ 6[1]-6[62] [remainder of "Fifteenth Cause of Action"];

(16) **July of 1998**-An unspecified "Defendant" violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff medication and access to a specialist outside Auburn C.F., for treatment of Plaintiff's serious hemorrhoid condition (Dkt. No. 16, ¶ 6[64] [unspecified cause of action] ); and

(17) **August of 1998**-Defendant Graceffo violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff access to contact lenses, which had been mailed to the Auburn C.F. medical

department and were to be delivered to Plaintiff, and when he told Plaintiff that he would have to wait one year for such contact lenses (Dkt. No. 16, ¶ 6[65] [unspecified cause of action] ).

As is evident from this summary of Plaintiff's claims, Plaintiff's (Fourth Amended) Complaint contains only four claims that appear to be permitted under the applicable three-year limitations period-i.e ., the claims listed above as "(4)," "(5)," "(16)" and "(17)." No matter how liberally I construe Plaintiff's (Fourth Amended) Complaint, I simply cannot find that the events forming the basis of the other claims-including claims "(7)," "(11)," "(13)," "(14)" and "(15)"-occurred after June 19, 1998. Nor can I grant Plaintiff's request (in his opposition papers) that I consider all of his claims as part of some massive conspiracy against him which continued until (or through) the day he was discharged from SHU on June 22, 1998 (Dkt. No. 60, Part 4 at 6.)

As an initial matter, it is questionable whether the "continuing violation" doctrine, which is typically applied in discrimination actions, may also be applied in actions filed pursuant to 42 U.S.C. § 1983.[FN22] Even assuming that the doctrine may be applied to actions filed pursuant to Section 1983, it should be remembered that "few attempts to invoke the doctrine are successful ... and the ... doctrine is disfavored in the Second Circuit." [FN23] It should also be remembered that, to be available, the doctrine requires proof of "a dogged pattern of related acts." [FN24]

> FN22. *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision"

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

regarding, inter alia, the application of the continuing violation doctrine).

FN23. *Konigsberg v. Lefevre,* 267 F.Supp.2d 255, 263 (N.D.N.Y.2003) (Munson, S.J.) [citations omitted]; *McFarlan,* 1998 U.S. Dist. LEXIS 5541, at *11.

FN24. *Konigsberg,* 267 F.Supp.2d at 263; McFarlan, 1998 U.S. Dist. LEXIS 5541, at *11.

Here, I find that Plaintiff's reliance on the "continuing violation" doctrine is misplaced given that Plaintiff's claims (even as liberally construed) allege, overwhelmingly, merely a series of (approximately three-dozen) isolated and unrelated actions taken by one or more of fifteen individuals at various times over a seven-month period at different locations within Auburn C.F., which actions (allegedly) constitute a variety of different constitutional violations.[FN25] I note that Plaintiff has not adequately stated a claim for (or even alleged the existence of) a conspiracy under either 42 U.S.C. § 1983 or 42 U.S.C. § 1985.[FN26] Any implicit allegations by Plaintiff in his (Fourth Amended) Complaint that these isolated acts are somehow linked are conclusory and unsupported by the record.

FN25. *(See generally* Dkt. No. 16, ¶¶ 6-6[65].) *See Verley v. Goord,* 02-CV-1182, 2004 U.S. Dist. LEXIS 857, at *25-26 (S.D.N.Y. Jan. 22, 2004) ("Because these doctors' involvement consisted of isolated acts ... the doctrine of 'continuing violation' cannot be applied to toll the statute of limitations as to [the inmate's] claims" of deliberate indifference to a serious medical need against two defendants for inappropriately cancelling the inmate's appointments for a liver biopsy.); *Konigsberg,* 267 F.Supp.2d at 263 ("Plaintiff's claims concerning the DOCS personnel at Auburn [C.F.], outside the limitations period, do not amount to a continuing violation or a continuous set of events that can be anchored to some event within the limitations period that expired many years ago.").

FN26. *See Rodriguez v. Selsky,* 2003 U.S. Dist. LEXIS 23087, at *12-16 (S.D.N.Y.2003) (rejecting plaintiff's continuing violation argument where, although plaintiff had alleged that defendants' isolated actions were part of a conspiracy, plaintiff failed to state a prima facie claim for conspiracy because, in part, he alleged no facts indicating that there was an *agreement* among defendants to deprive him of any rights), *aff'd sub nom, Rodriguez v. McElroy,* 04-0618, 2005 U.S.App. LEXIS 5288 (2d Cir. Apr. 1, 2005).

*7 Nor can I find any evidence (or even an argument) that the Court should toll the three-year limitations period with respect to any claims that are time barred due to an allegation that Defendants' actions somehow inhibited Plaintiff from filing this action.[FN27]

FN27. I note that Plaintiff acknowledges that, while he was in SHU during this time period, he filed other actions (e.g., a disciplinary decision appeal, a letter complaint, a grievance, and a state court action). (Dkt. No. 16, ¶¶ 6[6], 6[11], 6[43], 6[48] .)

Finally, it appears that Plaintiff's claims against seven of the Defendants (Hodges, Coyne, Driscoll, McClennen, Rourke, Koors, and Mitchell) should be found to be time barred for an additional reason. Even assuming that the continuing violation doctrine applies to all of Plaintiff's claims in his (Fourth Amended) Complaint, the sole reason that Plaintiff's claims against these seven Defendants (which were *first* asserted in Plaintiff's Second, Third or Fourth Amended Complaints) would be considered timely would be if they "related back" to the claims asserted in Plaintiff's original Complaint filed on June 20, 1999. *See* Fed.R.Civ.P. 15(c). However, it does not appear that Plaintiff's claims against these seven Defendants do in fact relate back to the claims in the original Complaint, which does not mention or clearly concern them.[FN28] Plaintiff himself appears to acknowledge this fact.[FN29]

FN28. (*See* Dkt. No. 1 [naming only Gummerson, Selsky and Graceffo as Defendants;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

and mentioning only Seitz, Androsko, Walker, Goord, O'Connor, and Halcott as additional wrongdoers in the Complaint].)

FN29. (Dkt. No. 40 [letter dated 12/30/03 from Plaintiff to Court, stating, *inter alia,* that "most of them [referring to Defendants Hodges, Rourke, Mitchell, Androsko and Koors] were added as defendants sometime during my third or fourth amend[ed] complaint"].)

Under the circumstances, it would appear to be unfair to these seven Defendants to permit Plaintiff to benefit from the "relation back" rule with respect to his otherwise untimely claims against them.[FN30] (For example, during the passage of time between when Plaintiff filed his original Complaint on June 20, 1999, and when he finally got around to asserting claims against Defendants Coyne, Hodges, Mitchell, and Koors, it appears that they left employment with DOCS.)[FN31]

FN30. *See Doe v. Blake,* 809 F.Supp. 1020, 1025-1026 (D.Conn.1992) (finding that because the DOCS Commissioner "was not named in plaintiff's original *pro se* complaint ... relation back [under Rule 15] is not appropriate here, as [the Commissioner] did not receive, within the limitations period, such notice of the institution of the action that he would not be prejudiced in maintaining a defense").

FN31. (Dkt. No. 26 [documents, filed on 11/17/03, showing that Christine Coyne could not be served with process because "she is no longer employed by the Dept. of Corrections and her whereabouts is unknown"]; Dkt. No. 43 [documents, filed on 3/29/04, showing that Gary Hodges could not be served with process because "service of process ... was attempted [unsuccessfully] on 11/6/03]; Dkt. No. 51 [documents, filed on 8/5/04, showing that Robert Mitchell and Mr. Koors could not be served with process because "Mr. Mitchell retired to Florida several years ago and [DOCS has no record of anyone] named Koors currently employed at" Auburn C.F.]; Dkt. No. 57 [documents, filed on

12/14/04, showing that Gary Hodges could not be served with process because he was "no longer employed at Gowanda C.F."].)

Although this last point provides merely an alternative reason for dismissing the claims against five of the seven Defendants based on untimeliness, it provides the sole reason for dismissing Plaintiff's claims against two of the Defendants (Defendants Rourke and Mitchell) in Plaintiff's "Fourth Cause of Action" based on untimeliness (since I previously found those claims to be timely).

As a result, I recommend that the Court dismiss all of Plaintiffs claims as barred by the applicable statute of limitations, *except* (1) the claims asserted against Defendants Walker and Seitz in Plaintiff's "Fourth Cause of Action," (2) all of the claims asserted in Plaintiff's "Fifth Cause of Action," (3) Plaintiff's claim that in July of 1998 an unspecified Defendant violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff treatment for his serious hemorrhoid condition, and (4) Plaintiff's claim that in August of 1998 Defendant Graceffo violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff access to contact lenses. (Dkt. No. 16, ¶¶ 6[64], 6[65], 7.)

**C. Whether Plaintiff's Last Two Claims Should Be Dismissed for Lack of Personal Involvement and/or Failure to Establish a Claim under the Eighth Amendment**

**1. Plaintiff's Claim Against an Unidentified Defendant for Deliberate Indifference to Plaintiff's Alleged Hemorrhoid Condition in or about July of 1998**

**\*8** Defendants argue that Plaintiff's claim for deliberate indifference to his (alleged) hemorrhoid condition in or about July of 1998 should be dismissed for two independent reasons. First, Defendants argue that Plaintiff has failed to establish (or even allege in his Fourth Amended Complaint) that any particular Defendant was personally involved in the alleged denial of adequate medical care of Plaintiff's (alleged) hemorrhoid condition in or about July of 1998. (Dkt. No. 58, Part 2 at 6-7 [citing Paragraph 6(64) of Plf.'s Compl.].) Second, Plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

failed to establish that his (alleged) hemorrhoid condition constituted a *sufficiently serious medical condition* for purposes of the Eighth Amendment, or that any Defendant exhibited the sort of reckless disregard necessary to show *deliberate indifference* to that serious medical condition for purposes of the Eighth Amendment. (Dkt. No. 58, Part 2 at 6-7.)

**a. Personal Involvement**

As to Defendants' first legal argument, I find that argument factually and legally supported. Defendants are correct that Plaintiff fails to identify, in his (Fourth Amended) Complaint, which Defendant (allegedly) denied him pain medication in or about July of 1998. (Dkt. No. 16, ¶ 6[64] [Plf.'s Compl., alleging, "On or about July, 1998, defendant denied plaintiff pain relief medication for his hemorrhoidal condition and access to all outside consult with a specialist for same."].) I agree with Defendants that such a claim fails as a matter of law, especially where (as here) Plaintiff has been given the opportunity to conduct discovery and amend his complaint and still has not identified which Defendant is the subject of his claim.[FN32]

> FN32. *See Shomo v. City of New York,* 03-CV-10213, 2005 WL 756834, at *9 (S.D.N.Y. Apr. 4, 2005) (granting Rule 12[b][6] motion to dismiss inmate's Section 1983 claims of deliberate indifference to a serious medical need due, in part, to the plaintiff's failure to name which individuals allegedly ignored medical instructions, and his use instead of the passive voice when discussing how his alleged injuries were inflicted; stating that the plaintiff "must identify the party responsible for his injuries").

While this conclusion needs no further support, it is further supported by the fact that, in his Memorandum of Law, Plaintiff responds only to the second legal argument advanced by Defendants (regarding the two elements of a deliberate indifference claim), while failing to address the first argument (regarding personal involvement). (Dkt. No. 60, Part 4 at 14-22.) Under the Local Rule 7.1(b)(3), Plaintiff is deemed to have consented to the granting of Defendants' motion based on this first argument.[FN33]

> FN33. *See Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

I note that buried in Plaintiff's opposition papers are two pieces of paper suggesting that Plaintiff may have complained to Defendant O'Connor of hemorrhoids, or shown symptoms of hemorrhoids, on April 26, 27, and 28 1998; and that Plaintiff may have complained to Defendant Graceffo of hemorrhoids, or shown symptoms of hemorrhoids, on April 29, 1998. (Dkt. No. 60, Part 6 at 12-13 [referred to by Plaintiff as "Ex. A69-70"].) Setting aside the fact that those records also indicate that Plaintiff repeatedly refused to let Defendant O'Connor examine and/or treat those hemorrhoids, the fact remains that this "evidence" is too slender a reed to grasp onto to save Plaintiff's deficient claim regarding his hemorrhoid condition. Even if Plaintiff did make such complaints, or exhibit such symptoms, on April 26 through 29, 1998, Plaintiff has adduced no evidence that Defendants O'Connor or Graceffo heard such complaints or observed such symptoms in *July of 1998,* or (more importantly) that

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

they did anything to *deprive* Plaintiff of adequate medical care (e.g., a prescribed pain medication, or an authorized consult with a specialist outside the facility) regarding his (alleged) hemorrhoid condition at that time. [FN34]

> [FN34.] There is also the fact that, if the Court permitted Plaintiff's vague and conclusory claim (stated in Subparagraph "64" to Paragraph 6 of his Complaint) to survive based on these two pieces of paper, the Court would be (1) simply guessing that Plaintiff intended his claim to be against Defendants O'Connor and/or Graceffo (as opposed to some other Defendant), and (2) in effect, permitting Plaintiff to amend his (Fourth Amended) Complaint after discovery has closed, thus prejudicing those two Defendants, who have relied on the plain meaning of Plaintiff's allegations.

*9 Because I recommend dismissal of this claim based on Plaintiff's failure to establish the personal involvement of any Defendant in the alleged constitutional deprivation, I need not reach Defendants' alternative argument that Plaintiff has failed to meet either of the two elements of the test for a claim for deliberate indifference to a serious medical need under the Eighth Amendment. However, for the sake of thoroughness, I will briefly address that argument.

**b. Elements of Eighth Amendment Claim**

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

Here, Defendants make the following factual assertions regarding Plaintiff's (alleged) hemorrhoid condition in their Rule 7.1 Statement: "There are no entries in plaintiff's Ambulatory Health Record during the time period January 13, 1998 through September 24, 1998

indicating that Plaintiff complained of hemorrhoids or symptoms of hemorrhoids [and][t]here are no entries whatsoever in Plaintiff's Ambulatory Health Record for the month of July 1998." (Dkt. No. 58, Part 2, ¶¶ 9, 10.) I find that these assertion are supported by the record. (Dkt. No. 58, Part 3, ¶¶ 10-12 & Ex. B.) Moreover, Plaintiff does not specifically controvert these factual assertions in his Rule 7.1 Response. (Dkt. No. 60, Part 2, ¶ 9 [setting forth assertions that are non-responsive to Defendants' assertions].) Therefore, Defendants' factual assertions are deemed admitted by Plaintiff, under Local Rule 7.1(a)(3).

Defendants attempt to use these two factual assertions to support their argument that Plaintiff has failed to establish both elements of the above two-part test for Eighth Amendment denial-of-medical-care claims. Specifically, they argue that, because there is no evidence in Plaintiff's "Ambulatory Health Record" of any complaints about (or symptoms of) a hemorrhoid condition, Plaintiff has not shown that he has established that he even had a hemorrhoid condition (much less a hemorrhoid condition that was so serious as to be of constitutional proportions). Moreover, they argue that, because there is no evidence in Plaintiff's "Ambulatory Health Record" that he made complaints about any medical conditions (or received treatment for any medical conditions) in July of 1998, Plaintiff has not shown that any medical staff at Auburn C.F. even had an opportunity to be deliberately indifferent to his alleged hemorrhoid condition. (Dkt. No. 58, Part 2 at 6-7.)

Liberally construed, Plaintiff's opposition papers offer only one piece of evidence in opposition to this argument-two pieces of paper (the same as discussed above) suggesting that Plaintiff may have complained to Defendant O'Connor of hemorrhoids, or shown symptoms of hemorrhoids, on April 26, 27, and 28 1998; and that Plaintiff may have complained to Defendant Graceffo of hemorrhoids, or shown symptoms of hemorrhoids, on April 29, 1998. (Dkt. No. 60, Part 6 at 12-13 [referred to by Plaintiff as "Ex. A69-70"].) Again, the problem with this "evidence" is that, while it might bear on whether Plaintiff had a hemorrhoid condition in *July of 1998* (three months later), it does not bear on whether any such condition in July of 1998 was sufficiently serious for purposes of the Eighth Amendment, whether Plaintiff complained of that condition (or exhibited symptoms of that condition) in July of 1998, whether Plaintiff was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

prescribed pain medication or authorized to attend a consult with a specialist outside the facility in July of 1998, and (most importantly) whether any Defendant interfered with that (allegedly) prescribed pain medication or authorized consult.

**\*10** Under the circumstances, I agree with Defendants that Plaintiff has failed to establish either element of the two-part test for denial-of-medical-care claims under the Eighth Amendment. As a result, I recommend that the Court dismiss Plaintiff's claim for deliberate indifference to his hemorrhoid condition.

**2. Plaintiff's Claim Against Defendant Graceffo for Deliberate Indifference to Plaintiff's Eye Condition in or about August of 1998**

Plaintiff alleges that "[o]n or around August, 1998, plaintiff required that he be provided with the contact lens that was mailed into medical for min [sic] because he never got it and defendant GRACEFFO told him he had to wait one year].) (Dkt. No. 16, ¶ 6[65].) Defendants argue that this claim against Defendant Graceffo should be dismissed because Plaintiff has failed to establish that Defendant Graceffo was personally involved in the (alleged) denial of adequate medical care in question. (Dkt. No. 58, Part 2 at 8.)

In support of their argument, Defendants make numerous factual assertions regarding Defendant Graceffo's lack of personal involvement in their Rule 7.1 Statement. *(See* Dkt. No. 58, Part 2, ¶¶ 1-8.) I find that each of these factual assertions are supported by the record. Moreover, Plaintiff does not specifically controvert these factual assertions in his Rule 7.1 Response. (Dkt. No. 60, Part 2, ¶¶ 1-8 [setting forth assertions that either repeat Defendants' factual assertions or that are non-responsive to Defendants' assertions].)

The closest Plaintiff comes to controverting these factual assertions is in Paragraphs 5, 6 and 8 in his Rule 7.1 Response. With regard to Paragraph 5, Plaintiff fails to specifically deny that "Dr. Graceffo has never examined plaintiff's vision"; rather, Plaintiff implicitly argues that Dr. Graceffo in effect examined Plaintiff's vision by

referring Plaintiff to a contact lens clinic on or about August 18, 1997, April 11, 2000, and April 18, 2000. *(Compare* Dkt. No. 58, Part 2, ¶ 5 *with* Dkt. No. 60, Part 2, ¶ 5.) Setting aside whether or not Plaintiff's implicit argument is supported by the record, Plaintiff's implicit argument is not the sort of specific denial required by Local Rule 7.1.(a)(3). In addition, Plaintiff's implicit argument is non-responsive.[FN35]

> **FN35.** For example, Plaintiff's assertion does not bear on whether or not Dr. Graceffo had first-hand knowledge *in July and August of 1998* of the *results* of an examination of Plaintiff's vision, which is the thrust of the relevance of Defendants' factual assertion. (Dkt. No. 60, Part 6 at 47, 50, 51 [cited by Plaintiff as "A104," "A107," and "A108" respectively].)

With regard to Paragraph 5, Plaintiff fails to specifically deny that "Dr. Graceffo has no control over when or even if, [sic] an inmate receives contact lenses"; rather, Plaintiff asserts essentially that "it is well settled" that medical specialists outside of prison merely make recommendations to prison doctors (such as Dr. Graceffo), who are the inmate's primary treating physicians and who make the ultimate decision as to the medical issue addressed by the medical specialists. *(Compare* Dkt. No. 58, Part 2, ¶ 6 *with* Dkt. No. 60, Part 2, ¶ 6.) The maze of record citations through which Plaintiff attempts to lead the Court does not lead to any evidence that supports Plaintiff's factual assertion. *(See* Dkt. No. 60, Part 2, ¶ 6 [citing to Paragraphs 11-12 and 19 of Plf.'s Aff., which cite only to either an unattached "Ex. B" or to Paragraphs 7-9 of the Aff., which again cite to the unattached "Ex. B"].) Even if, by "Ex. B," Plaintiff is referring to the "NYSDOCS Request & Report of Consultation" dated August 18, 1998 (Dkt. No. 60, Part 6 at 47[elsewhere referred to by Plaintiff as "Ex. A104"), at most this evidence (if the document is indeed signed by Defendant Graceffo) suggests that Dr. Graceffo may *request* that Plaintiff receive a consult at an eye clinic; it does not mean that Dr. Graceffo is making the ultimate decision (or has any control over the decision) as to when or if Plaintiff *receives* contact lenses.[FN36]

> **FN36.** I note that, logically, the only way that this document could possibly suggest that Dr.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

Graceffo had some modicum of "control" over when or if Plaintiff received contact lenses would be if it were established that (1) the only way that Plaintiff could receive contact lenses was if he were referred to an eye clinic outside Auburn C.F., and (2) Dr. Graceffo was the only doctor at Auburn C.F. who could have referred Plaintiff to an eye clinic outside Auburn C.F. Setting aside whether or not Plaintiff has established such facts, I decline to engage in such hair splitting of Defendants' factual assertion, especially considering (1) Plaintiff's failure to specifically controvert Defendants' factual assertion, and (2) the fact that Plaintiff does not allege in his Complaint that the wrongs that Dr. Graceffo committed included any failure to refer Plaintiff to an eye clinic outside Auburn C.F. (and, therefore, any such dispute of fact created would not be material to this motion).

*11 Finally, with regard to Paragraph 8, Plaintiff fails to specifically deny that "Dr. Graceffo has no involvement with the distribution of contact lenses prescribed to inmates at Auburn Correctional Facility"; rather, Plaintiff, in a nearly incomprehensible sentence, appears to argue that Dr. Graceffo must have had such involvement since Plaintiff's contact lenses were sent to the facility medical department (due to the fact that he was "too weak to ambulate or travel because of being on a hunger strike"). *(Compare* Dkt. No. 58, Part 2, ¶ 8 *with* Dkt. No. 60, Part 2, ¶ 8.) The "evidence" Plaintiff cites in support of this assertion are certain portions of his Complaint and Affidavit. (Dkt. No. 60, Part 2, ¶ 8 [citing Plf.'s Compl., ¶¶ 6(38), 6(42)-(44), 6(48)-(49), and Plf.'s Aff., ¶¶ 13-19].) It is perhaps of little surprise (given the presumptive and speculative nature of Plaintiff's factual assertion) that Plaintiff's "evidence" fails to establish (or even suggest) that Dr. Graceffo knew of, or was to play any part in, the medical department's alleged planned receipt and delivery of Plaintiff's contact lenses in or about August of 1998.

In light of the foregoing, Defendants' factual assertions (regarding Defendant Graceffo's lack of personal involvement) in their Rule 7.1 Statement are deemed admitted by Plaintiff, under Local Rule 7.1(a)(3). Given the nature of these assertions about the process by which an inmate receives glasses and contact lenses, and Defendant Graceffo's limited role (or complete lack of a

role) in that process in or about August of 1998, I find that they support Defendants' legal argument in favor of dismissal due to lack of personal involvement.

Plaintiff's memorandum of law spends much effort attempting to create a material issue of fact regarding the general issue of whether Defendant Graceffo (and three other Defendants) were deliberately indifferent to Plaintiff's serious medical needs regarding his eye condition. *(See, e.g.,* Dkt. No. 60, Part 4 at 14-22 [Plf.'s Mem. of Law].) The main problem with Plaintiff's argument is that the vast majority of it fails to address the precise issue at hand (i.e., whether Defendants were personally involved in the alleged denial of Plaintiff's receipt by mail of his contact lenses in August of 1998). *(See id.* [mostly containing argument regarding whether Plaintiff's medical need for contact lenses was sufficiently serious for constitutional purposes, or what the standard is for deliberate indifference to such a serious medical need].) To the extent Plaintiff does address the issue at hand, he fails to cite any record evidence.

For example, Plaintiff argues *conclusorily* that Defendant Graceffo was "sufficiently made aware" of Plaintiff's medical need to wear contact lenses because he "dealt with the plaintiff's medical records [which contained a code used to identify the plaintiff's permission to wear contact lenses] on a daily basis." *(Id.* at 16 [containing no record cite].) In addition, Plaintiff argues *vaguely* and *conclusorily* that, at some point, "Defendant Graceffo issued plaintiff a medical pass granting him authorization to wear his tinted glasses inside of the prison." *(Id.* at 19 [containing blank record cite].) Finally, Plaintiff argues *conclusorily* that Defendant Graceffo "confiscated [Plaintiff's] new contact lens, interefer[ed] with the treatment once prescribed for his serious visual medical need, and intentionally delay[ed] the delivery of his prescribed contact lens cleaning supplies...." *(Id.* at 19 [containing no record cite].) I note that, again, the Court has no duty to independently review the record to find proof of a factual dispute regarding the issue at hand.

*12 Even if the Court did find, in the record, evidence of Defendant Graceffo's *knowledge* of Plaintiff's general eye condition, such evidence would not establish Defendant Graceffo's personal involvement in the alleged constitutional deprivation. Still missing would be any

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

evidence establishing that Plaintiff was indeed going to be receiving contact lenses by mail in August of 1998,[FN37] that Defendant Graceffo *knew* that Plaintiff was to be receiving contact lenses by mail in August of 1998, and that Defendant Graceffo somehow *interfered* with Plaintiff's receipt of the contact lenses by mail in August of 1998.

> FN37. Although this fact is not determinative of my conclusion, I do find it worthy of mentioning that the DOCS Health Service Policy cited by the parties (Policy No. 1.03) provides that "CONSISTENT WITH DOCS DIRECTIVE 4911, INMATES ARE NOT ALLOWED TO RECEIVE PRESCRIPTION EYE WEAR THROUGH THE FACILITY PACKAGE ROOM." (Dkt. No. 58, Part 3 [Ex. A to Graceffo Aff.].)

As a result, I recommend that the Court dismiss Plaintiff's claim against Defendant Graceffo for deliberate indifference to Plaintiff's eye condition in or about August of 1998.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 58) be *DENIED* to the extent it seeks dismissal of (1) the claims asserted against Defendants Walker and Seitz in the "Fourth Cause of Action" of Plaintiff's Fourth Amended Complaint (Dkt. No. 16, ¶¶ 6[18], 7), and (2) the claims asserted against Defendants Walker, Gummerson and Seitz in the "Fifth Cause of Action" of Plaintiff's Fourth Amended Complaint (Dkt. No. 16, ¶¶ 6[11]6[17], 7), but that Defendant's motion be *GRANTED* in all other respects; and it is further

**ORDERED** that, following the Court's final Order on Defendants' motion for summary judgment, Defendants shall have *THIRTY (30) DAYS* in which to file a second motion for summary judgment (if they choose to do so) with regard to any of Plaintiff's claims that have not been dismissed due to a failure to serve or due to a violation of the three-year statute of limitations governing such claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)
(Cite as: 2006 WL 1555656 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner/Director of Special Housing/Disciplinary
Program; Anthony Graceffo, Chief Medical Doctor,
Auburn Correctional Facility; Glenn S. Goord; Hans
Walker; Gary Hodges; D.W. Seitz; Terry A. Halcott;
Christine Coyne; Nancy O'Connor; Ann Driscoll; John
McClellen; John Rourke, Captain Security Services at
Auburn Correctional Facility; Koors, Head Pharmacist
at Auburn Correctional Facility; Robert Mitchell,
Correctional Counselor at Auburn Correctional Facility;
and Androsko, Registered Nurse, Auburn Correctional
Facility, Defendants.
No. 9:01-CV-1039.

June 1, 2006.

Samuel Cabassa, Wallkill, NY, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, David Fruchter, Esq., Asst. Attorney General, of
counsel, Albany, NY, for Defendant Department of Law,
the Capitol.

***ORDER***

DAVID N. HURD, United States District Judge.

**\*1** Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated March 30, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,

recommended that defendants' motion for summary
judgment be denied to the extent it seeks dismissal of (1)
the claims asserted against defendants Walker and Seitz in
the Fourth Cause of Action of plaintiff's Fourth Amended
Complaint; and (2) the claims asserted against defendants
Walker, Gummerson, and Seitz in the Fifth Cause of
Action of Plaintiff's Fourth Amended Complaint, but that
defendants' motion be granted in all other respects.
Objections to the Report Recommendation have been filed
by all parties.

Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have
objected, the remainder of the Report-Recommendation is
accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The objections to the Report Recommendation are
REJECTED;

2. The defendants' motion for summary judgment is
DENIED to the extent it seeks dismissal of:

a. The claims asserted against defendants Walker and
Seitz in the Fourth Cause of Action of plaintiff's Fourth
Amended Complaint; and

b. The claims asserted against defendants Walker,
Gummerson, and Seitz in the Fifth Cause of Action of
Plaintiff's Fourth Amended Complaint;

3. The defendants' motion is GRANTED in all other
respects; and

4. The remaining claims in plaintiff's Fourth Amended
Complaint are DISMISSED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)
(Cite as: 2006 WL 1555656 (N.D.N.Y.))


IT IS SO ORDERED.


N.D.N.Y.,2006.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2006 WL 1555656
(N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Cyril KENDALL, Plaintiff,
v.
C.O. KITTLES, Shield No. 15396; C.O. Charles, Shield
No. 10739; C.O. Johnson; C.O. Cunningham; Frank
Squillante; William J. Fraser; New York City Dept. of
Correction; Rikers Island Correctional Facility,
Defendants.
**No. C0 Civ. 628(GEL).**


Aug. 4, 2004.

Cyril Kendall, plaintiff pro se.

Michael A. Cardozo, Corporation Counsel for the City of
New York, New York, N.Y. (Hillary A. Frommer) for
defendants Kittles, Charles, Squillante and Fraser, of
counsel.


OPINION AND ORDER


LYNCH, J.

**\*1** This action concerns allegations by plaintiff Cyril
Kendall that he was denied certain medical
accommodations and housing conditions while he was a
pre-trial detainee at Rikers Island Correctional Facility
("Rikers"), and that these denials infringed his
constitutional right to be free from cruel and unusual
punishment. Defendants Kittles and Charles are
corrections officers at Rikers, defendant Squillante is the
Warden of the North Infirmary Command unit where
Kendall was housed at Rikers, and defendant Fraser is the
former Commissioner of the New York City Department
of Correction. All four defendants now move for summary

judgment and, for the reasons that follow, the motion will
be granted.


BACKGROUND


Kendall was arrested on March 13, 2002, and was held as
a pre-trial detainee at the North Infirmary Command
("NIC") unit at Rikers. (Frommer Decl., Ex. D.) Kendall
filed his Complaint in this action on January 28, 2003,
asserting that during his time at Rikers he was denied
medically-indicated accommodations for his asthma and
for his hemorrhoid condition.[FN1]

> FN1. Kendall conducted no discovery in this
> action, and the only discovery taken by
> defendants was to subpoena Kendall's medical
> records. Although Kendall complains in his
> opposition brief that he was unable to take
> discovery due to his incarceration, he was
> provided ample opportunity for discovery by the
> Court and neither complained to the Court about
> his inability to take discovery during this period
> nor sought any assistance in doing so. Indeed,
> even now Kendall does not ask for any further
> discovery or suggest what discovery might be
> relevant or helpful. Accordingly, the Court will
> view the record as closed for purposes of
> summary judgment, and the factual discussion
> below will be drawn from the documentary
> evidence attached to Kendall's Complaint or
> submitted as exhibits to the Declaration of
> Assistant Corporation Counsel Hillary Frommer.


*Asthma* and Non-Smoking Housing


Kendall's medical records indicate that on August 26,
2002, Dr. Adriana Vives of the NIC medical clinic
requested that Kendall be housed in a non-smoking area
"for medical reasons." (Frommer Decl., Ex. A.) The same
request was made again by Dr. Vives, again without
further explanation, on September 24, 2002. (*Id.*) Neither
request mentioned Kendall's alleged asthma. When
Kendall visited the medical clinic at NIC on September

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

30, 2002, the treating physician noted that Kendall had previously complained of swelling in his neck, hands and lips, but that none of these conditions had been observed during any of Kendall's previous visits to the clinic. (*Id.,* Ex. J.) Apparently Kendall himself reported to the treating physician during this visit that his previously-complained-of swelling had resolved and that he had "no breathing difficulty." (*Id.*) The doctor noted that the physical exam revealed neither swelling, nor signs of recent swelling, in the face, eyes, lips, tongue, or neck. (*Id.*)

On January 4, 2003, Kendall apparently fell from his bed and was discovered unconscious on the floor of his cell around ten p.m. (*Id.,* Ex. K.) He was attended by emergency medical technicians at Rikers and transferred by ambulance to Elmhurst General Hospital within thirty minutes. (*Id.*) Kendall returned to Rikers on January 6, after refusing a transfer to Bellevue Hospital for further evaluation. (*Id.*) Kendall avers that he "passed out" due to secondhand smoke inhalation. (P. Mem. & Aff. ¶ 15.) It is undisputed that Kendall remained in a smoking-permitted housing unit throughout his time at Rikers.

*Hemorrhoids*

Kendall was treated at the Bellevue Hospital Rectal Clinic for swollen hemorrhoids on September 9, 2002. (Frommer Decl., Ex. J.) On October 4, 2002, Dr. Vives requested that Kendall be allowed to keep bottled water and some additional food in his cell "for medical reasons." (*Id.,* Ex. A.) Kendall avers that he was not provided with bottled water and was denied access to a water fountain, and so had to drink water from the sink in his cell. (P. Mem. & Aff. ¶¶ 7-8.) On the same day, Dr. Vives prescribed a "donut" pillow for Kendall to sit on, as well as stool softeners and suppositories, all to relieve his discomfort from the hemorrhoid condition. (Frommer Decl., Ex. J.) On October 10, 2002, Kendall again visited the Bellevue Rectal Clinic; the treatment notes from the second visit state that Kendall was "doing well" following a rubber band ligation procedure to address a prolapsed hemorrhoid. (*Id.*) Kendall received follow-up care at the NIC clinic on October 11 and 15, 2002. (*Id.*) On November 11, 2002, Physician's Assistant Allen Walker requested that Kendall be allowed an extra sheet to use for privacy while using the toilet, and that he be allowed to

hold material to change his surgical dressings in his cell. (*Id.,* Ex. A.) Kendall avers that the defendants denied him these recommended supplies. (P. Mem. & Aff. ¶¶ 14-15.) On November 13, 2002, Dr. Vives filed a consultation request for Kendall to be seen again at the Bellevue Rectal Clinic for additional treatment. (Frommer Decl., Ex. J.) Kendall was seen at Bellevue the following day and received an additional rubber band ligation on another prolapsed hemorrhoid; the treating physician noted that a "small amount of bleeding is normal" and requested a follow-up visit in five weeks. (*Id.*) On December 12, 2002, Kendall refused to attend his next scheduled visit to the Bellevue Rectal Clinic, despite having the medical consequences of such refusal explained to him. (*Id.*)

**\*2** Throughout the fall of 2002, Kendall was repeatedly seen and treated in the NIC medical clinic for a series of other medical complaints-flu-like symptoms, podiatry complaints, pain in his shoulder, difficulty digesting prison food, etc. (*Id.*)

*Exhaustion of Administrative Remedies*

On September 26, 2002, Kendall's counsel in his criminal case wrote to Warden Squillante, alerting him to the medical staff's recommendations of surgery for Kendall's hemorrhoid condition and transfer to a non-smoking housing unit on account of Kendall's asthma. (Frommer Decl., Ex. A.) Kendall asserts, both in the Complaint and in the sworn Affidavit submitted in opposition to the defendants' summary judgment motion, that he attempted to file a formal grievance with Mohammed Akinlolu, the Grievance Coordinator at NIC, but was told by Akinlolu that his complaints did not qualify as a grievance. (*Id.,* P. Mem. & Aff. ¶ 11.) According to Kendall, Akinlolu refused even to document these conversations. (*Id.*) Kendall also states that he requested and was denied an interview with the Grievance Resolution Committee at Rikers, and that he was unable to make any further efforts to comply with the Rikers grievance procedures because he was housed in protective custody, without access to the grievance form kept in another part of the prison, and because various corrections officers refused his requests to supply him with grievance forms. (*Id.* ¶¶ 11-12.)

Unsurprisingly, defendants dispute Kendall's version of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

pursuit of administrative remedies for his complaints. Grievance Coordinator Akinlolu declares in a sworn affidavit that Kendall had free and unimpeded access to grievance forms. (Frommer Decl., Ex. B. ¶ 3.) Akinlolu recalls discussing with Kendall his complaints regarding non-smoking housing and the desire to keep food and water in his cell, but Akinlolu avers that he merely told Kendall that, in order to grieve medical concerns, he would need written physician authorization for each request. (Id. ¶¶ 4-5.) Defendants have also submitted sworn affidavits from Arthur Harris, the director of the Inmate Grievance Resolution Program for the New York City Department of Corrections, and from Tonya Glover, intake secretary for the Board of Correction, both asserting that a diligent search of the relevant records reveals no grievance or other correspondence from Kendall regarding his desire to be placed in non-smoking housing or the alleged denial of medical accommodations. (Id., Exs. F & H.) Defendant Squillante testified by affidavit that he never received any correspondence from Kendall. (Id., Ex. G.) Finally, defendants Charles and Kittles likewise testified by affidavit that neither of them (i) were aware of any medical condition suffered by Kendall, (ii) were ever shown or given any medical authorizations regarding Kendall, (iii) ever denied Kendall access to a water fountain, or (iv) ever prohibited or prevented Kendall from keeping bottled water or food in his cell. (Id., Exs. L & M.)

**\*3** Defendants previously moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6). In an Opinion and Order dated September 15, 2003, this Court granted the motion as to defendants Johnson and Cunningham for lack of service, and as to defendants New York City Department of Corrections and Rikers Island Correctional Facility on the ground that they are non-suable agencies of the City of New York under the New York City Charter. The motion was denied as to all other defendants. Those remaining defendants filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on April 9, 2004.

DISCUSSION

I. *Standard on Summary Judgment*

Summary judgment must be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. *Id.* at 255; *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ") (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

II. *Exhaustion of Administrative Remedies*

On their motion for summary judgment, defendants renew the argument made in their motion to dismiss that plaintiff's claims cannot succeed because he has failed to exhaust the available administrative remedies before bringing this action. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

An action for deliberate medical indifference is an action "with respect to prison conditions," and is thus subject to the PLRA's exhaustion requirements. *See, e.g., Harris v. N.Y.C. Dept. of Corrections,* 00 Civ. 7164(NRB), 2001 WL 845448, at *2 (S.D.N.Y. July 25, 2001). Where exhaustion of administrative remedies is required, failure to do so must result in dismissal of the claims. *Neal v. Goord,* 267 F.3d 116, 117 (2d Cir.2001). As a number of courts in this district have detailed, and as defendants outline in their motion for summary judgment, prisoners in the custody of the New York City Department of Corrections must complete a three-step inmate grievance procedure, including two levels of appeals, to exhaust their administrative remedies. *See, e.g., McCoy v. Goord,* 255 F.Supp.2d 233, 246 (S.D.N.Y.2003).

**\*4** However, where a prison fails to provide access to grievance forms, a prisoner's complaint cannot be dismissed for failure to exhaust. *See Feliciano v. Goord,* 97 Civ. 263(DLC), 1998 WL 436358 (S.D.N.Y. July 27, 1998) (denying dismissal on failure to exhaust grounds where corrections officers refused to provide inmate with grievance forms); *Burns v. Moore,* 99 Civ. 977(LMM), 2002 WL 91607, at * 5 (S.D.N.Y. Jan. 24, 2002) ("if an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether he ... had any available administrative remedies"). The plain language of the statute requires only "available" administrative remedies to be exhausted. *See Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from utilizing is not an "available" remedy under § 1997e(a)") (internal quotations omitted). Common sense and fundamental fairness support this reading. A custodian cannot prevent an inmate's access to a grievance procedure, thereby frustrating the inmate's attempt to resolve his complaints administratively, and then defend against the inmate's subsequent lawsuit by faulting the inmate for failure to exhaust the administrative process. Congress could not have intended the PLRA's administrative exhaustion requirement to produce such a Kafkaesque result. On similar reasoning, a custodian may be estopped from arguing that an inmate failed to exhaust administrative remedies where the custodian previously informed the inmate that the complaints were "non-grievable." *See Feliciano,* 1998 WL 436358, at *2; *Davis v. Frasier,* 98 Civ. 2658(HB), 1999 WL 395414, at *4 (S.D.N.Y. June 15, 1999).

The parties present in the instant motion the same factual dispute that was presented on the motion to dismiss. As noted above, plaintiff claims that he did not fail to exhaust "available" administrative remedies because the actions of various corrections officials prevented him from availing himself of the inmate grievance procedure, both by denying him access to the proper forms and by informing him that his complaints were not grievable. (P. Mem. & Aff. ¶¶ 10-13.) Defendants claim that plaintiff's allegations are not true and that he had numerous opportunities to comply with the available grievance procedures but simply chose not to. (D. Mem. 3-5, 12-14; Frommer Decl., Exs. F-H, L-M.) The only difference between the presentation of this dispute in the two motions is that plaintiff has now submitted a sworn affidavit, and defendants have supplemented their factual presentation with additional sworn affidavits. However, the core factual dispute as to whether Kendall did or did not have access to grievance forms during the relevant period, and was or was not told by corrections officials that his complaints were nongrievable, remains. Whatever the relative persuasiveness of defendants' affidavit testimony versus plaintiff's affidavit testimony, such credibility determinations are properly for a jury, not for this Court on a motion for summary judgment.

**\*5** Viewing all evidence and making all reasonable inferences in the plaintiff's favor, as the Court must on summary judgment, the defendants have failed to establish that there is no material factual dispute as to the availability of administrative remedies, or that no reasonable fact-finder could find for the plaintiff on this issue. Defendants' argument that they are entitled to summary judgment because plaintiff has submitted "no evidence" is unavailing; Kelly's own sworn affidavit, relating his version of the conversation with Akinlolu and his experience trying to secure grievance forms, does constitute evidence creating a factual dispute, whatever defendants' views on its credibility. Accordingly, the motion for summary judgment on the ground of failure to comply with the requirements of the PLRA is denied.

III. *Section 1983 and the Eighth Amendment*

However, as to the substance of Kendall's claims-that the denial of requests for non-smoking housing and to be allowed to keep food, bottled water, and extra sheets and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

surgical dressing in his cell violated his Constitutional rights, the defendants' motion for summary judgment will be granted because, even accepting Kendall's version of disputed facts, his claims do not rise to the level of a Constitutional violation.

Kendall predicates his section 1983 claim on the Eighth Amendment, which protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). To establish an Eighth Amendment violation in the context of denial of medical care or accommodation, an inmate must show that prison officials acted with "deliberate indifference" to the inmate's serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05; *Fulmore v. Mamis,* 2001 WL 417119 at *7 (S.D.N.Y. Apr. 23, 2001); *Carbonell v. Goord,* 2000 WL 760751 at *6 (S.D.N.Y. Jun. 13, 2000). The requirement has two prongs-an objective inquiry as to whether the deprivation of medical attention is "sufficiently serious," and a subjective inquiry as to whether the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (*Hathaway II* ).

As to the first prong, it is well established that more than discomfort or minor injury is required in order for a plaintiff to demonstrate a serious medical need. *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (serious medical need may be demonstrated if "unnecessary and wanton infliction of pain" results, or if the denial of treatment causes an inmate to suffer a life-long handicap or permanent loss of function); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*Hathaway I* ) (the standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain.") *Compare Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief"); *Henderson v. Doe,* 98 Civ. 5011(WHP) 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture fragment, bone cyst and degenerative arthritis not sufficiently serious) *with Chance v.*

*Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (asserting that suffering "great pain" for six months from abscessed teeth where plaintiff could not chew properly and choked on his food, rose to the level of sufficiently serious condition); *Hathaway I,* 37 F.3d at 67 (finding that plaintiff had serious medical needs where his degenerative hip condition required surgery prior to incarceration and produced extreme pain that led to registered complaints on almost seventy occasions); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days was sufficiently serious).

**\*6** Kendall's complaints, even viewing the evidence in the light most favorable to him, simply do not rise to the level of Constitutional seriousness. Although placement in non-smoking housing would undoubtedly be preferable, from a health perspective, to exposure to secondhand smoke from other prisoners, there is no evidence that Kendall suffered any serious health consequences from this housing. The medical consultation forms that recommend he be transferred to non-smoking housing do not specify any medical condition, nor do they suggest that any serious consequences will result if the transfer does not occur. (Frommer Decl., Ex. A.) Kendall's medical records indicate that he was examined for his complaints of swelling due to secondhand smoke exposure, and that those complaints were not substantiated. (*Id.,* Ex. J.) Kendall himself told medical personnel that his previously-complained-of swelling had subsided and that he had no further breathing difficulties. (*Id.*) The one serious incident was the apparent fall that rendered Kendall unconscious. However, the medical records clearly indicate that Kendall received prompt and appropriate treatment, including hospitalization at a non-prison facility, and that Kendall refused further evaluation or treatment, even though he was advised of the possible medical consequences. (*Id.,* Ex. K.) No reasonable factfinder could, on this record, conclude that the failure to transfer Kendall to a non-smoking housing unit was "sufficiently serious" as to constitute a deprivation of Eighth Amendment rights.

The record similarly does not support a finding of a Constitutional violation with regard to Kendall's hemorrhoid condition. Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed "sufficiently

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

serious" by other courts. Moreover, Kendall's medical records indicate that he received frequent and appropriate medical treatment for this condition, and that the only time he was without medical care for his hemorrhoids was when Kendall refused to attend a scheduled visit to the Bellevue Rectal Clinic for a follow-up exam. (*Id.,* Ex. J.) The medical recommendation that Kendall be allowed to keep bottled water and extra food in his cell is not, on its face, even connected to his hemorrhoid condition (it appears connected to Kendall's complaints to NIC clinic staff about his difficulty adjusting to prison food). (*Id.,* Exs. A & J.) However, even assuming that the recommendation was related to the hemorrhoids, there is no evidence that the alleged failure to follow this recommendation caused any health consequences whatsoever for Kendall, much less consequences that are "sufficiently serious" to constitute an Eighth Amendment violation.

Finally, Kendall's allegations in his Complaint about the alleged failure of corrections officers to allow him an extra sheet or extra surgical dressing in his cell are not, at bottom, complaints about medical care, but rather amount to an argument that Kendall suffered embarrassment due to the difficulty of hiding the physical consequences of his hemorrhoid condition. (*Id.,* Ex. A.) While the Court sympathizes with Kendall's embarrassment, some loss of privacy and attendant loss of dignity is an inevitable consequence of incarceration, and so long as no serious medical consequences result, these allegations likewise do not amount to a Constitutional deprivation.

*7 As to the second prong of the inquiry, an official will be found to act with "deliberate indifference" to a prisoner's needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Mere negligence, even that which is tantamount to medical malpractice, does not amount to an Eighth Amendment violation. *Estelle v. Gamble,* 429 U.S. at 106; *Hathaway I,* 37 F.3d at 66 (2d Cir.1994) ("[d]eliberate indifference requires more than mere negligence, but less than conduct undertaken for the very purpose of causing harm"). On the present record, no reasonable factfinder could conclude that Kendall has satisfied this standard-chiefly because, as noted above, the

recommendations that were allegedly disregarded (request for non-smoking housing, request to keep bottled water and extra food in cell, request for "personal care" items such as an extra sheet for privacy and extra surgical dressing) did not constitute "an excessive risk to inmate health or safety." Thus, even accepting Kendall's testimony that defendants Kittles, Charles, and Squillante were all aware of the medical recommendations and aware of Kendall's complaints and requests, their alleged disregard of these recommendations does not give rise to a Constitutional violation.

All of the medical evidence in this case indicates that, while in the custody of the New York City Department of Corrections, Kendall received frequent, prompt, and appropriate medical treatment for his hemorrhoid condition, as well as for a variety of other complaints, both substantiated and unsubstantiated. (Frommer Decl., Exs. A, J, K .) Even though Kendall was denied requested transfers to non-smoking housing, and may have been denied permission to keep bottled water and extra food in his cell, there is no evidence that any of the medical personnel that examined or treated Kendall on a nearly weekly basis observed or noted any serious consequences from these circumstances. In short, the record of Kendall's time at Rikers does not remotely demonstrate the kind of callous disregard of the inmate's needs that is "repugnant to the conscience of mankind" and incompatible with "evolving standards of decency" that would constitute cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. at 105-06. Accordingly, the defendants' motion for summary judgment on Kendall's section 1983 and Eighth Amendment claims is granted.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted on the grounds that plaintiff has failed to establish an Eighth Amendment violation.

SO ORDERED:

S.D.N.Y.,2004.
Kendall v. Kittles
Not Reported in F.Supp.2d, 2004 WL 1752818

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))


(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Ernesto DEJESUS, Plaintiff,
v.
Dr. Lester WRIGHT and Dr. Mario Douyon De
Azevedo [FN1], Defendants [FN2].

> FN1. Plaintiff refers to this defendant as Dr.
> Azevedo. According to the Acknowledgment of
> Service, the person in question is Dr. Mario
> Douyon De Azevedo. (Dkt. No. 23). The court
> will refer to this defendant by using the proper
> spelling.

> FN2. The court includes only the remaining
> defendants in the caption.

No. 9:06-CV-1496.

Sept. 10, 2009.

Ernesto Dejesus, Malone, NY, pro se.

Office of the Attorney General, State of New York, Adele
M. Taylor-Scott, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Respondent.

*DECISION AND ORDER*

FREDERICK J. SCULLIN, JR., Senior District Judge.

**\*1** Currently before the Court is Magistrate Judge Gustave
J. DiBianco's Report-Recommendation filed August 7,

2009 to which the parties have filed no objections. On
August to Magistrate Judge DiBianco's
Report-Recommendation to on or before August 31, 2009.
Thereafter, plaintiff has filed no objections to said
Report-Recommendation. Accordingly, the Court having
reviewed that Report and Recommendation and the entire
file in this matter, the Court hereby

**ORDERS** that the Report-Recommendation of Magistrate
Judge Gustave J. DiBianco filed August 7, 2009 is
**ACCEPTED** in its entirety, for the reasons stated therein,
and the Court further

**ORDERS** that the motion for summary judgment on
behalf of defendants, Drs. Wright and De Azevedo is
**GRANTED,** and the Court further

**ORDERS** that the remaining claims are **DISMISSED IN
THEIR ENTIRETY,** and the Court further

**ORDERS** that the Clerk of the Court is to enter judgment
in favor of the defendants and close this case.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate
Judge.

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Frederick
J. Scullin, Jr., Senior United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y.
72.3(c).

In this amended civil rights complains [FN3], plaintiff alleges
that Dr. Lester Wright and Dr. Mario Douyon De Azevedo
were deliberately indifferent to plaintiff's serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

need of care for nerve damage in his left knee. (Dkt. No. 7 ("Am.Compl.")). Plaintiff seeks substantial monetary relief. (Am. Compl. at 14-15 [FN4]).

> FN3. In this recommendation, the court will only discuss plaintiff's remaining claims. Plaintiff abandoned several claims against other defendants when he filed his Amended Complaint. (Dkt. No. 7). The court dismissed any claims against Nurse Warner because the Amended Complaint failed to state any specific claims against her. (Dkt. No. 8). On a motion to dismiss by Defendants Good, Eagen and Wright, Senior District Judge Scullin granted the motion in part, and dismissed claims against Defendants Goord and Eagen. (Dkt. No. 35).

> FN4. Where the court can refer to plaintiff's numbered paragraphs, it will. On the pages where there are no numbered paragraphs, the court will refer to the page number.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 51). Plaintiff opposes the motion, and has filed a response in opposition to the motion. (Dkt. No. 54). This court recommends that defendants' motion to dismiss be granted, and the case be dismissed as to the remaining defendants, Drs. Wright and De Azevedo.

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the " 'the pleadings, depositions, answers to interrogatories, and admissions on the file, together with any affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

*2 If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

### 2. *Facts*

Plaintiff is currently incarcerated at Franklin Correctional Facility in Malone, New York. (Dkt. No. 56). The following is largely repeated from Senior District Judge Scullin's March 2008 Memorandum Decision and Order granting in part, and denying in part a motion to dismiss by some of the defendants. (Dkt. No. 35). It is not necessary to recount plaintiff's entire medical history related to his knee because of the very limited claims that remain in this action. In his amended complaint, plaintiff

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

states that, prior to his incarceration, he suffered an injury to his left knee. (Am. Compl., Facts at ¶ 1). Upon entering the Department of Correctional Services ("DOCS") system, plaintiff asserts that he sought treatment for his knee injury. *Id.* Plaintiff does not provide specific dates in the complaint, but claims he was evaluated, and it was determined that plaintiff would need surgery. Plaintiff was referred to a specialist, Dr. Mitchell Rubinovitch, who performed a total knee replacement on November 2, 2004. (Am. Compl., Facts at ¶¶ 2-3, 11). Although the operation appeared to have been successful, shortly after the surgery, plaintiff told his medical providers that he was experiencing severe pain and numbness in his left foot.[FN5] *Id.* at ¶¶ 3, 12.

FN5. The court notes that plaintiff's amended complaint appears to have two sets of facts. The beginning of plaintiff's amended complaint states facts very generally with no dates associated with certain events. *See* Am. Compl., at ¶¶ 1-10. Then, plaintiff returns to the beginning of his story and realleges some of the events from the beginning of the complaint, together with dates and names of individuals involved in the events. *Id.* at ¶¶ 11-49. The court has attempted to piece together plaintiff's entire story from both sections of the complaint.

The surgeon initially informed plaintiff that the numbness was normal after surgery and that the feeling in plaintiff's foot would return. (Am. Compl., Facts at ¶ 3). Dr. Rubinovitch prescribed physical therapy, and plaintiff asked the therapist about the loss of feeling in his left foot. *Id.* at ¶ 4. According to plaintiff, the therapist told plaintiff that what he was feeling was not the normal result of knee surgery and that the foot should have recovered from any "normal" loss of sensation. *Id.*

Plaintiff stated that on a routine visit to Dr. Craig Richards[FN6] sometime after the November 2004 surgery, he told the doctor that the pain in his leg was "excruciating;" and therefore, plaintiff was scheduled for an appointment with Dr. Rubinovitch. (Am. Compl., Facts at ¶ 13). Plaintiff states that, by letter dated January 27, 2005, Dr. Rubinovitch notified Dr. Richards about the increased pain in plaintiff's foot and discussed the possibility that plaintiff had some nerve damage that was causing the pain.

*Id.* at ¶ 14. On February 25, 2005, plaintiff told Dr. Rubinovitch that the pain in his left foot had not improved, and the doctor recommended that plaintiff's physical therapy be extended for an additional eight weeks. Plaintiff claims that on February 27, 2005, Dr. Rubinovitch specifically asked Defendant Dr. Wright to extend plaintiff's physical therapy, but on March 28, 2005, Defendant Dr. Wright denied the request. *Id.* at ¶¶ 16-17. According to plaintiff, on April 28, 2005, Defendant Dr. Wright again denied the extended physical therapy but approved an orthopedic consultation. *Id.* at ¶ 18.

FN6. Dr. Richards is a physician at Upstate Correctional Facility and is not named as a defendant in this case.

*3 Defendant Dr. Wright submitted a declaration in which he denied that he was personally involved in any decision-making about plaintiff's physical therapy,

I do not personally review requests for consult. When a request is made, it is sent to an outside reviewer, APS, a nationally certified utilization review company, used by many fortune [sic] 500 companies that contracts with DOCS to perform this service. APS can either approve or disapprove a request or refer it back to the facility provider for more information. The entire process is done electronically between my coordinated specialty care staff, APS and the facility where the **inmate** is housed. If the facility provider wants to appeal a denial, the provider directs the appeal to one of the five regional medical directors, senior physicians who work directly for me. If the regional medical director denies the appeal, the facility can appeal that decision to me. That did not happen in this case.

(Dkt. No. 51, Wright Dec'l at ¶¶ 6-11). The medical records show that on February 23, 2005, Physical Therapist Roberts requested approval for eight more visits to increase plaintiff's range of motion and strength in his knee and ankle. (Dkt. No. 51, Wright Dec'l, Ex. B at 42[FN7]). In the notes for plaintiff's physical therapy on March 2, 2005, the provider[FN8] wrote "Pls. extend for 3x/wk for 12 visits to continue improvement to knee range of motion ...". (Dkt. No. 51, Wright Dec 'l, Ex. B at 44).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

FN7. Defendants failed to number any of the pages in any of the exhibits. The court, therefore, numbered the pages.

FN8. The provider's name and title are illegible.

The medical records do not include a February 27, 2005 request by Dr. Rubinovitch to Defendant Wright to extend physical therapy. However, the medical records do show letters from Dr. Rubinovitch to Dr. Craig Richards on both January 27 and March 31, 2005.FN9 (Dkt. No. 51, Wright Dec'l, Ex. B at 32 and 45. In the January letter, Dr. Rubinovitch requests, "[p]lease continue his Physical Therapy and include his pain meds. I would like to see him back here in 2 month's time to check on him further." *Id.* at 32. A handwritten notation in the upper-right corner of the January letter states "OK" followed by the date "2/6/05". It is unclear who made the handwritten notation. In the March letter to Dr. Richards, Dr. Rubinovitch states, "I would appreciate him still having some Physical Therapy to work on both strength and extension of his knee ... I would like to see him again in 3 month's time to check on his progress." *Id.* at 45. A handwritten notation along the right side of the March 31 letter starts with the letters "Cl" followed by the date "4/12/05". *Id.* The handwriting continues, "Done Albany refused more PT," then "I already consulted more PT," followed by illegible initials and the date "4/12/05". *Id.* Again, it is unclear who made the notations, and the initials are illegible. *Id.*

FN9. Plaintiff separately submitted over 200 pages of documents related to his case, including the two letters dated January 27 and March 31, 2005. However, plaintiff does not submit any letter from Dr. Rubinovitch dated February 27, 2005.

The final two pages of the medical records attached as Exhibits to Defendant Dr. Wright's Declaration are computer printouts. (Dkt. No. 51, Wright Dec'l, Ex. B at 46-47). The computer printouts are titled "Health Services System" and "Referral Decision" and appear to be copies of the exact same computer printout. *Id.* The first copy included in the medical records shows that a referral request dated March 3, 2005 was denied. *Id.* at 46. The medical records submitted by defendants do not include a

request for more physical therapy dated March 3, 2005. The computer printout indicates that the initial decision to deny the request was made on March 9, 2005, and the "committee decision" to deny the request was made March 11, 2005. *Id.* The notes state "aatient [sic] has completed 30 sessions of [physical therapy] s/p knee surg 11/04. No indication of continued benefit offered here. Suggest F/U with ortho prior to any consideration for additional sessions." *Id.*

*4 The second copy includes exactly the same information and appears to be the same printout, but also shows handwritten notations that appear to have been written by two different people. (Dkt. No. 51, Wright Dec'l, Ex. B at 47). The first notation shows the letters "Cl" followed by the date "5/3/05." The second notation is "ORTho [illegible] above, no further PTH, address health concerns at 3 month interim visit per Dr. Richards, 5-3-05". *Id.*

Plaintiff claims that Dr. Rubinovitch also recommended an increase in pain medication and that this was initially denied, but that on November 4, 2005, the pain medication was increased for the morning dose only. (Am. Compl., Facts at ¶ 19). Plaintiff states that on October 6, 2005, "defendants" were informed that plaintiff was suffering from "severe axonal neuropathy." *Id.* at ¶ 20. Plaintiff contends that he was "eventually transferred to Bare Hill Correctional Facility," FN10 where he was placed in a top bunk in a housing unit far from the medical unit. *Id.* at ¶ 21. Plaintiff states that he suffered for more than one year without treatment for his damaged foot. *Id.* at ¶ 22.

FN10. Plaintiff does not appear to indicate where he was incarcerated before his transfer to Bare Hill.

Plaintiff alleges that he filed grievances on March 3 and 23, August 8 and 24, September 13 and 17, October 17, and December 18, 2005. (Am. Compl., Facts at ¶ ¶ 23, 28, 32). Plaintiff claims that the nursing staff verbally harassed him by stating that his foot impairment was the result of another medical condition from which plaintiff suffered. *Id.* at 8, 27. Plaintiff filed some of the grievances to which he refers against the nursing staff for the emotional suffering allegedly caused by their conduct. *Id.* at ¶¶ 27-28. In his Amended Complaint, plaintiff states

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

that he notified Defendant Dr. Wright and the Commission on Corrections that his serious medical needs were being ignored and that his complaints were being "mis-titled to avoid the real issues of the complaints in an effort to divert attention away from the investigations of any other agency," but does not detail the dates that he claims to have written letters to these officials. *Id.* at ¶ 29.

Plaintiff submitted a packet of 223 numbered documents [FN11] of assorted medical and grievance records to the court in August 2007. (Plaintiff's Records). The packet includes *one* letter [FN12] dated October 21, 2005 written by plaintiff to Defendant Dr. Wright. (Plaintiff's Records at 52). Plaintiff's letter included a number of complaints about the care he received at Bare Hill Correctional Facility related to his leg and foot. *Id.* Plaintiff's records also include two responsive letters to plaintiff from the Regional Health Care Administrator of DOCS dated October 28 and December 27, 2005. (Plaintiff's Records at 53, 168). The letters begin with the statement "Dr. Wright has asked me to respond to your recent letter." *Id.* The October 28, 2005 letter states that the Division of Health Services "has investigated your concerns with the health staff at Bare Hill Correctional Facility. I have been informed that you are scheduled in the near future to see an Orthopedic Specialist. It appears that your medical needs are being met." *Id.* at 53. The December letter states "I have been informed that you saw the Orthopedic Specialist on November 3, 2005 and you are scheduled for an appointment with the Orthopedic Surgery Specialist. You also saw the facility physician on November 29, 2005 and you will be scheduled for another follow up appointment. It appears that your medical needs are being met." *Id.* at 168.

> FN11. Most of the 223 documents are only one page. Very few of the documents have two pages, and those additional pages are not numbered. The court has not cited to any of the "second" pages, and so relies on plaintiff's numbering of the documents.

> FN12. It is unclear why defendants did not separately submit these highly relevant documents (Plaintiff's Records at 52, 53, 77, and 168). The documents go directly to the question of personal involvement by Defendant Dr.

Wright. Defendants also do not address the documents in any way in any of the Declarations or the Memorandum of Law at Docket Number 51.

**\*5** Defendant Dr. Wright also responded on January 6, 2006 that the Division of Health Services had investigated plaintiff's concerns. (Plaintiff's Records at 77). The letter begins, "[t]his is in response to your recent letter. The Division of Health Services has investigated your concerns with the health staff at Bare Hill Correctional Facility." *Id.* The rest of the text of Defendant Dr. Wright's letter is exactly the same as the text of the December letter from the DOCS Regional Health Care Administrator, and does not include any additional information. Plaintiff does not include any other letters to Defendant Dr. Wright, or any other responses from Defendant Dr. Wright or his staff. (*See* Plaintiff's Records).

Plaintiff's 223 page submission includes a number of letters (in addition to his grievances) that plaintiff wrote to various state and DOCS agencies, as well as outside agencies, in which plaintiff complains about the medical care of his left leg, as well as their responses. *Id.* at 75, 82, 84, 85, 95, 118, 121, 122, 123, 143, 144, 145, 146, 147, 148, 149, 150, 153, 154, 155, 182, 184, 187, 188, 189, 203, 211, 212, 213, 215).

Plaintiff claims that on November 3, 2005, Dr. Rubinovich informed the "defendants" that plaintiff was suffering from "Neuropraxia postoperatively," but nothing was done to address plaintiff's medical needs. (Am. Compl., Facts at ¶ 30). Plaintiff states that, after fourteen months of suffering, he was referred to Dr. Marco R. Bernard for a consultation. *Id.* at ¶ 41. According to plaintiff, Dr. Bernard determined that, because the damage to plaintiff's peroneal nerve had been left untreated for over fourteen months, plaintiff's prognosis for repair of the damage was not good. *Id.* at ¶¶ 41, 43. Plaintiff alleges that Dr. Bernard also determined that, after the knee surgery, plaintiff had developed a "soft tissue mass," causing hematoma, numbness, and weakness over the left lower extremity. *Id.* at ¶¶ 42-43.

In addition, plaintiff claims that a neurosurgeon examined him on April 13, 2006, and recommended exploratory

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

surgery to correct the nerve damage, however, plaintiff states that he has been "informed" that any attempt to operate now could result in the loss of his foot or his leg due to the great delay in providing treatment for his condition. (Am. Compl., Facts at ¶¶ 45-47). Finally, plaintiff states that his attorney contacted Defendant Dr. De Azevedo, who stated that plaintiff had been scheduled for surgery. However, the surgery was cancelled. *Id.* at ¶ 48. Plaintiff generally claims that, although he was made promises regarding medical his care, these promises were never kept. *Id.* at ¶ 37.

In the list of his claims, plaintiff alleges that "Doctor Azevedo continues to violate plaintiff's rights by failure to provide adequate medical care and treatment, then providing **false statements** when **investigations** by state agencies and plaintiff [sic] attorney inquires as to the status of the surgery." (Am. Compl. at 14). However, in his numbered paragraphs of facts, plaintiff makes clear that the focus of his claim against Defendant Dr. De Azevedo is that the doctor assured plaintiff's attorney "that the plaintiff is scheduled for the surgery, and that the surgery had not been canceled. However, plaintiff had already obtained a copy of the consent form which clearly states that the operation had, yet again been canceled. The result is a blatant disregard for plaintiff's serious medical condition, with malicious intent." (Am. Compl., Facts at ¶ 48). Plaintiff mentions Defendant Dr. De Azevedo only once in either of the fact sections in the complaint.

**\*6** Defendant Dr. De Azevedo submitted some of plaintiff's medical records as exhibits to his Declaration in support of the motion for summary judgment. (Dkt. No. 51, De Azevedo Dec'l, Ex. B [FN13]). The medical records include entries to plaintiff's Ambulatory Health Record ("AHR"). *Id.* In an entry dated May 26, 2006, the provider wrote "Sched for Neuro Surgery, on cal. 6-27-06 for Albany Med. Ctr." and "on cal 7-4-06 for NPO". *Id.* at 33. Although it is unclear on which date the surgery was scheduled, the entry indicates that the surgery was scheduled. *Id.* Dr. De Azevedo states in his Declaration that he "performed the pre-operative physical and examination on June 15, 2006." (Dkt. No. 51, De Azevedo Dec'l at ¶ 14). The medical records include the form that Dr. De Azevedo filled out during the physical and examination. (Dkt. No. 51, De Azevedo Dec'l, Ex. B at 35-37). The first page of the form has the handwritten notation "surgery 7/5/06". *Id.* at 35. The notation is

crossed out. *Id.* In his Declaration, Dr. De Azevedo states his belief that "scheduling is handled by the secretaries in the medical office in conjunction with the hospital. I had no say or control over scheduling decision. I did not scratch out the date, and I have no knowledge of information about why the date was changed." (Dkt. No. 51, De Azevedo Dec 'l at ¶ 15).

> FN13. Defendants did not number any of the pages in the exhibits to Dr. De Azevedo's Declaration. The court has numbered the pages.

At some point, plaintiff became aware that the surgery scheduled for July 2006 would not or did not occur, and he wrote to the **Prisoners**' Legal Services of New York ("PLSNY"). On October, 3, 2006, PLSNY wrote a letter to Dr. De Azevedo and asked why the surgery had not been performed. (Dkt. No. 51, De Azevedo Dec'l, Ex. A). Dr. De Azevedo responded on October 10, 2006, by writing at the bottom of the letter, "L leg surgery is scheduled (pending soon). IT WAS *NEVER CANCELED." Id.* In his Declaration, Dr. De Azevedo states that his "response to the inquiry by **Prisoner** Legal Services was based upon my review of plaintiff [sic] medical records as they existed at the time. Based upon those records, I appropriately responded that plaintiff was scheduled for surgery, and that the surgery was not cancelled. As demonstrated from the records, I was not the physician who referred plaintiff for exploratory neurosurgery. I was not responsible for nor did I have any say in when the surgery would be scheduled, and I did not have a hand in its purported delay." (Dkt. No. 51, De Azevedo Dec'l at ¶¶ 21-23).

At his deposition, plaintiff testified that in the time period around 2006 and 2007, he was not sure how many times he saw Dr. De Azevedo. Plaintiff testified "[i]t could be five times. It could be three times. I don't know." (Deposition Transcript ("Depo.") at 19). Plaintiff also testified that he did not know if Dr. De Azevedo personally scheduled the surgery, or if Dr. De Azevedo cancelled it. (Depo. at 21). Plaintiff acknowledged that the surgery was eventually performed on March 28, 2007. (Depo. at 15).

**3. *Respondeat Superior and Personal Involvement***

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

**\*7** It is well-settled that in order to be held liable for damages in a **section 1983** action a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). The doctrine of respondeat superior is inapplicable to **section 1983** claims. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied,* 414 U.S. 1033 (1973).

In *Williams v. Smith,* the Second Circuit detailed the various ways in which a defendant can be personally involved, and thus, in a constitutional deprivation, subject to individual liability. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants argue that Defendant Drs. Wright and De Azevedo were not personally involved in plaintiff's alleged violations. (Dkt. No. 51, Mem. of Law at 5). In the Amended Complaint, plaintiff claims that Dr. De Azevedo personally cancelled or rescheduled the surgery originally scheduled for July 2006, and that plaintiff suffered because of the delay. (Am. Compl., Facts at ¶ 48). Plaintiff also alleges that Dr. De Azevedo maliciously provided incorrect information about the status of the surgery to plaintiff's counsel. *Id.* At his deposition, plaintiff contradicted his earlier assertions in the Amended Complaint when he acknowledged that he did not have any personal knowledge of whether Dr. De Azevedo was involved in either the scheduling or re-scheduling of the surgery. (Depo. at 21). In his Declaration, Dr. De Azevedo states that his response to PLSNY was "based upon my review of plaintiff [sic] medical records as they existed at the time." (Dkt. No. 51, De Azevedo Dec'l at ¶ 21).

Regardless of the correctness of the information [FN14] that Dr. De Azevedo provided to PLSNY, it is clear that Dr. De Azevedo was not personally involved in the consultations that led to the surgery, the scheduling of the surgery itself, or any delay after the surgery did not occur as originally scheduled. Plaintiff himself states in the Amended Complaint that private doctors rendered his diagnosis and recommended surgery. It appears that Dr. De Azevedo's *only* involvement with the treatment of, and surgery on, plaintiff's knee was when Dr. De Azevedo performed the pre-operative physical and examination on June 15, 2006. (Dkt. No. 51, De Azevedo Dec'l, Ex. B at 35-37). Conducting the pre-operative interview and examination does not confer upon Dr. De Azevedo responsibility for the subsequent scheduling or rescheduling of the surgery. The motion for summary judgment should be granted as to Defendant Dr. De Azevedo, and the claims against Defendant Dr. De Azevedo should be dismissed.

> FN14. There may exist an issue of fact as to whether the original surgery was cancelled or rescheduled, and the timing and the reasons for the delay. However, these possible issues of fact are not material to the legal determination of whether or not Defendant Dr. De Azevedo was personally involved in any of those decisions.

**\*8** Plaintiff makes two separate claims against Defendant Dr. Wright, both related to the medical care that plaintiff received for his left knee. Plaintiff's claims against Dr. Wright are that Dr. Wright failed to respond to plaintiff's letters and failed to rectify the ineffective care plaintiff received at Bare Hill Correctional Facility (Am. Compl., Facts at ¶ 29), and that Dr. Wright personally denied additional physical therapy sessions for plaintiff (*Id.* at ¶¶ 16-18). It is apparent from Dr. Wright's Declaration that he was not personally involved in the decision not to continue plaintiff's physical therapy. Plaintiff has not refuted in any way that the decision-making in this regard was performed by APS, and has not submitted any records to indicate that Dr. Wright is factually mistaken about how the process occurred in this case. Therefore, plaintiff's claim against Defendant Dr. Wright regarding continuation of physical therapy fails for Dr. Wright's lack of personal involvement, and should be dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2929805 (N.D.N.Y.)
(Cite as: 2009 WL 2929805 (N.D.N.Y.))

Plaintiff's claim that Dr. Wright failed to remedy the allegedly insufficient care that plaintiff received is narrow since it concerns a specific timer period. Plaintiff does not allege that there were any letters to Dr. Wright other than the one dated October 21, 2005. (Plaintiff's Records at 52). Dr. Wright responded on January 6, 2006. *Id.* at 77. Therefore, for the purposes of Dr. Wright's personal involvement, plaintiff's only complaint is about medical care that plaintiff received *prior to* Dr. Wright's response. Plaintiff has made no claim that he wrote Dr. Wright again at any time after Dr. Wright's response in January 2006, or that Dr. Wright should have been aware of any aspect of plaintiff's medical care after January 2006.

Generally, letters by **inmates** to DOCS officials do not, standing alone, establish liability under 42 U.S.C. **§ 1983**. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (cataloguing cases holding that informal letters to supervisory officials alleging constitutional violations do not render the officials personally liable for the purported violations). In this case, however, plaintiff's letter does not stand alone and is, in fact, accompanied by Defendant Dr. Wright's response to plaintiff's letter. Therefore, an issue of fact may exist as to Defendant Dr. Wright's personal involvement with plaintiff's medical care prior to Dr. Wright's response in January 2006. This court will therefore proceed to analyze whether Defendant Dr. Wright was deliberately indifferent to plaintiff's medical needs.

**4. *Medical Care***

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

**\*9** In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillan,* 503 U.S. 1, 9 (1992)). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the **inmate** to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the **inmate's** health or safety. *Id.* (citing *Chance,* 143 F .3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to **inmates**. *Id.* (citations omitted). An **inmate** does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an **inmate**. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under **Section 1983**). Thus, any claims of malpractice, or disagreement with treatment are not actionable under **Section 1983**.

***10** The court does not make a finding as to the first element of the standard, that is, whether or not plaintiff had a serious medical need. As to the second element of the deliberate indifference standard, it appears that when contacted by plaintiff, Defendant Dr. Wright or one his subordinates initiated an investigation that concluded that plaintiff's medical needs were being met. The results of the investigation showed that after plaintiff's October 21, 2005 letter (Plaintiff's Records at 52), plaintiff had an appointment with an Orthopedic Specialist in November 2005 and was scheduled for an appointment with an Orthopedic Surgery Specialist (*id.* at 168 and 77). At the point that it was clear that plaintiff was receiving ongoing care for his medical needs, Dr. Wright's office closed the investigation. That plaintiff disagreed with the results of the investigation, or with Defendant Dr. Wright's response, does not constitute a claim of deliberate indifference under the Eighth Amendment. Because Defendant Dr. Wright was not deliberately indifferent to plaintiff's medical needs, the court recommends that the motion for summary judgment as to Defendant Dr. Wright be granted.[FN15]

> FN15. This court's decision was more difficult because defendants did not include pertinent copies of all letters between plaintiff and Defendant Dr. Wright. There was also no reference to this correspondence in Dr. Wright's Declaration. Nevertheless, the court was able to examine the existing record to make its decision.

**WHEREFORE** it is hereby

**RECOMMENDED,** that the motion for summary judgment on behalf of defendants, Drs. Wright and De Azevedo (Dkt. No. 51) be **GRANTED;** and it is further

**RECOMMENDED,** that the remaining claims be **DISMISSED IN THEIR ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.
DeJesus v. Wright
Slip Copy, 2009 WL 2929805 (N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Henry **BENITEZ**, Plaintiff,
v.
Patricia A. **PECENCO**, Defendant.
**No. 92 Civ. 7670 (DC).**

July 27, 1995.

Henry Benitez, Comstock, NY, pro se.

Dennis C. Vacco, Atty. Gen. of the State of N.Y. by
Richard T. Mathieu, Judy E. Nathan, New York City, for
defendants.

*MEMORANDUM DECISION*

CHIN, District Judge.

**\*1** *Pro se* plaintiff Henry Benitez brings this action under
42 U.S.C. § 1983 alleging that defendant violated his
constitutional rights by failing to provide him with
adequate medical attention and by endorsing a false
disciplinary report against him. Before me are the parties'
cross-motions for summary judgment. For the following
reasons, defendant's motion is granted. Plaintiff's motion
is denied.

*BACKGROUND*

Plaintiff is an inmate at the Greenhaven Correctional
Facility ("Greenhaven") and is housed in the Special
Housing Unit (the "SHU"). He was transferred to
Greenhaven from another prison on May 5, 1992.
Defendant Pecenco is a registered nurse at Greenhaven; in

the spring and summer of 1992, she worked in the clinic
area during the day shift. Her responsibilities included
attending to inmates in the SHU.

Upon his arrival at Greenhaven, plaintiff was given a
medical checkup by a Nurse Berthold during which he
complained of low back pain but denied chronic medical
problems. (Pl.Exh. A). The Ambulatory Health Record
("AHR") for that day states that an examination of
plaintiff did not reveal any signs of "fresh trauma." (*Id.*).
Plaintiff was checked again the next day by another nurse,
and the AHR indicates that plaintiff stated he had "no
medical problems at this time" and is not on any
prescribed medication. (*Id.,* AHR dated May 6, 1992).
The AHR also reveals that plaintiff had no signs or
symptoms of distress.

Between May 8, 1992 and June 5, 1992, plaintiff was
examined by various medical personnel (but not defendant
Peceno) 24 times. The record reveals that plaintiff
intermittently complained of low back pain and a sore
throat and that he requested band-aids. (Pl.Exh. A). The
AHRs also reflect the medical staff's assessments that
plaintiff showed no signs of acute distress and walked with
a normal gait. Nevertheless, plaintiff was prescribed a
painkiller, Robaxin, and was given the nonprescription
medicines Advil and Motrin. [FN1] (*See, e.g.,* Pl.Exh. A,
AHRs dated May 10, 21, 23, 24, 26, 27, and June 3,
1992).

On Friday, June 5, 1992, plaintiff was examined by Dr.
Chander, who ordered a prescription pain killer, Fioricet,
for his back pain and who referred the case to a physiatrist
for consultation. [FN2] On Saturday, June 6, plaintiff
complained of back pain to defendant and requested his
prescription. Defendant informed plaintiff that she could
not check on the prescription over the weekend and told
him he would have to wait until Monday, June 8. She
offered to give plaintiff Advil, which he refused. (Pl.Exh.
A, AHR dated June 8, 1992). [FN3]

On Monday, June 8, plaintiff complained of back pain to
another medical staff member but refused to accept either
the Fioricet that had been prescribed or Motrin. (Pl.Exh.

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

A, AHR dated June 8). On June 9, 1992, plaintiff
complained again of back pain but his condition was
evaluated as a "non-emergency" by a Nurse Ryan, due
to the fact that plaintiff had been recently examined by a
doctor and had refused to accept medication. (Pl.Exh. A,
AHR dated June 9). Plaintiff was sent to a physiatrist for
an examination on June 15, 1992, but refused to cooperate
or give any information with respect to his back pain. He
was therefore returned to his cell without being examined.
(Pl.Exh. B, Physiatrist's Consultation Report dated June
15, 1992).

**\*2** Defendant did not see plaintiff again until June 20,
1992 at which time plaintiff requested band-aids, which
defendant provided. Defendant examined plaintiff for the
last time on July 4, 1992 when plaintiff asked for pain
medication that purportedly had been prescribed.[FN4]
Defendant informed plaintiff that she had no knowledge of
any prescription and told him to speak with the doctor.
None of the AHRs between June 9 and July 3 indicate that
prescription drugs had been ordered.

Defendant also noted on the July 4th AHR that plaintiff
became verbally abusive to her at which point a
corrections officer Zemkin intervened and warned plaintiff
that he was abusing his sick call privileges. Zemkin later
filed an inmate misbehavior report concerning the
incident, which was signed by defendant as an "employee
witness." Plaintiff was found guilty after a disciplinary
hearing of verbal interference with prison employees and
verbal harassment (a charge of making threats was
dismissed). (Pl.Exh. C).

An AHR dated July 5, 1992 reveals that plaintiff had
MRIs ordered to determine the cause of his lower back
pain, but had refused to go for them. (*See* Pl.Exh. A, AHR
dated July 5). The final AHR indicates that plaintiff was to
be examined after July 31, 1992.

The parties have cross-moved for summary judgment.
Plaintiff alleges that defendant refused to give plaintiff
medication for back pain and signed a "trumped-up"
disciplinary report against plaintiff. Defendant asserts that
she did not give plaintiff his medication because she is not
authorized to provide medication without an order from a
physician. She also claims that the disciplinary report was

not falsely made.

*DISCUSSION*

*I. Standards for Summary Judgment*

The standards applicable to motions for summary
judgment are well-settled. A court may grant summary
judgment only where there is no genuine issue of material
fact and the moving party is therefore entitled to judgment
as a matter of law. *See* Fed.R.Civ.P. 56(c). Accordingly,
the court's task is not to "weigh the evidence and
determine the truth of the matter but [to] determine
whether there is a genuine issue for trial." *Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505,
2511 (1986)*. Summary judgment is inappropriate if,
resolving all ambiguities and drawing all inferences
against the moving party, there exists a dispute about a
material fact "such that a reasonable jury could return a
verdict for the nonmoving party." *Id.* at 248-49, 106 S.Ct.
at 2510-11 (*citing Adickes v. S.H. Kress & Co., 398 U.S.
144, 159, 90 S.Ct. 1598-1609 (1970)*). To defeat a motion
for summary judgment, however, the nonmoving party
"must do more than simply show that there is some
metaphysical doubt as to the material facts." *Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106
S.Ct. 1348, 1356 (1986)*. There is no issue for trial unless
there exists sufficient evidence in the record favoring the
party opposing summary judgment to support a jury
verdict in that party's favor. *Anderson,* 477 U.S. at 249-50,
106 S.Ct. at 2510-11. As the Court held in *Anderson,* "if
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted." *Id.* at
249-50, 1065 S.Ct. at 2511 (citations omitted). With these
standards in mind, I turn to the parties' motions for
summary judgment.

*II. Plaintiff's Medical Treatment*

**\*3** Plaintiff complains that defendant violated his Eighth
Amendment right against cruel and unusual punishment by
refusing to check on the status of his prescription
medication or provide "emergency medical treatment." To
succeed on a claim under section 1983 for inadequate
medical care, an inmate must show "deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976). Thus, two elements must be satisfied: first, the inmate's medical conditions must be, in objective terms, sufficiently serious; and second, defendant must have acted with a sufficiently culpable state of mind. *See id.; see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Holmes v. Fell,* 856 F.Supp. 181, 183 (S.D.N.Y.1994) (section 1983 claim based on deliberate indifference requires intentional disregard to "affected medical needs that were serious"). Plaintiff cannot satisfy either of these elements; accordingly, his claim must be dismissed.

A. *Serious Medical Need*

Apart from plaintiff's conclusory assertions, there is nothing in the record to support his claim that he suffered from a serious medical condition. First, plaintiff's own conduct refutes any claim that his back pain was serious: plaintiff refused to cooperate with the physiatrist for an examination and would not leave his cell for scheduled MRIs. (Pl.Exhs. A and B). *See Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986) (prisoner's back condition not deemed serious medical need given his constant refusal to be examined by doctors). Furthermore, plaintiff was offered both over-the-counter and prescription medication for back pain on several occasions but refused to accept it. (*See, e.g.,* Pl.Exh. A., AHRs dated May 21, 24, 25, and June 8, 1992).[FN5] In fact, his refusal to accept medication caused another nurse, not the defendant, to classify his condition as "non-emergency." (Pl.Exh. A).[FN6]

Second, there is nothing in the record to suggest that plaintiff's back pain was severe or excruciating. Plaintiff was visited by various medical staff members, including prison doctors, 43 times over a period of two months. None of the 43 AHRs registered by the medical staff indicate that plaintiff was in acute distress or had any difficulty standing or walking. Furthermore, his complaints of back pain were only sporadically made and were interspersed with complaints of a sore throat and sore finger, all of which were treated as requested.[FN7]

Plaintiff's intermittent complaints of back pain simply do not constitute a serious medical need. The Second Circuit has required medical conditions more serious than those

posed in this case to find an Eighth Amendment violation. *See, e.g., Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990)* (in holding that doctor exhibited deliberate indifference by failing to examine prisoner for three days, court contrasted prisoner's alcohol withdrawal, which was life-threatening and fast-degenerating, with the back condition at issue in *Estelle,* which did not require immediate attention and thus was not a serious medical condition); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994)* (prisoner with degenerative hip condition requiring corrective surgery including the placement of pins held to have serious medical needs); *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991)* (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss and "alarmingly deteriorating" condition).

**\*4** Given plaintiff's refusal to cooperate with his medical care, his sporadic complaints of pain, the extensive record of his treatment, and the complete absence of any credible evidence of a serious medical condition, a reasonable jury could only conclude that plaintiff did not suffer from a serious medical condition. Accordingly, defendant's motion for summary judgment on this claim is granted.

B. *Deliberate Indifference*

Even assuming that plaintiff's back condition did constitute a serious medical need, the record before me does not contain any evidence from which a jury could reasonably find that defendant exhibited deliberate indifference to plaintiff's condition.

To succeed on his claim, plaintiff must show that defendant intentionally denied him needed medical care over a period of time or completely withheld medical care. *See Hathaway v. Coughlin,* 841 F.2d 28, 50 (2d Cir.1988). Plaintiff argues that on June 6, June 20 and July 4, 1992, defendant "deliberately refused, on each occasion, either to ascertain the status or whereabouts of plaintiff's prescribed medication and/or to summon a doctor, even though empowered to do so." (Pl.Mem. at 7). This argument fails, however, for several reasons.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

First, plaintiff has adduced no proof that defendant intentionally interfered with or intentionally delayed treatment prescribed by doctors. *See Bowman v. Campbell, 850 F.Supp. 144, 147 (N.D.N.Y.1994)* (defendant nurse's motion for summary judgment granted where prisoner failed to adduce any proof that nurse intentionally withheld treatment). Plaintiff claims that defendant exhibited deliberate indifference on June 6 by informing him that "she was not going to issue plaintiff medication because there was no way of her investigating the matter." (Pl.Aff., ¶ 19). The AHR from that day, which plaintiff cites, notes defendant's statement that she could not ascertain the status of a prescription from the pharmacy over the weekend and that plaintiff would probably receive the medicine on Monday. (Pl.Exh. A; Pl.Mem. at 9). At worst, defendant's conduct arguably constituted negligence, which is not sufficient to state a claim under section 1983. *Estelle,* 429 U.S. at 106-07, 97 S.Ct. 292-93; *Bryant v. Maffucci,* 923 F.2d 979, 982-83 (2d Cir.), *cert. denied,* 112 S.Ct. 152 (1991).

Furthermore, the record clearly reveals that plaintiff was not prescribed any medication by a doctor prior to being seen by defendant on June 20 or July 4. Since defendant had no authority to dispense medication without a prescription by a physician, she could not provide plaintiff with medical treatment.

Second, plaintiff's claim that he complained of severe back pain to defendant on June 20 and that she wilfully ignored his request for emergency medical care has no support in the record. The AHR from that day simply indicates that plaintiff requested band-aids from defendant. Indeed, plaintiff was examined by a different nurse on June 21, who noted only that plaintiff again requested band-aids. (Pl.Exh. A, AHR dated June 21, 1992). *See Bowman, 850 F.Supp. at 147* (no evidence of deliberate indifference where record established that nursing staff attended to prisoner no fewer than eighteen times during his incarceration). Plaintiff has not disputed the accuracy of the AHR for that day; indeed, he relies on it himself.

**\*5** Finally, plaintiff's complaint that he experienced severe back pain "as a result of having been denied requested pain relieving medication by defendant Pecenco for a herniated disc" on May 9, 1992 (Cmplt. ¶ IV(A)), is rejected. The uncontested record (including exhibits

plaintiff himself attaches to his motion papers) reveals that defendant attended to plaintiff *for the first time* on June 6, 1992.[FN8]

Since plaintiff has not shown that defendant exhibited deliberate indifference to his serious medical needs, his claim must be dismissed.

III. *The Disciplinary Report*

Plaintiff alleges that defendant's endorsing the allegedly false disciplinary report interfered with his First Amendment right to complain about his illnesses. Generally, a prison inmate does not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of protected liberty interest," so long as the prisoner is provided with due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S. Ct. 1273 (1988). Where the false report is issued in retaliation for a prisoner's having exercised his substantive constitutional rights, however, a constitutional violation occurs and subsequent procedural due process does not correct the violation. *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988) (claim that prison officials intentionally filed false disciplinary charges against inmate in retaliation for his cooperation with a state investigation into reported incidents of inmate abuse at the prison sufficiently stated a claim under § 1983). Because retaliation claims may easily be fabricated, however, they should be viewed "with skepticism and particular care." *Colon v. Coughlin,* 1995 WL 383310, \*5 (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). As the Second Circuit held in *Flaherty:*

We agree ... that claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes.

713 F.2d at 13.

Of course, the initial question is whether defendant's conduct in endorsing the disciplinary report abridged any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

of plaintiff's substantive constitutional rights. This is not an instance where plaintiff was disciplined in retaliation for bringing a lawsuit against defendant or otherwise petitioning the government for a redress of grievances. *See, e.g., Colon,* 1995 WL 383310 (alleged retaliation for instituting lawsuits); *Franco,* 854 F.2d at 589 (cooperation with state investigation); *Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983) (participation in a class action suit against prison officials). Nor is plaintiff contending that he was deprived of medical treatment in retaliation for complaining. Rather, he alleges that his First Amendment rights were violated because he was retaliated against, *i.e.,* disciplined, for "repeatedly" complaining about his medical ailments. While I do not believe that an inmate has a constitutional right to "repeatedly" complain about his medical ailments, *see Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (section 1983 claim dismissed where prisoner alleged that prison officials filed false disciplinary report against him in retaliation for his verbal confrontation with a guard over the guard's treatment of another inmate; court held that confrontation did not affect any constitutional right), I need not reach that question, for I will assume for purposes of this motion that a substantive constitutional right has been implicated.

**\*6** Even assuming that plaintiff's complaints about his health implicated his First Amendment rights, there is no substantial evidence in the record to support his conclusory allegation that defendant endorsed the disciplinary report in retaliation for his exercise of his First Amendment rights. The sum of plaintiff's evidence is that he complained about his health three times to defendant as reflected in the AHRs, that defendant indicated on the July 4, 1992 AHR that "each time [she] make[s] rounds on SHU [plaintiff] demands something," and that a disciplinary report was filed by officer Zemkin following a verbal exchange between defendant and plaintiff. (Pl.Exhs. A, C). No reasonable jury could conclude from this barest of circumstantial evidence, when considered in the context of all the evidence in the record, that defendant endorsed the disciplinary report in retaliation for plaintiff's complaints regarding his health.

Significantly, the misbehavior report was issued not by defendant but by officer Zemkin, who was personally involved in the incident. Indeed, the report states that plaintiff told officer Zemkin that he was only "fucking security" and that he should mind his "fucking business."

FN9 It was Zemkin who observed in the report that "in the past every medical staff person that goes by [plaintiff's] cell he tries ... to get them to authorize medication." (Pl.Exh. C). Defendant had only seen plaintiff three times and she merely endorsed the report as an "employee witness." There is no concrete proof in the record that she caused the disciplinary proceedings to be commenced against plaintiff or that she retaliated against him in any way.

The Second Circuit's recent decision in *Colon* is instructive. There, the inmate had filed two lawsuits complaining about the conditions of his confinement. Shortly after he was to begin participating in a Family Reunion Program that had been the subject of one of his lawsuits, he was brought up on disciplinary charges (possession of marijuana and a weapon) that prevented him from participating. In addition, the inmate presented evidence that he had never previously been found to be in possession of weapons or drugs. While the Second Circuit noted that the temporal proximity between the inmate's lawsuits and disciplinary action and the evidence of prior good conduct presented some circumstantial evidence of retaliation, the Court held that if this circumstantial evidence had represented "the sum total" of the inmate's proof, "we might be inclined to affirm the grant of summary judgment based on the weakness of [the inmate's] case." *Colon,* 1995 WL 383310 at \*7. Because there also existed direct evidence of retaliation, however (the defendant's alleged admission of a retaliatory scheme), the Court reversed.

Plaintiff's proof of retaliation in the present case is not even as strong as the circumstantial evidence in *Colon* that the Second Circuit suggested might not be enough. Based on the record before me, a reasonable jury could only conclude that defendant did not retaliate against plaintiff for his exercising any substantive constitutional rights. Accordingly, plaintiff's claim is dismissed.FN10

*CONCLUSION*

**\*7** Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The complaint is dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

SO ORDERED.

**FN1.** On May 8, 1992, plaintiff complained of low back pain to a prison doctor, who prescribed Robaxin. An AHR dated May 10, 1992 reveals that plaintiff requested the Robaxin on May 10 from a Nurse Maier.

**FN2.** An inmate at the Facility can obtain prescription drugs only after being examined by a prison physician. After the examination, the physician writes out an order for the drug which is filled by the Greenhaven pharmacy. The medication is then dispensed by nurses or guards. If the inmate refuses either the prescription or the nonprescription drug, he is not forced to take it; the prescription medicine, however, will be returned to the pharmacy. In addition, once an inmate patient refuses a prescription drug, a physician must provide another prescription before the inmate can be given the drug again.

Nurses at the Facility cannot dispense prescription medication without a physician's order and cannot write a prescription. A nurse may, however, provide nonprescription medicine. (Pl.Aff. ¶¶ 6, 7; Stevens Aff. ¶¶ 4, 5).

**FN3.** On Monday, June 8, medical staff checked on the status of plaintiff's prescription and discovered that it had been sent to SHU the previous Friday.

**FN4.** Other medical staff attended to plaintiff's needs on nine separate occasions between June 8 and June 19. Plaintiff's complaints included back pain, sore throat and requests for band-aids. Plaintiff was examined by medical staff three times between June 21 and July 3.

**FN5.** Plaintiff claims that the record supports his allegation that he was never issued over-the-counter medication. The record,

however, clearly shows that he was issued the medication and refused it. Plaintiff does not allege that the AHRs were falsified and, indeed, sometimes relies on their notations in an effort to bolster his claims. (*See, e.g.,* Pl.Mem. at 9, quoting AHR dated June 6, 1992). Thus, apart from plaintiff's conclusory allegations, there is no factual dispute presented by the record with respect to the issuance of the nonprescription medicine. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (*citing SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

**FN6.** Plaintiff's later refusal to cooperate with the physiatrist or to attend his MRI sessions caused yet another medical staff member to classify his condition as a "non-emergency." (Pl.Exh. A, AHR dated July 5, 1992).

**FN7.** Plaintiff's conclusory allegations that it was the medical staff's policy to indicate that prisoners were not in distress when they were experiencing excruciating pain is simply preposterous. Plaintiff does not offer any evidence to support such a charge. Moreover, the record is replete with notes concerning plaintiff's medical treatment, from complaints of back pain to a tender writing finger. If defendant, or any of Greenhaven's medical staff, were intent on concealing plaintiff's true medical condition, they would not have made such a detailed record of his care.

**FN8.** Plaintiff argues that because defendant admitted she was assigned to the SHU during the spring and summer of 1992, she must have seen him on May 9 and wilfully opted not to complete an AHR. Plaintiff's argument is untenable. The uncontroverted record shows that many medical staff attended to the needs of the SHU inmates. In fact, plaintiff himself was seen by numerous medical staff over a period of a few weeks. Furthermore, if defendant wanted to conceal her

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)
(Cite as: 1995 WL 444352 (S.D.N.Y.))

allegedly poor treatment of plaintiff, she would not have completed the other three AHRs.

FN9. Plaintiff denies making these statements to Zemkin. Whether plaintiff actually harassed Zemkin in this manner, however, is not a material fact with respect to *defendant's* participation in the disciplinary report that would preclude summary judgment.

FN10. I do not need to determine whether the disciplinary hearing with respect to the July 4, 1992 incident was infirm since plaintiff does not allege that his procedural due process rights were violated by that hearing.

S.D.N.Y.,1995.
Benitez v. Pecenco
Not Reported in F.Supp., 1995 WL 444352 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Candido BAEZ, Plaintiff,
v.
J. HARRIS, Deputy Superintendent, Shawangunk
Correctional Facility; Donald Selsky, Director Special
Housing Unit Program; and Quartarone, Nurse,
Shawangunk Correctional Facility, Defendants.
**No. 9:01-CV-807.**

Feb. 7, 2007.

Candido Baez, Ossining, NY, Plaintiff Pro Se.

Andrew M. Cuomo, Attorney General for the State of New
York, Maria Moran, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

**INTRODUCTION**

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983. The amended complaint
(Dkt. No. 49) claims that defendants violated his
constitutional rights under the Eighth and Fourteenth
Amendments.

Defendants' motion for summary judgment (Dkt. No. 75)
was referred to United States Magistrate Judge David R.
Homer for a report and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Homer's Report and Recommendation (Dkt. No. 81)
recommends that defendants' motion be granted in part
and denied in part.

Plaintiff has submitted an objection (Dkt. No. 82) to the
Report and Recommendation. Pursuant to 28 U.S.C. §
636(b)(1)(C), this Court conducts a *de novo* review of
those parts of a magistrate judge's report and
recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See Brown v. Peters, 1997 WL
599355,*2-\*3 (N.D .N.Y.), af'd without op., 175 F.3d
1007 (2d Cir.1999).* Failure to object to any portion of a
report and recommendation waives further judicial review
of the matters therein. *See Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993).*

**DISCUSSION**

Plaintiff objects to Magistrate Judge Homer's Report and
Recommendation insofar as it recommends: (1) that all
claims against Selsky be dismissed; and (2) that all Eighth
Amendment claims be dismissed.

**(1) Claims against Selsky**

Plaintiff asserts Eighth and Fourteenth Amendment claims
against Selsky. Plaintiff objects to Magistrate Judge
Homer's recommendation that they be dismissed.

The Court first addresses plaintiff's Eighth Amendment
claims against Selsky. Plaintiff's amended complaint may
be read to assert a claim against Selsky based on the
allegedly premature removal of plaintiff's bandages after
hernia surgery. In a Memorandum-Decision and Order
entered on September 29, 2003 (Dkt. No. 29) the Court
adopted Magistrate Judge Homer's recommendation (Dkt.
No. 27) to dismiss without prejudice plaintiff's claims
based on premature removal of the bandages because
plaintiff had failed to exhaust this claim. Plaintiff then
filed a grievance raising this issue. The grievance was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

rejected as untimely, and that rejection was affirmed on administrative appeal. Accordingly, the claim remains unexhausted. Plaintiff objects to dismissal of this claim, arguing that he attempted to exhaust it. The fact that plaintiff was foreclosed from exhausting the claim due to the passage of time does not, without more, excuse him from the administrative exhaustion requirement. *See Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir .2005); *Baez v. Kahanowicz,* 2007 WL 102871, *7 (S.D.N.Y.). Thus, the Court agrees with Magistrate Judge Homer that plaintiff's Eighth Amendment claim based on removal of his bandages must be dismissed for failure to exhaust his administrative remedies. Further, the Court agrees with Magistrate Judge Homer that, in any event, the claim lacks merit. Accordingly, to the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

**\*2** Plaintiff also appears to assert an Eighth Amendment claim against Selsky stemming from plaintiff's allegedly premature removal from the hospital and subjection to a lengthy bus trip when he needed immediate medical attention. However, there is no basis to find that Selsky was personally involved in these events. To the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

To the extent that plaintiff bases an Eighth Amendment claim on the conditions he experienced in SHU, this Court agrees with Magistrate Judge Homer that as a matter of law plaintiff's allegations fail to state such a claim. *See generally Branch v. Goord,* 2006 WL 2807168, *5 (S.D.N.Y.). Thus, all Eighth Amendment claims against Selsky are dismissed.

With respect to plaintiff's Fourteenth Amendment claims against Selsky, plaintiff's objections state: "Defendant Selsky could have release[d] plaintiff sooner from SHU, but instead waited until I submitted a C.P.L.R. Article 78 [petition] to change his decision and release me. Defendant Selsky was put on notice sooner with my administration *[sic]* appeal to release me from SHU but chose not to." Essentially, plaintiff asserts Fourteenth Amendment liability against Selsky stemming from the disciplinary hearing conducted by defendant Harris and Selsky's handling of plaintiff's appeal from Harris' determination. [FN1]

FN1. In his objection, plaintiff also states: "My father addressed a letter to Mr. Selsky documenting the violations of my rights. Therefore, [Selsky] is personally involve[d] because he was aware of the violation and never release[d] me from SHU[.]" The receipt of a letter does not, however, constitute sufficient personal involvement to generate supervisory liability. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Garvin v. Goord,* 212 F .Supp.2d 123, 126 (S.D.N.Y.2002).

Selsky's affidavit in support of summary judgment states that he is the Director of the Special Housing/Inmate Disciplinary Program, and that he personally responds, as the Commissioner's authorized designee, to all Tier III appeals taken by inmates. Under the circumstances of this case, the record is sufficient to withstand summary judgment on the issue of personal involvement. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through a report or an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."). Likewise, defendants are not entitled to dismissal of plaintiff's claim against Selsky based on plaintiff's confinement in SHU for one year. *See generally Sandin v. Connor,* 515 U.S. 472, 483-84 (1995).

**(2) Claims against Quartarone**

Plaintiff objects to Magistrate Judge Homer's recommendation that the Court dismiss plaintiff's Eighth Amendment claim against defendant Quartarone. Insofar as this claim is based on Quartarone's allegedly premature removal of plaintiff's bandages after his hernia repair surgery, it is unexhausted as discussed above.

Plaintiff's other Eighth Amendment claims, based on his allegedly premature removal from the hospital and bus transfer, do not allege any involvement on the part of Quartarone. The sole named defendant allegedly involved in these events is Forte; however, all claims against him have been dismissed (Dkt. No. 79). Accordingly, all claims against Quartarone are dismissed.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

**CONCLUSION**

**\*3** It is therefore

ORDERED the Court accepts and adopts the Report and Recommendation (Dkt. No. 81) of United States Magistrate Judge David R. Homer, except insofar as it recommends dismissal of the Fourteenth Amendment claims as against Selsky; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 75) is granted in part and denied in part; and it is further

ORDERED that dismissal of all claims against defendant Quartarone is granted; and it is further

ORDERED that dismissal of plaintiff's Eighth Amendment claims against defendant Donald Selsky is granted; and it is further

ORDERED that dismissal of plaintiff's Fourteenth Amendment claims against Donald Selsky is denied; and it is further

ORDERED that dismissal of plaintiff's claims against J. Harris is denied.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Candido Baez ("Baez"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] three DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. Am. Compl. (Docket No. 49) at ¶¶ 50-53. Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 75. Baez opposes the motion. Docket No. 76. For the reasons which follow, it is recommended that defendants' motion be granted in part and denied in part.

> FN2. Harris, Selsky, and Quartarone. Defs. Mem. of Law (Docket No. 75) at 2. The remaining defendant, Doctor Forte, was dismissed following his death in 2004. Docket No. 79.

**I. Background**

The facts are set forth in the light most favorable to Baez as the non-movant. See Section II(A) *infra*.

**A. Disciplinary Hearing**

At all relevant times, Baez was incarcerated at Shawangunk Correctional Facility ("Shawangunk"). Am. Compl. at ¶ 1. On November 8, 1999, while in the A yard, Baez swung a five-pound weight and hit inmate Garbez on the left side of his head. Moran Aff. (Docket No. 75), Ex. A at 1. Another inmate, Valdez, began to fight with Baez and both ignored orders from corrections officer Riopelle to stop. *Id.* A response team was able to separate Valdez and Baez, removed them from the yard, and brought both inmates to the infirmary. *Id.* Baez was issued a misbehavior report for assault on an inmate, fighting, refusing a direct order, and having a weapon. *Id.* On the same day, corrections officers searched Baez's cell and confiscated a bottle of expired medication, a broken ruler, and a hard plastic plate. *Id.* at 2. Baez received another misbehavior report for possessing unauthorized medication, contraband, property in unauthorized area, and an altered item. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

On November 10, 1999, the commencement of Baez's Tier III disciplinary hearing [FN3] was adjourned to November 16, 1999 because the hearing officer, Deputy Superintendent of Programs J. Harris, was unavailable. Docket No. 24, Ex. C; Hrg. Tr. at 1. Baez's assistant for the hearing, Boyham, [FN4] first met with Baez on November 10, 1999 and completed his assistance on November 12, 1999. Hrg. Tr. at 2. On November 16, 1999, Baez's disciplinary hearing commenced. Hrg. Tr. at 1. On November 23, 1999, Harris found Baez guilty of assault, fighting, possessing a weapon, refusing a direct order, and having an altered item and found him not guilty of unauthorized medication, having property in an unauthorized area, and possessing contraband. Moran Aff., Ex. A at 3-4. Baez was sentenced to twenty-four months in the Special Housing Unit ("SHU"), [FN5] loss of packages, commissary, and telephone privileges, and the recommended loss of twenty-four months of good time credit. *Id.* Additionally, Baez lost his inmate grade-pay and program assignment. Compl. (Docket No. 1) at ¶ 17.

FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendents' hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

FN4. Boyham, an original defendant in this matter, was dismissed from the case on a motion for summary judgment on September 29, 2003. Docket No. 29.

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

*4 Baez appealed Harris's determination. Docket No. 24, Ex. H. On March 21, 2000, Baez filed a petition pursuant to N.Y. C.P.L.R. Art. 78. [FN6] Moran Aff., Ex. C. The defendants received three extensions of time to answer Baez's petition. Am. Compl. at ¶ 10. On May 17, 2000, Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, modified Baez's punishment from twenty-four months to twelve months. Moran Aff., Ex. B at 1-2. On October 26, 2000, Baez's petition was transferred from Ulster County Supreme Court to the Appellate Division, Third Department. Moran Aff., Ex. C at 3. On March 12, 2001, Selsky administratively reversed the disciplinary determination because the hearing officer considered medical evidence not on the record. Moran Aff., Ex. B at 4. On June 14, 2001, Baez's Article 78 petition was denied as moot. Moran Aff., Ex. C at 3-4.

FN6. N.Y. C.P.L.R. Art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

**B. Medical Treatment**

On December 14, 1999, Baez had hernia repair surgery at Albany Medical Center. Am. Compl. at ¶ 33. Baez was to remain on bed rest in the hospital for three days. *Id.* On December 16, 1999, Baez was discharged from the hospital. *Id.* Baez was instructed to keep the dressing dry and intact for two days and then remove the outer dressing and resume showering. Davidson Decl. (Docket No. 75), Ex. 1. Baez was not allowed to engage in lifting, strenuous work, straining or reaching for six weeks and was allowed to return to work or school. *Id.* A follow-up examination at the prison clinic was also required. *Id.* Quartarone removed Baez's bandages and padding from the incision area against doctor's orders. Am. Compl. at ¶ 33.

On the day of Baez's discharge, he was ordered to board a bus for transfer to Downstate Correctional Facility. *Id.* Baez was taken on a bus trip which included stops at Shawangunk and Wallkill Correctional Facility where Baez began to vomit and experience severe pain. Am. Compl. at ¶ 34. Baez's requests to be taken to the infirmary were ignored. *Id.* This action followed.

**C. Procedural History**

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

Baez commenced this action by filing a complaint on May 25, 2001. *See* Compl. Defendants filed a motion for summary judgment on December 13, 2002. Docket Nos. 21-23. As a result of that motion, several claims and defendants were dismissed. Docket No. 27. That decision was modified on November 18, 2004 and required Baez to file an amended complaint within thirty days of the order. Docket No. 47. Baez complied and filed his amended complaint on December 17, 2004. Docket No. 49. This motion for summary judgment of the remaining defendants followed. Docket No. 75.

## II. Discussion

Baez asserts three causes of action in his amended complaint. The first alleges that defendant Selsky failed to correct behavior that violated Baez's Eighth and Fourteenth Amendment rights. The second alleges that defendants Harris and Selsky deprived him of his due process rights in connection with a prison disciplinary hearing. The third alleges that defendant Quartarone was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[FN7] Am. Compl. at ¶¶ 50-53. Defendants seek judgment on all claims.

> FN7. Any claims against Dr. Forte have been dismissed and are not being considered on this motion. *See* note 2 *supra*.

### A. Standard

*5 A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the nonmovant special solicitude.[FN8] *Id.; Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 2006 WL 3499975, at *5 (2d Cir. Dec. 5, 2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

> FN8. Baez has, however, filed at least seven other actions in the federal courts of New York since 1990. *U.S. Party/Case Index* (visited Jan. 8, 2007) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

### B. Eighth Amendment

### 1. Defendant Quartarone

In his third cause of action, Baez contends that "less than forty (40) hours after the [hernia] surgery, defendant Quartarone ... removed the bandages and padding from the incision area of [his] operation," thereby acting with deliberate indifference to his medical needs. Am. Compl. at ¶ 33. Defendants contend that Baez has failed to exhaust his administrative remedies on this claim and, in the alternative, the claim is without merit.

### a. Failure to Exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

Defendants contend that Baez has not exhausted his administrative remedies with regard to the claim that his Eighth Amendment rights were violated by defendant Quartarone. This assertion is based on the fact that Baez did not raise the issue of his surgery dressings being removed prematurely in his Grievance No. UST-2681-00. Defs. Mem. of Law at 10; *see also* Moran Aff., Ex. E.

Issues that have previously been determined become the law of the case. *In re Lynch,* 430 F.3d 600, 604 (2d Cir.2005) (citing *Quern v. Jordan,* 440 U.S. 332, 348 n. 18 (1979)). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber,* 407 F.3d 34, 44 (2d Cir.2005).

**\*6** Here, this Court has already decided that Baez did not exhaust his claim regarding removal of the bandages because he never filed a grievance regarding it. Docket No. 27. The Report-Recommendation and Order containing that finding was adopted in full by the district court on September 29, 2003. Docket No. 29. In response to this Court's decisions, Baez filed a grievance on October 3, 2003 where he raised the issue of the early bandage removal. Am. Compl., Ex. A. That grievance was rejected as untimely in the absence of any reason provided for the delay. *Id.* Baez appealed the decision to reject his late grievance, but that decision was affirmed. *Id.* Although Baez attempted to remedy his failure to exhaust, filing an untimely grievance does not amount to an exhaustion of remedies. *Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir.2005). Further, since this Court finds no reason to reconsider its previous decisions, Baez has not exhausted his claim for removal of the bandages.

**b. Medical Treatment**

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Cameros v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*7** Even assuming that hernia repair surgery is a serious medical need, Baez failed to raise a question of material fact with regard to the alleged deliberate indifference of Quartarone in removing his bandages. The bandages were removed on the second post-operative day, which was within the instructed time period recommended by Baez's surgeon. Davidson Decl. at ¶¶ 3-4. Therefore, it is recommended in the alternative that defendants' motion for summary judgment on this ground be granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

### 2. Defendant Selsky

Baez alleges that Selsky "contributed to and proximately caused the ... violation of [his] Eighth and Fourteenth Amendment Rights." Am. Compl. at ¶ 50. Summary judgment in favor of all defendants, including Selsky, with regard to Baez's Eighth Amendment claim resulting from his disciplinary hearing has already been granted. Docket No. 27 at 16. As such, Baez's claim against Selsky for a violation of his Fourteenth Amendment due process rights in connection with his prison disciplinary hearing is dismissed. Baez's claim against Selsky for his alleged involvement in Baez's Eighth Amendment claims relative to his medical care remain at issue.

#### a. Personal Involvement

Defendants contend that Baez cannot demonstrate the personal involvement of Selsky in any Eighth Amendment violation.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior is not a substitute for personal involvement. Polk *County v. Dodson,* 454 U.S. 312, 325 (1981). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved," however, if they participated in the conspiracy, learned of the violation but failed to remedy the wrong, created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue, or were grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

In his amended complaint, Baez's only allegation as to the personal involvement of Selsky is that he and his father wrote Selsky a letter documenting the violations of Baez's rights. Am. Compl. at ¶ 42. However, "receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability." *Petty v. Goord,* No. Civ. 00-803(MBM), 2002 WL 31458240, at *8 (S.D.N.Y. Nov. 4, 2002). Further, there is no evidence that Selsky participated here in the alleged violations or created a policy which allowed constitutional violations to continue.

Therefore, it is recommended that defendants' motion for summary judgment as to Selsky be granted on this ground.

### C. Fourteenth Amendment

**\*8** Defendants Harris and Selsky contend that Baez's due process claim should be dismissed and that qualified immunity bars Baez's claim.

#### 1. Liberty Interest

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, this Court has already decided that Baez has raised a question of fact as to whether twelve months spent in SHU establishes a protected liberty interest. Docket Nos. 27, 29, & 47; *see also Colon v. Howard,* 215 F.3d 227 (2d Cir.2000) (holding that 305 days spent in normal SHU conditions was sufficient to raise a question of significant hardship). Defendants' motion on this ground should, therefore, be denied.

### 2. Process Provided

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
(Cite as: 2007 WL 446015 (N.D.N.Y.))

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges, (2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Again, this Court has already determined that there is a question of fact as to the fourth prong of Wolff. Docket No. 27 at *12;.see also In re Lynch,* 430 F.3d at 604 (quoting *Quern,* 440 U.S. at 348 n. 18)). As such, it is recommended that defendants' motion for summary judgment on this ground be denied.

## C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the issue of defendants entitlement to qualified immunity has already been decided in Baez's favor. Docket Nos. 27, 29, & 47.

*9 Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

## III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 75)

1. **GRANTED** as to Quartarone and Selsky in all respects; and

2. **DENIED** as to Harris as to the due process claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Baez v. Harris
Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.